UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No.: 00-6069-Civ-Ferguson/Snow

MOSES HOPE,                                      )
                                                 )
            Plaintiff,                           )
                                                 )
v.                                               )
                                                 )
DAVID STRAUSS, individually,                     )
ANTHONY FERNANDEZ, individually,                 )
and the CITY OF HOLLYWOOD, a                     )
Florida Municipal corporation,                   )
                                                 )
            Defendants.                          )
_____)

**NIGHT BOX**
**FILED**

MAR - 5 2001

CLARENCE MADDOX
CLERK, USDC / SDFL / FTL

### PLAINTIFF MOSES HOPE'S MEMORANDUM OF LAW
### IN RESPONSE TO DEFENDANT CITY OF HOLLYWOOD'S
### MOTION FOR SUMMARY JUDGMENT AS TO COUNTS II - III

**COMES NOW** the plaintiff, Moses Hope, by and through his undersigned attorneys and

pursuant to Federal Rule of Civil Procedure 56 and S.D. Fla. L.R. 7.5, and hereby submits his

response to defendant City of Hollywood's motion for summary judgment as to Counts II - III of

plaintiff's complaint, and in support thereof, states the following:

1.    This is a civil action resulting from the arrest of plaintiff, Moses Hope, on September

17, 1995, by defendant David Strauss, for conduct occurring during his employment as a police

officer for defendant City of Hollywood.

2.    Count II of plaintiff's complaint seeks relief against defendant City of Hollywood,

pursuant to 42 U.S.C. § 1983 and Monell v. New York City Dept. of Social Services, 98 S.Ct. 2018

(1978).



3.    Count III of plaintiff's complaint seeks relief against defendant City of Hollywood

pursuant to state law, for negligent supervision.

4.    Defendant City of Hollywood seeks summary judgment as to counts II - III of the

complaint.[1]

## I.    CONCISE STATEMENT OF FACTS, PURSUANT TO LOCAL RULE 7.5

### a).    The arrest of Moses Hope on September 17, 1995:

On September 17, 1995, plaintiff Moses Hope was at 2247 Simms Street, Hollywood,

Florida.   (Sworn statement of Moses Hope, p. 9, hereinafter cited as Hope, p. -).[2]    Hope was

"shooting dice" and playing dominoes   (Hope, pp. 9, 12).    While shooting dice, Hope heard one

of the dice players say: "They are going to raid us."   Hope turned around and saw members of

defendant City of Hollywood's "street crimes" unit exiting three different cars.   Hope stood up,

placed the money he had in his hand into his pocket, and put his hands up.   (Hope, p. 15).

Hope was then ordered to stand next to a wall, along with the other participants of the dice

game.   (Hope, p. 17).    The pockets of all the dice players were searched, and turned inside out.

(Hope, pp. 49 - 50).   No drugs were found during this search.   (Hope, p. 50).   The money in Hope's

pocket was retrieved, and turned over to Sgt. Marano.   (Hope, p. 18).

---

[1]

There are no claims for relief against defendant City of Hollywood in count I, IV, and V of

the complaint, which allege causes of action against defendant Strauss and defendant Fernandez in

their individually capacities under state law, and 42 U.S.C. § 1983.

[2]

A copy of the sworn statement of Moses Hope, dated March 31, 1997, has been submitted

contemporaneously with this motion, by notice of filing dated March 6, 2001.

2

The remainder of Hope's personal property was taken by Officer Truntz and turned over to Hope's friend, James Borgmann. Officer Truntz called Borgmann over and stated: "I'm gonna give you Moses' property. (Hope, pp. 18 - 19). He'll be right out, he's only going to jail for loitering or gambling." (Hope, p. 19).     Officer Wilbur Fernander concurred, telling Hope he was being arrested for loitering and gambling. (Hope, p. 59). Officer Fernander added: "If you were gonna gamble, why didn't you go inside?" (Hope, p. 59).

Hope was next directed to sit on a nearby sidewalk, along with the other members of the dice game, Larry Medlock, Clarence Mathis, Edward Norris, and Fred Parrish, a/k/a Bobby McGhee. (Hope, pp. 20 -22).     Then, Edward Norris was placed in the back seat of Andres Astacio's police car, along with Clarence Mathis and Larry Medlock. (Hope, p. 30). After being placed in the back of Andres Astacio's police car, Clarence Mathis complained that he was uncomfortable– that "he was too tall or something." (Hope, p. 30). Mathis was then removed from the back of the car, and Sgt. Marano stated to Moses Hope: "Well Moses, since you're a smaller guy– you get in the middle and then put Larry Medlock back in the car." (Hope, pp. 30 - 31).

Edward Norris, Moses Hope, and Larry Medlock were then transported to the City of Hollywood police department by Andres Astacio. (Hope, p. 31).     Clarence Mathis and Fred Parrish, a/k/a Bobby McGhee, remained on the sidewalk, and were later transported to the police station by Andres Astacio. (Hope, p. 31).

City of Hollywood dispatch records reflect that a "gambling" arrest occurred at 2247 Simms Street at 6:11 p.m.[3]   The probable cause affidavit for the arrest of Moses Hope indicates a time of

---

3

A compilation of the dispatch logs for the arrest location of 2247 Simms Street on September

arrest of 6:11 p.m. At 6:17 p.m., dispatch records reflect that Andres Astacio was en route to the City of Hollywood police department with three black males in custody. The dispatch records do not make reference to any "narcotics" related activity until 6:39 p.m.

Consistent with the dispatch records compiled by the City of Hollywood police department, plaintiff Hope alleges that after he was transported to the City of Hollywood, Andres Astacio entered the detention area and claimed that he located drugs in the back seat of his police car. Andres Astacio stated: "I think it was where you were sitting, Hope." (Hope, pp. 29, 31). According to Hope, no cocaine was located at the Simms Street location prior to the time he was transported to the City of Hollywood police department. (Hope, pp. 28 - 29). Moses Hope does not know whether Andres Astacio was telling the truth when he claimed he found drugs in the back of his police car. (Hope, p. 30).

As a result of his arrest on September 17, 1995, Hope was charged with possession of cocaine. (Hope, p. 58). Hope subsequently entered into an agreement with the Broward County State Attorney's Office to submit to a polygraph examination.[4] (Hope, p. 6). Pursuant to the stipulated polygraph examination, the State Attorney's Office offered to dismiss the charges filed against Hope if he passed the polygraph exam. (Hope, p. 7). On the other hand, if Hope failed the

---

17, 1995, as contained in a correspondence dated May 8, 1997, from Sgt. Bill Wynn, City of Hollywood Internal Affairs Unit, to Assistant State Attorney John E. Countryman, has been submitted contemporaneously with this motion, by notice of filing dated March 6, 2001.

[4]

A copy of the polygraph agreement and stipulation has been submitted contemporaneously with this motion, by notice of filing dated March 6, 2001.

4

polygraph examination, the results of the polygraph would be admissible against Hope at trial.
(Hope, p. 7).  Hope subsequently passed the polygraph examination, and the Broward County State
Attorney's Office entered a nolle prosequi.[5]

### b).    The arrest of Dwight Edman on January 31, 1996:

On January 31, 1996, Dwight Edman was arrested by the City of Hollywood "street crimes"
unit.  See Dwight Edman v. Jeffrey A. Marano, individually, Anthony Fernandez, individually, and
the City of Hollywood, a Florida Municipal corporation, Case No. 97-6825-Civ-Ferguson/Snow.
Following his arrest, Dwight Edman filed claims against Sgt. Marano and officer Anthony
Fernandez.    The jury subsequently returned a verdict against Jeffrey Marano and Anthony
Fernandez on Dwight Edman's civil rights claims for false arrest, pursuant to 42 U.S.C. § 1983, and
against the City of Hollywood on Dwight Edman's state law claims for false arrest, and for violation
of the State of Florida notary public laws.

In the civil trial of Dwight Edman claims against Sgt. Marano, Anthony Fernandez, and the
City of Hollywood, Sgt. Marano testified that the arrest of Dwight Edman was "a mistake" or
attributed to "miscommunication" amongst members of the "street crimes" unit, including Anthony
Fernandez, and David Strauss.  (R.4-96-8, 9).[6]    During his trial testimony, Sgt. Marano admitted

---

[5]

A copy of the close-out memorandum from Assistant State Attorney John E. Countryman
has been submitted contemporaneously with this motion, by notice of filing dated March 6, 2001.

[6]

Pursuant to Fed. R. Evid. 201 (d), Plaintiff Moses Hope requests that this Honorable Court
take judicial notice of the evidence and testimony presented during trial before this Honorable Court
in Dwight Edman v. Jeffrey A. Marano, individually, Anthony Fernandez, individually, and the City

that he did not review any of the police reports prepared by Anthony Fernandez in conjunction with the arrest of Dwight Edman. (R.4-96-9, 10). Moreover, Sgt. Marano testified that as a "general rule," he never reviewed the reports of his subordinates in the "street crimes unit." (R.4-96-11, 13).

In the Dwight Edman arrest, the evidence and testimony established that Anthony Fernandez prepared a typed probable cause affidavit and subsequently dictated an offense incident report setting forth the basis for the Dwight Edman's arrest. The incident report was subsequently transcribed by a civilian employee of the City of Hollywood. (R.4-96-15). Ms. Pauline Dixon, a transciptionist for the City of Hollywood, testified that Anthony Fernandez' incident report was transcribed on February 8, 1996. (R.5-97-35, 36). Sgt. Marano's incident report was transcribed on February 11, 1996. (R.5-97-32). Sgt. Marano's transcribed report was then forwarded to Sgt. Marano for his review. (R.5-97-38).

Sgt. Marano testified that upon review of the incident report bearing his badge number, Sgt. Marano realized he had not dictated the report bearing his badge number. (R.4-96-16). Sgt. Marano subsequently discussed the arrest with Anthony Fernandez, and contacted the Broward County State Attorney's Office to report that the arrest of Dwight Edman was "a mistake." (R.4-96-16, 17). Sgt. Marano made no effort to determine who authored the report bearing his badge

_____

of Hollywood, a Florida Municipal corporation, Case No. 97-6825-Civ-Ferguson/Snow, as codified in the Record on Appeal, Jeffrey A. Marano, individually, Anthony Fernandez, individually, and the City of Hollywood, a Florida Municipal corporation, Appellants/Defendants v. Dwight Edman, Appellee/Plaintiff, Case No. 99-10550-GG, United States Court of Appeals, 11th Circuit. Unless noted otherwise, the citations set forth herein are to the Record on Appeal.

6

number. (R.4-96-30).

Sgt. Marano testified that he pre-signed affidavits swearing to the truthfulness of his reports in blank, which where then "notarized" by members of City of Hollywood's case filing unit, for submission to prosecuting authorities. (R.4-96-35, 36). According to Marlene Beguin, a civilian employee of City of Hollywood's case filing unit, the practice of attaching pre-signed affidavits to police reports was routine. (R.5-97-15). In accordance this routine practice, Ms. Beguin would pull a photocopy of a *pre-signed* affidavit from a storage shelf, and fill in the date next on the notation: "Sworn to and subscribed before me, the undesigned authority, this ___ day of _____, 19___." (R.5-97-23). Ms. Beguin would then pass the filled-in affidavit to Karen Bifield, because Ms. Bifield was a notary public. (R.5-97-24). Ms. Bifield would then notarize the pre-signed affidavits. (R.5-97-24).

In the Dwight Edman case, Ms. Beguin pulled the wrong pre-signed affidavit (i.e., an affidavit in the name of officer Tomas Hernandez, instead of the pre-signed affidavit of Anthony Fernandez). (R.5-97-24, 25). As a result, neither Anthony Fernandez or Sgt. Marano actually swore to the truthfulness of their incident reports. (R.5-97-24, 27).[7]

This practice of using pre-signed affidavits in violation of state notary law has a long-

---

[7]

At the conclusion of the *plaintiff's* case-in-chief in the Dwight Edman trial, this Honorable Court granted Dwight Edman's motion for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50 (a), against Sgt. Marano and Anthony Fernandez, on Dwight Edman's false arrest claims pursuant to 42 U.S.C. § 1983. At the conclusion of trial, the jury also returned a verdict finding that the City of Hollywood violated state notary laws, in violation of Chapter 117 of the Florida Statutes.

standing and widespread tradition at the City of Hollywood police department. Kathleen Skinner began working in the City of Hollywood's case filing unit in 1988. (See deposition of Kathleen Skinner dated June 30, 1998, p. 7, taken in the matter of <u>Dwight Edman v. Jeffrey A. Marano, individually, Anthony Fernandez, individually, and the City of Hollywood, a Florida Municipal corporation</u>, Case No. 97-6825-Civ-Ferguson/Snow, and hereinafter cited as Skinner, depo, p. --).[8] Ms. Skinner is the same individual whose notary seal and signature appears on the affidavits attached to the offense incident reports prepared in conjunction with the arrest of Moses Hope.

According to Ms. Skinner, the practice of using pre-signed affidavits existed at the time Ms. Skinner began working in the City of Hollywood's case filing unit, in 1988. (Skinner, depo, pp. 7 - 8). At that time, pre-signed affidavits were used only in emergencies. (Skinner, depo, p. 8). An "emergency" was any time an officer failed or refused to go to the case filing unit to properly swear to the truthfulness of a police report. (Skinner, depo, p. 10). Sgt. John Thomas, the then supervisor of the case filing unit, became aware of the practice of using pre-signed affidavits, and ordered the civilian employees working in the case filing unit to throw out the pre-signed affidavits kept on file. (Skinner, depo, pp. 8, 10).

Sgt. Thomas subsequently left the case filing unit.    (Skinner, depo, p. 11).    As soon as Sgt. Thomas left the case filing unit, the practice of using the pre-signed affidavits again became the uniform practice of the case filing unit. (Skinner, depo, pp. 11 - 12). According to Ms. Skinner, the practice of using the pre-signed affidavits was re-instituted out of both "convenience" and

---

8

A copy of the deposition of Kathleen Skinner, dated June 30, 1998, has been submitted contemporaneously with this motion, by notice of filing dated March 6, 2001.

8

"necessity," insofar as the State Attorney's Office refused to file criminal charges unless police reports were accompanied by an executed affidavit attesting to the truthfulness of the reports. (Skinner, depo, p. 12). As a result, the State Attorney's Office would "decline" to file criminal charges in instances where no affidavit was affixed to a police report. (Skinner, depo, p. 12).

The case filing unit subsequently tried another procedure where the officers would sign an affidavit and forward the executed affidavit to the case filing unit. (Skinner, depo, p. 15). A notary public in the case filing unit would then notarize the affidavit (notwithstanding the fact that the affiant did not execute the affidavit under oath, in the presence of a notary public). (Skinner, depo, p. 15). However, the officers ultimately stopped forwarding affidavits to the case filing unit for notarization, so this practice was discontinued. (Skinner, depo, p. 16). As a result, the civilian employees in the case filing unit reverted back to the use of pre-signed affidavits. (Skinner, depo, p. 16). The practice of using pre-signed affidavits was thereafter used "virtually exclusively," and continued through the time of Ms. Skinner's transfer out of the case filing unit in November, 1995. (Skinner, depo, pp. 17 - 18). As set forth above, the arrest of Moses Hope occurred on September 17, 1995.

## II. MEMORANDUM OF LAW

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." Fed. R. Civ. P. 56(c). In the context of a motion for summary judgment, all evidence and factual inferences must be viewed in a light most favorable to the non-moving party. Jones v. Cannon, 174 F.3d 1271, 1281 (11th Cir. 1999); Tippens v. Celotex Corp, 805 F.2d 949, 953 (11th Cir. 1986); Sweat v. Miller, 708

F. 2d 655, 656-657 (11th Cir. 1983). "The plaintiff opposing summary judgment has the burden of showing that a genuine dispute on a material fact exists." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993).

### a).    Custom, policy, and practice claim pursuant to 42 U.S.C. § 1983:

Plaintiff's complaint alleges in count II that, pursuant to either official policy, or practice, custom, and usage, defendant City of Hollywood violated the notary public laws of the State of Florida, such that law enforcement officers knew they were not required to swear to the truthfulness of official reports, did not swear to the truthfulness of official reports, and that official reports would nevertheless be notarized by employees of defendant City of Hollywood as if the reports were made under oath.    Count II of plaintiff's complaint further alleges that prior to September 17, 1995, defendant City of Hollywood knew or should have known of the wide-spread practice of its employees violating the notary public laws of the State of Florida, and of supervisors failing to review the unsworn reports of their subordinates.    Plaintiff alleges that defendant City of Hollywood failed to implement policies designed to eliminate the practice, or otherwise discipline those who violated the law.    Finally, count II of plaintiff's complaint alleges that if defendant City of Hollywood implemented and enforced procedures designed to prevent these deficiencies, the use of false or planted evidence in an effort to obtain a criminal conviction would have been prevented. (Plaintiff's complaint, paragraphs 47 - 48).

Viewing the evidence and factual inferences in a light most favorable to plaintiff, it is apparent that defendant City of Hollywood had a long-standing and widespread custom and practice of violating the notary laws of the state of Florida.    Under this custom and practice, pre-signed affidavits were customarily attached to police reports, and forwarded to the State Attorney's Office,

10

for the filing of criminal charges.  In actuality, these police reports were unsworn.

It is well settled that "[a] municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a 'custom or policy' if the municipality tacitly authorizes these actions or displays deliberate indifference towards the police misconduct." Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987); Church v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir. 1994).   In the case sub judice, the systemic violation of state notary laws by defendant City of Hollywood was never fully corrected.  Although sporadic efforts were made by supervisory personnel in the case filing unit to discontinue the practice, the customary use of pre-signed affidavits eventually returned over time.  And according to Kathleen Skinner, as of the date of plaintiff's arrest on September 17, 1995, pre-signed affidavits were again used on a departmental-wide basis.

It is plaintiff's contention that the systemic violation of state notary laws, combined with Sgt. Marano's failure to review the reports written by members of the "street crimes" unit, fostered an environment were the use of false or planted evidence in an effort to obtain a criminal conviction was tacitly tolerated.  Put another way: "'Would the injury have been avoided had the employee been trained [and supervised and disciplined] under a program that was not deficient in the identified respect[s]?'"   Vineyard v. County of Murray, Ga., 990 F.2d 1207, 1213 (11th Cir. 1993) (quoting City of Canton v. Harris, 109 S.Ct. 1197, 1205 (1989)).   In the context of a police department, the answer is obvious.

It is unreasonable to believe that if members of the "street crimes" unit were properly supervised and disciplined, that the use of false or planted evidence in an effort to obtain a criminal

11

conviction would have been tolerated. This, combined with the failure of the City of Hollywood to require that its employees swear to the truthfulness of their reports as required by state notary law, created an environment in which the submission of police reports to prosecuting authorities, incorporating the use of false or planted evidence, was almost certain to occur. And in fact, with regards to the "street crimes" unit, allegations of criminal conduct based upon false or planted evidence occurred both on September 17, 1995 (as alleged in plaintiff's complaint), and again on January 31, 1996 (as proven during the civil trial concerning to the false arrest of Dwight Edman). In both instances, Sgt. Marano and Anthony Fernandez were directly involved—and in both instances David Strauss played a supporting role. Put another way, the misconduct alleged herein would have been avoided had Anthony Fernandez and David Strauss been properly trained, supervised, and disciplined.

No reasonable police officer would risk termination from employment, criminal prosecution, or both, if there existed real consequences for official misconduct, including the use of false or planted evidence to obtain a criminal conviction. On the other hand, were there is no fear of adverse consequence for official misconduct, it is unreasonable to suggest that misconduct will not occur. To believe otherwise suggests that police officers do not need supervision, and state notary laws do not serve as a deterrent to false testimony, and the planting of evidence. In the final analysis, for the reasons set forth above, and viewing the evidence and inferences in the light most favorable to plaintiff, defendant City of Hollywood motion for summary judgment as to count II of plaintiff's complaint must be denied, insofar as the unconstitutional customs and practices permitted by the City of Hollywood police department fostered an environment were the use of false or planted evidence in an effort to obtain a criminal conviction was tacitly tolerated.

12

### b).    State law claim for negligent supervision:

Count III of Plaintiff's Complaint sets forth a claim for negligent supervision under Florida law.    See Farabee v. Rider, 995 F.Supp. 1398 (M.D. Fla. 1998); Johnson v. Cannon, 947 F.Supp. 1567 (M.D. Fla. 1996).    As set forth above, the allegations of plaintiff's state law claim for negligent supervision are based upon the failure of the supervisor of defendant City of Hollywood's "street crimes unit," Sgt. Jeffrey Marano, to supervise subordinates.    By his own admission, Sgt. Marano did not review the police reports prepared by his subordinates in the "street crimes unit." Plaintiff alleges that Sgt. Marano failed to prevent the alleged use of false or planted evidence by defendant Strauss, by failing to review the police reports of his subordinates.    Because Sgt. Marano never reviewed the reports of his subordinates, Sgt. Marano could not have known that reports of his subordinates were false.

In support of its motion for summary judgment, defendant City of Hollywood alleges that Sgt. Marano's conduct, "by definition," constitutes "bad faith" and "malicious purpose."    (City of Hollywood's motion for summary judgment, pp. 9 - 10).    Therefore, defendant City of Hollywood has no respondeat superior liability, pursuant to F.S. § 768.28 (9) (a).    Defendant City of Hollywood unsuccessfully raised this same argument in its "motion to dismiss" count III of plaintiff's complaint. For purposes of summary judgment, the City of Hollywood's reliance on F.S. § 768.28 (9) (a), is again misplaced.

Defendant City of Hollywood first suggests that two cases under the Federal Tort Claims Act are supportive of its motion for summary judgment.    Specifically, defendant City of Hollywood cites Sheridan v. United States, 108 S.Ct. 2449 (1988), and Guccione v. United States, 878 F. 2d 32 (2nd Cir. 1989).    Based upon the "intentional tort exception" of the Federal Tort Claims Act,

13

defendant City of Hollywood suggests that "[p]laintiff's claim is an attempt to circumvent the intentional tort exception of § 768.28." (City of Hollywood's motion for summary judgment, p. 11). Defendant City of Hollywood also relies on a Texas state court decision, Medrano v. City of Pearsall, 989 S.W. 2d 141 (Tx. App. San Antonio 1999), interpreting the Texas Tort Claims Act.

Defendant City of Hollywood's reliance on the "intentional tort exception" of the Federal Tort Claims Act and the Texas Tort Claims Act is misguided, insofar as the State of Florida's limited waiver of sovereign immunity is completely different than the limits of governmental immunity established by either the Federal Tort Claims Act, or the Texas Tort Claims Act.

For conduct occurring within the scope of a governmental actor's "employment or function," the limited waiver of sovereign immunity contained in section 768.28 (9) (a) of the Florida Statutes provides that "[n]o officer, employee, or agent of the state or any of its subdivisions shall be held personally liable in tort . . . unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." F.S. § 768.28 (9) (a). As set forth in count III of the complaint, plaintiff alleges that Sgt. Marano was negligent in his supervision of the members of defendant City of Hollywood's "street crimes unit." In this regard, defendant City of Hollywood's argument that "[p]laintiff's claim is an attempt to circumvent the intentional tort exception of § 768.28" is nonsensical. Count III of the complaint states a cause of action for negligence– not an intentional tort.

Defendant City of Hollywood also alleges that Sgt. Marano's conduct, "by definition," constitutes "bad faith" and "malicious purpose." (City of Hollywood's motion for summary judgment, pp. 9 - 10). As a consequence, defendant City of Hollywood claims that it has no respondeat superior liability pursuant to F.S. § 768.28 (9) (a).

14

Under Florida law, the question of whether an employee acted in "bad faith" or "malicious purpose" is generally a question of fact for the jury. In McGhee v. Volusia County, 679 So. 2d 729 (Fla. 1996), the Florida Supreme Court reviewed the history of Florida Statute § 768.28 (9) (a), beginning with the territorial council of Florida's codification of the common law as it then existed, in chapter 744, Laws of Florida Territory (1834). Id. at 730.    The issue before the Florida Supreme Court in McGhee v. Volusia County was whether the Volusia County could be vicariously liable under state law for the intentional tort of its deputy sheriff, George T. Hernlen.    The plaintiff, Morris McGhee, alleged that deputy Hernlen lunged at him, grabbed him by the throat, and began kicking him with force, as a result of McGhee advising Hernlen during booking procedures that Hernlen, and others, were no longer welcome in his father's saw shop. Id. at 730.  McGhee alleged that he remained handcuffed at all times during the incident. Id. at 730.

In McGhee v. Volusia County, the Florida Supreme Court analyzed a series of cases, including Hennagan v. Department of Highway Safety & Motor Vehicles, 467 So. 2d 748 (Fla. 1st DCA 1985), and Richardson v. City of Pompano Beach, 511 So. 2d 1121 (Fla. 4th DCA 1987), *review denied*, 519 So. 2d 986 (Fla. 1988).    In Hennagan, a Highway Patrol officer allegedly arrested a minor child for the pretextual purpose of sexually assaulting that child.    Although the Florida Supreme Court agreed that the alleged conduct was illegal, the Court noted that the illegal act was "accomplished through an abuse of power lawfully vested in the officer, not an unlawful usurpation of power the officer did not rightfully possess."  McGhee v. Volusia County, 679 So. 2d 729, 732 (Fla. 1996).

Similarly, in Richardson v. City of Pompano Beach, a police officer was accused of excessive force during an arrest.    Even though the claim in Richardson alleged conduct that constituted an

15

intentional tort, the Court in <u>McGhee v. Volusia County</u> again described the allegations as "a case

of lawful power abused, not of an unlawful usurpation of authority."    <u>McGhee v. Volusia County</u>,

679 So. 2d at 732.    In analyzing the 1980 amendments to Florida Statute § 768.28, the Florida

Supreme Court in <u>McGhee</u> concluded:

> [A] jury question as to the sheriff or employing agency's liability exits for
> acts of officers that can be described as abuses of lawful power. The employing
> agency is immune as a matter of law only if the acts are so extreme as to constitute
> a clearly unlawful usurpation of authority the deputy does not rightfully possess
> [citation omitted], or if there is not even a pretense of lawful right in the performance
> of the acts [citation omitted]. Here, Deputy Hernlen clearly had the lawful authority
> to restrain arrestees, detain them, or even respond with force in appropriate
> situations. His office gave him that authority, and he therefore cannot be described
> as a usurper. The fact that Hernlen may have intentionally abused his office does not
> in itself shield the sheriff from liability. In sum, the question must be put to the fact-
> finder whether Deputy Hernlen acted in bad faith, with malicious purpose, or in a
> manner exhibiting wanton or wilful disregard of human rights, safety, or property.
> *See* § 768.28 (9) (a), Fla. Stat. (1989).

<u>Id</u>. at 733. For the reasons set forth in <u>McGhee v. Volusia County</u>, while it is clear that the alleged

conduct of Sgt. Marano was negligent, it is equally clear that Sgt. Marano had an obligation to

supervise subordinates in defendant City of Hollywood's "street crimes" unit.    Because Sgt.

Marano's office gave him that authority, Sgt. Marano is not a usurper.

Therefore, even though plaintiff alleges conduct in count III of the complaint that, if proven,

demonstrates that Sgt. Marano was negligent in his supervision of subordinates, this does not in itself

shield the City of Hollywood from liability. See <u>McGhee v. Volusia County</u>, 679 So. 2d 729, 733

(Fla. 1996).    As in <u>McGhee</u>, "the question must be put to the fact-finder" whether Sgt. Marano

"acted in bad faith, with malicious purpose, or in a manner exhibiting wanton or wilful disregard

of human rights, safety, or property," contrary to Florida Statute § 768.28 (9) (a).    <u>Id</u>. at 733.

Therefore, defendant City of Hollywood's motion for summary judgment as to count III of the

complaint must be denied.

**WHEREFORE**, plaintiff Moses Hope respectfully requests that this Honorable Court enter an order denying defendant City of Hollywood's motion for summary judgment as to counts II - III of the complaint.

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing was furnished by U.S. Mail to **Tracy A. Lyons, Esq.**, Assistant City Attorney, City of Hollywood, 2600 Hollywood Boulevard, Suite 407, Hollywood, FL 33020, and **Bruce W. Jolly, Esq.**, Purdy, Jolly & Giuffreda, attorneys for defendant Strauss, 1322 S.E. Third Avenue, Fort Lauderdale, Florida, 33316, this **6** day of March, 2001.

> HUGH L. KOERNER, P.A.
> Attorney for plaintiff
> 100 S.E. Sixth Street
> Fort Lauderdale, FL 33301
> (954) 522-1235
> (954) 522-1176 (Fax)
>
> By: _____
> Hugh L. Koerner
> Florida Bar No.: 716952