UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No.: 00-6069-Civ-Ferguson/Snow

| | |
|---|---|
| MOSES HOPE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DAVID STRAUSS, individually, | ) |
| ANTHONY FERNANDEZ, individually, | ) |
| and the CITY OF HOLLYWOOD, a | ) |
| Florida Municipal corporation, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**NIGHT BOX**
**FILED ...**

MAR - r 2001

CLARENCE MADDOX
CLERK, USDC / BDPL / FTL

## NOTICE OF FILING

**COMES NOW** plaintiff, Moses Hope, by and through his undersigned attorneys, and serves

notice of filing of the following items, in support of plaintiff's statement of facts and memorandum

of law submitted in response to defendant City of Hollywood's motion for summary judgment:

1.    Sworn statement of Moses Hope, dated March 31, 1997;

2.    Probable Cause Affidavit;

3.    Offense Incident Report;

4.    Correspondence dated May 8, 1997, from Sgt. Bill Wynn, City of Hollywood
      Internal Affairs Unit, to Assistant State Attorney John E. Countryman, re: dispatch
      logs for the arrest location of 2247 Simms Street on September 17, 1995;

5.    Polygraph Agreement and Stipulation;

6.    Close-Out Memorandum from Assistant State Attorney John E. Countryman;



7.    Deposition of Kathleen Skinner dated June 30, 1998.

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing notice was

furnished by U.S. Mail to **Tracy A. Lyons, Esq.**, Assistant City Attorney, City of Hollywood, 2600

Hollywood Boulevard, Suite 407, Hollywood, FL 33020, and **Bruce W. Jolly, Esq.**, Purdy, Jolly

& Giuffreda, attorneys for defendant Strauss, 1322 S.E. Third Avenue, Fort Lauderdale, Florida,

33316, this __6__ day of March, 2001.

> HUGH L. KOERNER, P.A.
> Attorney for plaintiff
> 100 S.E. Sixth Street
> Fort Lauderdale, FL 33301
> (954) 522-1235
> (954) 522-1176 (Fax)
>
> By: _____
>     Hugh L. Koerner
>     Florida Bar No.: 716952

2

STATE OF FLORIDA    )
                 )SS.    **ORIGINAL**
COUNTY  OF BROWARD   )

IN RE:  SWORN STATEMENT OF
        MOSES HOPE           SP-97-03-049

---

The sworn examination of MOSES HOPE, taken on

MONDAY, MARCH 31, 1997, beginning at 9:30  a.m. and

concluding at  10:30 a.m., at the Broward County

Courthouse, Room 660, 201 SE Sixth Street, Fort

Lauderdale, Florida, before LISA DONAHUE, Trump

Fairchild Court Reporter, Notary Public, State of

Florida at Large.

A P P E A R A N C E S:

MICHAEL J. SATZ, STATE ATTORNEY
      MR. COUNTRYMAN, ESQUIRE,
      ASSISTANT STATE ATTORNEY

      MR. PATTERSON, ESQUIRE,
      ASSISTANT STATE ATTORNEY

      SERGEANT WYNN,
      INTERNAL AFFAIRS

      DETECTIVE SMITH,
      INTERNAL AFFAIRS

ON BEHALF OF THE DEFENDANT:

      MR. BUSCHEL, ESQUIRE,
      ASSISTANT PUBLIC DEFENDER



```
 1                    I N D E X

 2              WITNESS:     MOSES HOPE
                                         page
 3

 4     EXAMINATION                        3
       by MR. COUNTRYMAN:
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1         Sworn Statement of MOSES HOPE, a witness of

2   lawful age, taken on behalf of the STATE herein, for

3   the purpose of discovery and for use as evidence in

4   the above-entitled matter, pending in the Circuit

5   Court of the 17th Judicial Circuit, in and for

6   Broward County, Florida, pursuant to notice

7   heretofore filed, before Lisa Donahue, a Notary

8   Public within and for the State of Florida at Large,

9   at the Office of the STATE ATTORNEY, Broward County

10   Courthouse, 201 Southeast Sixth Street, in the City

11   of Fort Lauderdale, County of Broward, State of

12   Florida, on the 31st day of MARCH, 1997, commencing

13   at or about 9:30 o'clock a.m.

14                  * * *

15   Thereupon:

16                MOSES HOPE

17   a witness of lawful age, being called as a witness by

18   the STATE, having been duly sworn, as hereinafter

19   certified, testified as follows:

20

21   EXAMINATION BY MR. COUNTRYMAN:

22       Q.   Would you please state your name and

23   spell your last name for the record?

24       A.   Moses Hope, H-O-P-E.

25       Q.   Mr. Hope, present with you is Mr. Robert

1    Buschel, your attorney, is that correct?

2         A.    Yes, sir.

3         Q.    And present also is Sergeant Wynn and

4    Detective Mark Smith from the Hollywood Police

5    Department.  My name is John Countryman and I'm an

6    Assistant State Attorney.

7         Present in a few minutes also will be John

8    Patterson, Assistant State Attorney, who is actually

9    prosecuting the case against you.

10        And also Miss Mathis, a detention deputy, who

11   has brought you here today.

12        Now before we begin this statement I need to go

13   over some matters with you to make sure that you

14   understand.  Do you realize that your statement here

15   is given voluntarily?

16        A.    Yes.

17        Q.    Do you realize that anything that you say

18   can and will be used against you in this case, Case

19   No. 95-16310 CF10A, State verses Moses Hope?

20        A.    Yes, sir.

21        Q.    We cannot use your statements against you

22   for other charges or things that you may or may not

23   have done other than on the day in question when you

24   were arrested in 1995, on the 17th day of September;

25   is that understood?

MOSES HOPE                          5

```
 1          A.    Yes, sir.

 2                     MR. BUSCHEL:   And just legally,

 3     derivative and use immunity.

 4          Q.    And that means for matters other than

 5     what you're being asked, tested on here today--excuse

 6     me, for other than what you're being questioned for

 7     here today which are the events on Sunday, September

 8     the 17th?

 9          A.    Yes, sir.

10          Q.    Are you willing to speak to us today?

11          A.    Yes.

12          Q.    Do you realize that you do not have to do

13     so?

14          A.    Yes, sir.

15          Q.    Do you realize that you can at any time

16     stop the questioning?

17          A.    Yes, sir.

18          Q.    Do you realize that if you wish to

19     consult with your attorney you may do so?

20          A.    Yes.

21          Q.    Do you realize that you can at any point

22     decide that you don't want to answer any one

23     particular question at any time?

24          A.    Yes, sir.

25          Q.    Or that you can cease the questioning all
```

MOSES HOPE                    6

```
 1    together?
 2         A.    Yes, sir.
 3         Q.    Are you willing to speak to us here
 4    today?
 5         A.    Yes, sir.
 6         Q.    Have you signed and executed this
 7    polygraph agreement and stipulation that I'm holding
 8    up in front of you?
 9         A.    Yes, sir.
10         Q.    Do you understand that the questioning
11    here today is to prepare a sworn statement for the
12    polygrapher to review in order to prepare a polygraph
13    test for you in the near future?
14         A.    Yes, sir.
15         Q.    That he will be looking at the transcript
16    of this statement to make up the questions?
17         A.    Yes, sir.
18         Q.    The issue in general is whether you
19    possessed cocaine on September 17th?
20         A.    Yes, sir.
21         Q.    Are you ready to begin?
22         A.    Yes, sir.
23               MR. BUSCHEL:    Just put the State
24    agrees that if Mr. Hope passes the polygraph.
25               MR. COUNTRYMAN:    The polygraph
```

1    stipulation is that if you pass the polygraph, if

2    you're deemed to be speaking truthfully on this

3    matter the charges against you are dismissed and will

4    not ever be revised.

5         Q.    If you fail the polygraph, not only what

6    you say here today comes in against you, but the fact

7    that you've taken a polygraph and failed it comes

8    before the jury without any question as to it's

9    admissibility; do you understand that?

10        A.    Yes, sir.

11        Q.    Are you still willing to do so?

12        A.    Yes, sir.

13              MR. HOPE:    There is one question I

14   want to know on the polygraph test, I would like to

15   know how does it work?  As long as you're telling the

16   truth it's going to show you're telling the truth?

17              MR. COUNTRYMAN:    Yes.

18              MR. HOPE:    So if I'm just naturally

19   nervous that wouldn't make a difference?

20              MR. COUNTRYMAN:    I'm not a

21   polygrapher but being nervous is natural to the

22   polygraph.  As a matter of fact that's

23   probably--well, I won't say it, I don't know for

24   sure, but it's probably to your advantage to be

25   apprehensive because that's gonna be able to get a

MOSES HOPE                    8

```
1    result.
2         A person who is showing no emotion one way or
3    the other is very difficult to polygraph.
4                   MR. HOPE:  I'm going to speak the
5    truth, but right now I'm sitting here and I'm not
6    taking a test, and I'm kind of nervous.  I'm gonna
7    tell the truth.
8         Q.   If you're ready to begin we'll start.
9         A.   Yes, sir.
10        Q.   All right.  Mr. Hope, in September of
11   1995 where were you living?
12        A.   With my mom, 2210 Douglas Street.
13        Q.   In Hollywood?
14        A.   Yes, sir.
15        Q.   What were you doing for a living?
16        A.   Construction work, sir.
17        Q.   And basically what kind of work did you
18   do?
19        A.   Carpenter's helper.
20        Q.   Were you working for a company or were
21   you working just as you were needed?
22        A.   Well, at first I was working for a
23   company called Group Construction, and then my
24   bossman, Mr. Westbrook, him and his brother have
25   their own company.
```

MOSES HOPE                9

```
 1          He started to do his own subcontractor and I
 2     was working with him on a daily basis.  Sometimes six
 3     days a week.  But I worked there everyday with him.
 4          Q.    At that point you were on probation from
 5     a previous matter; is that correct?
 6          A.    Yes, sir.
 7          Q.    And in front of Judge Goldstein?
 8          A.    Yes, sir.
 9          Q.    Now on September 17th, which I believe is
10     a Sunday, do you remember that day?
11          A.    Yes, sir.
12          Q.    Tell us what you were doing in the
13     morning on that day?
14          A.    In the morning?
15          Q.    If you remember?
16          A.    I can't recall what I did that morning.
17          Q.    How about in the afternoon?
18          A.    Well, in the afternoon it was on 2247 Sim
19     Street, me and maybe five or six other guys was out,
20     was shooting dice, and we had been shooting dice four
21     or five minutes and the raiders pulled up.
22          And about maybe, I think it was two or three
23     cars, when they proceeded from the cars one got--
24          Q.    Let me back you up here.  Who were you
25     with?
```

1        A.    It was Larry Medlock, Clarence Mathis,

2    Edwin Norris, this one guy Bobby Magee, but he used

3    alias that particular day, Fred Parrish, it was James

4    Borgmann, it was a guy by the name Clifton Sherrod,

5    and there was a guy under the tree named Wayne

6    Collier, and there was a young lady in the yard by

7    the name Rolisa Davis.

8        Q.    Now 2247 Douglas Street?

9        A.    Sim Street.   2210  Douglas Street is

10   where my mom lives.

11       Q.    Who was living there?

12       A.    On Sim Street?  A friend of mine named

13   Joe Windham was living there at the time.

14       Q.    Anybody else?

15       A.    Claudia Hubbard, some lady by the name

16   Pearly May, a guy stayed in apartment five by the

17   name of Bob, and Pinky Reed stayed in apartment two,

18   and apartment three--I can't recall who lived in

19   apartment three, but Mr. Borgmann lived in four.

20       Q.    Who was shooting dice?

21       A.    Me, Larry Medlock, Bobby Magee, and

22   Clarence Mathis.

23       Q.    Were you inside or outside the apartment

24   building?

25       A.    It was outside the apartment building.

```
1              Q.    In the front or the back?

2              A.    In the front.

3              Q.    What is the yard like out there?

4              A.    It's, well, the apartment was shaped in

5    an L and in the center of the yard it's a lot of

6    gravel and two trees set one on this end, one on that

7    end.  And once you pass the gravel it's a parking lot

8    with several spaces.

9              Q.    And that's right off the street?

10             A.    Yes, sir.  Right off 23rd Avenue.

11             Q.    Was it light or dark when the dice game

12   started?

13             A.    It was daylight.

14             Q.    Do you remember if it was raining or--

15             A.    It wasn't raining.

16             Q.    Now you're shooting dice, do you remember

17   what the lady was doing that you mentioned?

18             A.    Which one?

19             Q.    The one in the yard.

20             A.    Rolisa?

21             Q.    Yes, I think so.

22             A.    She was out standing around.

23             Q.    How about what Mr. Borgmann was doing?

24             A.    Well, Mr. Borgmann was sitting under the

25   trees with Wayne Collier and Clifton Sherrod.
```

```
 1          Q.    Doing what?
 2          A.    Just sitting there under the tree.  There
 3    was a couple of chairs with a table sitting up under
 4    the tree.
 5          Q.    How far is the tree where he was seated
 6    from where you were?
 7          A.    Probably about five or ten feet away.
 8          Q.    From here to those books?
 9          A.    Yeah, about that far.  Not even that far.
10          Q.    What had you been doing prior to the dice
11    game?
12          A.    Well, prior to the dice game before we
13    started shooting it was a dominoe game going on under
14    the tree.  They was playing dominoes.
15          Q.    Were you playing that?
16          A.    Yeah, I played a few hands of dominoes.
17          Q.    Before that what were you doing?
18          A.    Well, once I came over, Mr. Borgmann, he
19    wasn't home quite at the time.  He got off work and
20    it was around about four o'clock, because Miami
21    Dolphins was supposed to play the Philadelphia Eagles
22    that particular day and all of us are Miami Dolphin
23    fans.
24          So we went in Mr. Borgmann house and we watched
25    a little bit of the football game and at halftime we
```

1    exited the apartment.

2         And when we exited the apartment they had a

3    dice game going on and that's when I joined in on the

4    dice game.  And Mr. Borgmann sat under the tree with

5    Collier and Clifton·Sherrod.

6         Q.    When was the dominoe game?

7         A.    Well, it was probably about, maybe thirty

8    minutes prior to the--twenty minutes prior to the

9    dice game.

10        Q.    Now did Mr. Borgmann come home while the

11   dominoe game was going on, or did he come home before

12   the dominoe game started?

13        A.    It was after the dominoe game he came

14   home.

15        Q.    So did you watch the Dolphin game from

16   the kick off to the halftime or did you turn it on

17   while it was going on?

18        A.    We watched it from the opening kick off

19   to the halftime.

20        Q.    All right, so the halftime comes and you

21   go outside and was the dice game already in progress

22   or did it just start up?

23        A.    It was in progress.

24        Q.    Is it the type of game where you can join

25   in if you have money?

MOSES HOPE                          14

```
1         A.    Yes, sir.
2         Q.    Now have you had occasion to read the
3    police reports on the case?
4         A.    Yes, sir.  I've been reading them for
5    quite a while. .   .
6         Q.    Do you remember where the report says
7    that the officers were watching the front of that
8    apartment?
9         A.    Yes, sir.
10        Q.    Do you remember if anyone came up to talk
11   to you during the dice game?
12        A.    No, sir, no one came to talk to me.
13        Q.    Did you leave the dice game to go talk to
14   someone in the yard?
15        A.    No, sir.
16        Q.    When you went out for the halftime, did
17   you go out and talk to somebody who had just come on?
18        A.    No, sir.  I went directly to the dice
19   game and started to shoot dice.
20        Q.    You said earlier that the dice game had
21   been going on for just a few minutes?
22        A.    Yes, sir.
23        Q.    Were you winning or losing?
24        A.    Well, at that point I don't think I was
25   winning or losing because I had just recently got
```

MOSES HOPE                                    15

```
 1    into it, so I couldn't really say if I had lost or
 2    not.
 3           Q.    So when do you first notice the cars
 4    coming up, when you said the raiders were inside?
 5           A.    Well, I.was down on the ground kneeling
 6    to the dice game, and I heard one of the guys say
 7    they're going to raid us.
 8           So I turned and looked back I seen them running
 9    out of their car.  So the money I had on the ground,
10    I just left it there.
11           And I stood up, and I folded my money that I
12    had in my hand and I put it in my pocket and I put my
13    hands up.
14           Q.    Where did they park their cars?
15           A.    Well, they was coming and heading north
16    bound off of Sheridan Street, one whipped in almost
17    by the mailbox, off Sim Street.
18           Another one whipped into the parking lot, and
19    if I'm not mistaken the third one whipped right in
20    behind the one that pulled into the parking lot.
21           Q.    How far away is the car from the dice
22    game?
23           A.    Maybe about twenty, twenty-five feet.
24           Q.    Three different cars come up?
25           A.    Yes, sir.
```

```
 1          Q.    Do you remember the kind of car?
 2          A.    I think it was--they was in a gray car, I
 3     think it was burgundy car, and if I'm not mistaken it
 4     was a truck also, if I'm not mistaken.
 5          Q.    Do you remember the make of the cars?
 6          A.    No, I don't quite remember the make.
 7          Q.    So was it like a four-door or two door?
 8          A.    They was a four door.  I know it was new
 9     cars they had just got, it was some new cars they had
10     just got in and started coming out in.
11          Q.    How where the Raiders dressed?
12          A.    They had on black shirts with Hollywood
13     Police Department police on it and most had on jeans.
14          Q.    Do you remember who showed up?
15          A.    Yeah.
16          Q.    Do you know them by name?
17          A.    Yes, sir.
18          Q.    Who was there?
19          A.    Well, there was one we call Chuck Norris,
20     I think that's Sergeant Marano; Officer Strauss,
21     black guy; Officer Fernander, Officer Trunce, and
22     Fernandez.                   -
23          Q.    And anybody else?
24          A.    Not to my recollection.
25          Q.    Who was with who, do you remember?
```

```
1         A.   Well, when I turned around all of them
2    was running out of car, and Officer Trunce was the
3    first one that got to me.
4         Once I put my money in my pocket he told us all
5    to get up against the wall.
6         By this particular time Marano, Fernandez,
7    Strauss, and Fernando--everybody had came up on the
8    sidewalk and they started to pat us down.
9         Q.   How many people did they pat down, you
10   and who else?
11        A.   The four in the dice game.
12        Q.   What about Borgmann?
13        A.   He was up under the tree, they never did
14   bother him.
15        Q.   How about the lady?
16        A.   They never did bother her neither.
17        Q.   And the other two guys with Borgmann, did
18   they get searched?
19        A.   Not to my recollection.
20        Q.   How do you meet Mr. Borgmann?
21        A.   I think I had just got out from being
22   incarcerated and him and one of my cousins was in
23   school together, in R. O. T. C. and they was close
24   friends.  So I met him through her.
25        Q.   What is your cousin's name?
```

```
1          A.    Carmela Lucas.

2          Q.    How long would you say you've known him?

3          A.    Probably about eight or nine years, close

4     to ten years.  Something like that.

5          Q.    Now did your cousin go in the service?

6          A.    No, she didn't enter the service not that

7     I recall.

8          Q.    He did though, right?

9          A.    Yes, sir.

10         Q.    What was he doing for a living when this

11    thing happened?

12         A.    He was working at the Broward Mall as

13    security worker I think.  I used to see him come home

14    with that outfit on.

15         Q.    And now he works for the post office?

16         A.    Yeah, I think he do.

17         Q.    All right, so you and the guys that are

18    in the dice game are put up against the wall and

19    searched?

20         A.    Yes, sir.

21         Q.    Did they take your money?

22         A.    Officer Trunce took my money and gave it

23    to Sergeant Marano.

24         Q.    What else did they take from you?

25         A.    He took my house key, he took some
```

```
 1    lottery tickets, I had a letter from my girlfriend's
 2    daughter grandfather gave me to give to her, and I
 3    had a buff cloth.
 4         Q.   You mean for wax?
 5         A.   Yeah, to clean your teeth with.
 6         Q.   What did he take your key for?
 7         A.   He called Borgmann over and gave it to
 8    him.  He said to Mr. Borgmann, I'm gonna give you
 9    Moses' property.  He'll be right out, he's only going
10    to jail for loitering and gambling.
11         So them he gave it to him and then he came back
12    and he said, Hope, I'm gonna give Mr. Borgmann all
13    your property.
14         Q.   Officer Trunce tells you you're going to
15    jail for gambling?
16         A.   For loitering or gambling.  He said
17    you're gonna be arrested for loitering or gambling.
18    And at that time he gave Sergeant Marano my money,
19    and he gave Mr. Borgmann my property.
20         Q.   When did you first learn that you're
21    arrested for possession of cocaine or possession with
22    intent to delivery cocaine?
23         A.   After I had been finger printed and
24    placed in a holding cell.  And they came in and read
25    everybody's charges and they said they called about
```

MOSES HOPE                    20

```
 1    three guys first.
 2            And once they got to my name they said I was
 3    arrested with possession and intent to deliver.
 4            And I said, man, stop playing.  And I went to
 5    the county jail.   .
 6            Q.    Does any other police officer say
 7    anything when you're up against the wall getting
 8    searched?
 9            A.    Well, no other police officer was really
10    standing there but I saw Sergeant Marano take Larry,
11    once he got handcuffed, and he was like dish-ragging
12    him around out toward the sidewalk.  And he sat him
13    down on the sidewalk.
14            Q.    You're gesticulating when you say
15    dish-ragging, what do you mean by that,  what's he
16    doing?
17            A.    Like handling him rough, he was already
18    handcuffed, and he was like snatching him around,
19    taking him out towards the sidewalk.
20            And he sat him down on the sidewalk, he came
21    back, got Clarence.  Cuffed him, took him out on the
22    sidewalk, came back, got me, slapped me on the
23    sidewalk.
24            And then he got to the other guy, sat him on
25    the sidewalk.
```

```
 1            Q.    How do you get to the police station?
 2            A.    They called a police car to come and get
 3    us.  Officer Stassio, if I'm not mistaken, that's
 4    what the name was, transported us to the station.
 5            Q.    All four of you go in the one car?
 6            A.    No, they took three of us at once and
 7    then they came and got the other two guys.
 8            Q.    Who else got arrested besides the four of
 9    you shooting dice?
10            A.    Norris got arrested.
11            Q.    And he was under the tree with--
12            A.    He wasn't under the tree, he was coming
13    across the street and they took him, they said he was
14    being disrespectful or something.  They called him
15    and sat him on the sidewalk also.
16            Q.    What did they get charged with, the other
17    four?
18            A.    If I'm not mistaken I think loitering and
19    gambling, I'm not mistaken, except for me.
20
21    EXAMINATION BY SERGEANT WYNN:
22            Q.    Who all got arrested that day, do you
23    remember the names?
24            A.    It was Moses Hope, me, Larry Medlock, it
25    was Clarence Mathis, it was Edward Norris, and the
```

```
 1    guy--he went under Fred Parrish but his real name was
 2    Bobby Magee.
 3          Q.    His other name is Parrish?
 4          A.    He went up under Fred Parrish the day we
 5    got arrested.
 6          Q.    So that's five guys plus you?
 7          A.    Four guys plus me.
 8          Q.    Okay, right.
 9
10    EXAMINATION BY MR. COUNTRYMAN:
11          Q.    Are you in the same holding cell as them
12    in the police station?
13          A.    Yes, sir.
14          Q.    When is the next time--do you bond out of
15    jail for this?
16          A.    I bonded out after I got to the county
17    jail.
18          Q.    That day or the next day?
19          A.    I think it was the next day.
20          Q.    You go back to work for the construction
21    company?
22          A.    Yes, sir.
23          Q.    Do you see these guys that were arrested
24    that day--when is the next time that you see them?
25          A.    Probably about maybe two days later I saw
```

```
1    Larry and Norris; I didn't see Parrish.
2         Q.    Do you tell them what you were arrested
3    for?
4         A.    Yeah.   They knew what I was arrested for
5    in the holding cell.when they read my charge, and I
6    started to get kind of disrespectful.
7         Q.    Did the police officer find drugs on you
8    when they pulled your money out?
9         A.    No, sir.
10        Q.    Did you have drugs on you?
11        A.    No, sir.
12        Q.    When is the next time that you see
13   Borgmann after you were arrested?
14        A.    I can't recall.
15        Q.    Do you remember who posted the bond?
16        A.    My mom posted the bond or my girlfriend.
17        Q.    Do you go back to Borgmann's apartment
18   building?
19        A.    No, sir.   He had taken my property to my
20   mom house.
21        Q.    Did you ever go back to visit him after
22   you got out of jail?
23        A.    Well, I stayed away from over there for
24   two or three weeks from that particular area.  But we
25   ended up seeing each other again.
```

```
1         Q.    When was next time you see the Hollywood
2    Raiders?
3         A.    January the 1st.
4         Q.    When they arrested you?
5         A.    Yes, sir.
6         Q.    Before you get arrested, before that
7    Sunday, on the 17th of September, when is the last
8    time that you saw them?
9         A.    They used to come out on a daily basis
10   and I had run into them a week prior to my arrest.
11   They ran my name through and they found out I was on
12   probation, and they let me go.
13        And a week later they arrested me for that and
14   charged me with a possession charge.
15        Q.    What happened--how did they meet up with
16   you?
17        A.    Well, they used to basically see us on
18   the street everyday, and I lived over across the
19   street at one point.  So I basically ran into them on
20   a daily basis.
21        Q.    Which one would you run into?
22        A.    All of them, Fernandez, Trunce, Marano,
23   Fernander, Strauss.
24        Q.    Did they know you by name?
25        A.    Yeah.  All of them knew me by name.
```

MOSES HOPE                                25

1          Q.    Now in the police report the officer

2    says that he takes up a surveillance position across

3    the street from this apartment house.  Have you found

4    out from his statement where he says he was standing?

5          A.    Yes, sir, I did.

6          Q.    Is where he says he's standing, is that

7    possible that he could have been there?

8          A.    No, I don't think it's possible.

9          Q.    How come?

10         A.    Because for him to be where he says he

11   was one of the guys out there would have saw him

12   there because it's a plain view.

13         Q.    There is no tree, no building?

14         A.    It's a house and it's a couple of trees

15   almost out by the road but they're tall with a little

16   base.

17         Q.    Is it a palm or do you know what kind of

18   tree they are?

19         A.    No.

20         Q.    But it's not big enough for a man to hide

21   behind?

22         A.    No.

23

24   EXAMINATION BY SERGEANT WYNN:

25         Q.    Can you describe for us where that

1   surveillance position would be, so if we went out to

2   look at it?

3        A.    From his report he stated that he was

4   across the street from the side of the house, it's

5   white with a burgundy trim and it's fenced off by a

6   fence.

7        And he's claiming that he was at the corner of

8   the house hiding behind some bushes or something, and

9   I know for a fact that there ain't no bushes there

10  that he could have been hiding behind.

11                    MR. COUNTRYMAN:  Do you want a copy

12  of this, this is a sketch and I think--Mr. Buschel,

13  is this Mr. Fernandez' initials here?

14                    MR. BUSCHEL:  Yes.

15                    MR. COUNTRYMAN:  We'll make a copy

16  of this for you so we'll leave that out.

17                    MR. HOPE:  I had drew up a diagram

18  also that I gave to Mr. McHugh when he was my lawyer

19  and it's more photerized (sic) like with pictures and

20  objects of the area.

21       Because I had been living on Sim Street for

22  twenty-five years so I basically know the whole area.

23

24  EXAMINATION BY MR. COUNTRYMAN:

25       Q.    So you run into this Street Crimes Unit

```
 1    guys about a week before?

 2         A.    Yes, sir.

 3         Q.    And what do they talk to you about, why

 4    do they come into contact with you?

 5         A.    Every time they see us they just pull us

 6    over and run our names through.

 7         Q.    Who?

 8         A.    Search us, see if we got any drugs or

 9    something on us.

10         Q.    What were you doing when that happened?

11         A.    I was talking with a guy, a friend by the

12    name Head, I call him Head.  I think his real name is

13    Willie, but me and him got to talking.

14         Q.    Do you remember his last name?

15         A.    Hall, Willie Hall.  Me and him was

16    talking one day and the Raiders pulled up, and they

17    jumped out and ran both our names through.  Patted us

18    down and they let us go.

19         Q.    Now, you read Officer Fernandez police

20    report, have you not?

21         A.    Yes, sir.

22         Q.    Where he says he's watching people come

23    up, getting together with you, you going over to a

24    blue bag, getting something out and coming back to

25    them.  You read that?
```

MOSES HOPE                28

```
 1        A.    Yes, sir.

 2        Q.    Was there a blue bag in the yard that day

 3   that you remember?

 4        A.    No, sir.  No, sir.

 5        Q.    Now you're smiling when I'm telling you

 6   what happened.  Why does that seem funny to you?

 7        A.    Because he fabricated that.  That's a

 8   complete lie.

 9        Q.    It's a complete lie.  So you didn't have

10   anybody come up and talk to you?

11        A.    No, sir.

12        Q.    You didn't give anything to this person?

13        A.    No, sir.

14        Q.    You don't get money from this person?

15        A.    No, sir.  I don't serve no truck, I don't

16   do none of that accusation that he said in his

17   report.  The only thing in his report that's true is

18   that there was a dice game going on.

19              Everything else he fabricated.

20        Q.    So two different people, different times

21   that afternoon, don't come up to you, talk to you,

22   you go get something out of a bag, you go back to

23   the--

24        A.    No, sir.  No, sir.

25        Q.    Did the police find a bag of cocaine?
```

```
 1         A.    Not while I was at the scene, no.

 2         Q.    Did they find cocaine on any of the guys

 3    you were with?

 4         A.    No, not to my recollection they didn't.

 5         Q.    Were any of them holding?

 6         A.    Not that I know of, not that I could say

 7    he was actually holding. I don't know.

 8         Q.    Do you know how guys act when the police

 9    come up and they're holding?

10         A.    Yeah, some of them will run and some will

11    go, oh, shit. Some will just--half of the time

12    they'll run when they're holding.

13         Q.    None of these guys did anything, they

14    just got caught for shooting dice?

15         A.    Yes, sir. I know once they placed me in

16    the police car and took us to the station, when the

17    officer  went to get the other two guys, when they

18    came back to the station we was sitting on a bench

19    waiting to get booked.

20         And Officer Stassio came in and he said I found

21    drugs sitting in the back seat of my car and I think

22    it was where you were sitting, Hope, and he pointed

23    at me.

24         And I said, no, man. Don't charge me like

25    that. I don't have no dope. And then they put
```

1   everybody in a holding cell and I didn't found out

2   what I was arrested for until they came in about two

3   hours later and read off the charge.

4        Q.    Do you think Stassio was telling the

5   truth about the drugs?

6        A.    I don't know, but I know they brought us

7   three down to the station first and they went and got

8   the other two guys, Clarence and Bobby.

9        Q.    How much did Stassio find?

10       A.    He didn't say, he just say he found drugs

11  in the back seat of his car and think it was where I

12  was sitting.

13       Q.    Do you remember where you were seated in

14  the car?

15       A.    Yeah, they put me in the middle.  First

16  they put Clarence in, they put Peanut in, I mean

17  Edward Norris, they put him in first and then they

18  put Clarence in the car and then they went to put

19  Medlock in the car.

20       And Clarence for some reason was telling the

21  officer he was uncomfortable.  That his knees was--he

22  was too tall or something.

23       So they pulled him back out of the car and

24  Sergeant Marano said, well, Moses, since you're a

25  smaller guy--because at the time I was a smaller--he

MOSES HOPE                          31

1   said, you get in the middle and then he put Larry
2   Medlock back in the car.

3        And when he placed Larry Medlock back in the
4   car Officer Stassio drove us to the station.  Only
5   two guys was still sitting on the sidewalk waiting to
6   be escorted down to the station.

7        Q.   Did you ever ask the other two guys?

8        A.   Well, when they came into the station,
9   once Clarence and Bobby sat down, they was like, man,
10  that police say he found drugs in the back seat of
11  his car, so I was like, man, you better tell them
12  something because I ain't gonna go to jail for
13  nobody's stuff.

14       Q.   When you say you better tell them
15  something--

16       A.   I said you better tell them whose shit
17  that is because I ain't going to take nobody charge.
18  So when the officer came here he said I found drugs
19  in the back seat of my car.

20       And I think it was where you was sitting, Mr.
21  Hope, and he pointed directly at me.  And I said, no,
22  man, I don't have no drugs.

23       Q.   When you say you tell them you better
24  tell them something because you're not getting ready
25  to take a charge for somebody, and then Officer

1   Stassio comes in and says he finds drugs in the

2   backseat where you're sitting?

3          A.    He said I found drugs in the backseat of

4   my car.  I think it was where you were sitting at Mr.

5   Hope.  And he pointed at me.  And I said, no, man.  I

6   didn't have no drugs.

7          Q.    What did the other guys say?

8          A.    Nobody else said nothing, not to my

9   recollection they didn't.

10         Q.    Now we said at the start that what you

11  say about things that didn't happen on September 17th

12  cannot be used against you.

13         A.    Yes, sir.

14         Q.    I'm going to be asking you about drug

15  sales.  Have you sold drugs in the front of that

16  apartment complex where Mr. Borgmann was living?

17         A.    Yes, I sold drugs there in the past.

18         Q.    When was the last time you did it?

19         A.    Maybe two or three years ago.

20         Q.    It's been that long?

21         A.    Yes, sir.

22         Q.    Is what Fernandez is talking about in his

23  police report, does that sound like something that

24  did happen when you were selling drugs there?

25         A.    That absolutely did not happen.

MOSES HOPE                    33

```
 1          Q.    Not that day but maybe an earlier day?
 2          A.    It could have.  Not that I recollect, but
 3     it could have happened over in that particular area
 4     because it's a high crime drug area?
 5          Q.    I'm talking about you?
 6          A.    Me?  No, I never.
 7          Q.    Did you keep your stuff in a bag?
 8          A.    Yeah, I kept it in the bag but I never
 9     dug it in the ground over there.
10          Q.    What did you do with it?
11          A.    I kept it in the house.
12          Q.    Did you ever sell drugs at another place
13     nearby before you got arrested?
14          A.    Directly across the street.
15          Q.    When was the last time you sold drugs
16     there?
17          A.    About the same period, two years or three
18     years ago.
19          Q.    How long would you say you were not
20     selling drugs, before you got arrested?
21          A.    About two or three years ago.
22          Q.    Well, that would be like '97, back to '95
23     or '94.  So you get arrested in September of '95.
24     How long had you not been selling drugs, a year, two
25     years?
```

MOSES HOPE                    34

1          A.    Well, I got arrested in '93 for selling
2    drugs.
3          Q.    That's when you were on probation?
4          A.    I got out in '94.  From that point in
5    time when I got out.I didn't sell any drugs from that
6    point, from '94 up until now.
7          Q.    How come you changed?
8          A.    Well, I had had a little daughter from
9    this chick and I just felt like I was ready to stop
10   going to jail.  And I had got a job, I was making
11   good money.
12         My girlfriend was in college and learning to be
13   a nurse, and I just felt like I wanted to settle down
14   and do the right thing.
15         Q.    How many times from the time you got out
16   of jail in '94 until the time you got arrested, how
17   many times would you have encounters or meetings with
18   the Street Crimes Unit?
19         A.    Quite a few.  They arrested me once for
20   drinking a beer on my front porch.  I had just got
21   off work and I was sitting on my front porch and they
22   took me to jail for that.
23         And if I'm not mistaken Sergeant Marano told me
24   that day, well Moses, too bad.  The good got to
25   suffer with the bad.  You got to suffer for your

1    brother now.

2         And he took me to jail for drinking a beer.  I

3    had just got off work and I was on my front porch.  I

4    was not on the sidewalk, I wasn't in the street, none

5    of that.

6         And that particular day he asked me what I was

7    doing.  I told him I worked every day.  He said well

8    let me look at your hands.  I showed him my hands, he

9    said, yeah, you're hands are pretty rough.

10        I said, yeah, man, I work everyday.  And they

11   still took me to jail.

12        (Whereupon, a brief recess was taken).

13                  MR. COUNTRYMAN:   Sergeant Wynn, do

14   you have questions?

15                  SERGEANT WYNN:   I just have a

16   couple.

17

18   EXAMINATION BY SERGEANT WYNN:

19        Q.   In this police report that Fernandez did,

20   he claims that on that day somebody encountered you

21   on a bicycle.

22        A.   That's false accusations.

23        Q.   There was nobody on a bicycle?

24        A.   Not once.  Never.

25        Q.   Do you have any idea why Officer

1  Fernandez would fabricate this case against you?

2       A.    Yeah, because basically they don't like

3  my family. They been trying to bust us with drugs

4  and they never come up with anything.

5       So from my understanding he just want to get me

6  off the street, so he fabricated a police report

7  against me.

8       The whole police report is fabricated except

9  for the part about the dice game.

10      (Whereupon, a discussion was held off the

11  record).

12      Q.    Just to clarify this, back in May,

13  specifically on May 24th, of 1996, at ten-thirty in

14  the morning, did I meet with you at Broward County

15  Detention Facility?

16      A.    Yes, sir.

17      Q.    Why did I meet with you?

18      A.    Because I had wrote a letter to the

19  Internal Affairs requesting that they will give me a

20  polygraph test pertaining to this matter; that I

21  hadn't did anything, and I was falsely arrested.

22      And I spoke with you and I think it was him.

23  Him or someone else if I'm not mistaken.

24      Q.    And what brought you about to write that

25  letter?

1       A.   Because I felt like I was being

2   incarcerated for something I knew I didn't do, and I

3   didn't think it was fair for me to be away from my

4   family for something that I didn't do.

5       Q.   Did anybody else in the Broward County

6   Detention Facility tell you or suggest to you that

7   you should write us a letter?

8       A.   Well, I had a guy suggest to me maybe I

9   should file a complaint to the Internal Affairs.

10      Q.   Can I ask who that was?

11      A.   Who was this--Joseph, I think it was

12  Joseph.  I can't recall his name but if I'm not

13  mistaken it was Joseph.

14      Q.   And can you tell us why you didn't go

15  forward with a complaint on May 24th, of 1996?

16      A.   Well, I didn't actually know that I was

17  filing a complaint.  I just wanted to talk to

18  somebody about the issue.

19      I was willing to take a polygraph test then,

20  and I'm willing now, because I know I'm telling the

21  truth.

22      If I would have knew that I could have filed a

23  complaint, I felt like by you coming and

24  investigating the issue, I felt that that was

25  actually filing the complaint itself.

```
 1              I just know I wanted to take a test and show
 2      that I was telling the truth and go home.  That was
 3      the whole issue of me writing the letter.
 4              Because I felt like as soon as I take the test
 5      I'm going to pass it because I'm telling the truth.
 6      So that was the purpose of me writing the letter.
 7              Q.    Did you ever speak to your lawyer,
 8      Mr. McHugh, and explain to Mr. McHugh that we were
 9      aggressively investigating this?
10                        MR. BUSCHEL:  Just hold on a
11      second.  I don't want him to get into any privileged
12      matters for future.
13
14      EXAMINATION BY DETECTIVE SMITH:
15              Q.    Moses, what's your mother's name and
16      where does she live?
17              A.    Florene Butler, B-U-T-L-E-R.  She lives
18      at 2210 Douglas Street, Hollywood, Florida.
19              Q.    Does she have phone number?
20              A.    Yes, sir.  926-7922.
21                        MR. COUNTRYMAN:  Any more
22      questions?
23                        DETECTIVE SMITH:  No.
24                        MR. COUNTRYMAN:  John, do you have
25      questions?
```

```
 1                    MR. PATTERSON:  Yeah.

 2

 3      EXAMINATION BY MR. PATTERSON:

 4           Q.   You were arrested back in September of

 5      '95?

 6           A.   Yes, sir.

 7           Q.   You got out of jail eventually?

 8           A.   Yes, sir.

 9           Q.   How long did you stay in jail when you

10      first got arrested?

11           A.   One day.  I was out the next day.  I

12      bonded out.

13           Q.   Who was it that bonded you out, your

14      girlfriend?

15           A.   My girlfriend and mom.

16           Q.   They had to put money down, right, to

17      bond you out?

18           A.   Yes, sir.

19           Q.   Did that upset you about that, that you

20      were falsely accused and you had to bond out of jail?

21           A.   Well, it didn't really upset me about

22      bonding out, but I was upset about being falsely

23      accused and arrested for something I know I didn't

24      do.

25           Q.   You spent the night in jail?
```

MOSES HOPE                          40

```
 1          A.    Yes, sir.
 2          Q.    Your girlfriend had to take money out of
 3     her pocket to bond you out?
 4          A.    Yes, sir.
 5          Q.    At that time the only thing you had to do
 6     was attend your court hearings?
 7          A.    Yes, sir.
 8          Q.    And even though you were being charged
 9     with possession of cocaine with intent to distribute?
10          A.    Yes, sir.
11          Q.    You went in for an arraignment on it?
12          A.    I never had an arraignment.  I didn't go
13     in for an arraignment.
14          Q.    You eventually had an arrest warrant put
15     out for you?
16          A.    Yes, sir.
17          Q.    Because you didn't show up?
18          A.    Yes, sir.
19          Q.    You eventually got held over on a no bond
20     hold, right?
21          A.    Yes, sir.
22          Q.    When was that that you got arrested on
23     the no bond hold on the arrest warrant?
24          A.    January 1st.
25          Q.    So January 1st you're going to be sitting
```

```
 1    in jail until your case comes to trial, right?
 2         A.    Yes, sir.
 3         Q.    And there was no chance of you getting
 4    out of jail at that time?
 5         A.    Yes, sir.
 6         Q.    Did that upset you that you were falsely
 7    accused at this time?
 8         A.    Yeah, I would say it did.
 9         Q.    Did you talk to some of the people there
10    at the jail about your case?
11         A.    No, I don't never talk to no one about my
12    case.
13         Q.    Were there other people there at the jail
14    that had been arrested by a Hollywood Street Crimes
15    Unit?
16         A.    No.
17         Q.    Was anybody in the jail talking about the
18    Hollywood Street Crimes Unit and there being an
19    investigation into that?
20         A.    No, sir.
21         Q.    So you waited five months on a no bond
22    hold before you ever contacted the Hollywood Police
23    Department about this investigation, correct?
24         A.    Well, the issue behind that was the
25    simple fact I had been sitting in jail and Mr. McHugh
```

MOSES HOPE                    42

```
 1    hadn't came to interview me, he hadn't given me no
 2    depo, no police reports, or none of that.
 3         So I felt like let me go above him, and let me
 4    go to the Internal Affairs to see if they can help me
 5    because my lawyers not trying to help me, so I got to
 6    get somebody.  So that's what made me go with the
 7    letter.
 8         Q.   And that was five months later?
 9         A.   Yes, sir.
10         Q.   Did you ever hear anybody talk about the
11    Hollywood Street Crimes Unit up at the North Broward
12    Detention Center?
13         A.   Well, recently I did hear a lot about it.
14         Q.   How about back then?
15         A.   Back then early '96, I never knew
16    anything about an investigation going on.
17         Q.   You stated when you were in the dice game
18    you really didn't win or lose anything, right?
19         A.   No, sir.  The money I was betting was on
20    the ground.  When the Raiders pulled up I left it on
21    the ground.
22         Q.   So actually when the Raiders got you they
23    pulled money out of your pocket?
24         A.   Yes, sir.
25         Q.   And that was less money that you had in
```

1  your pocket than what you had when you started in the

2  dice game?

3       A.    I had a $190 in my pocket.

4       Q.    But you essentially had more in your

5  possession, right? .

6       A.    Yeah, like I said, I had just gotten into

7  the dice game so I didn't really get a chance to win

8  or lose anything.

9       Q.    But you left some of your money on the

10  ground, right?

11       A.    Yeah.

12       Q.    So you actually had more than $190 in

13  your possession when you started in the dice game,

14  right?

15       A.    I probably had a little more.  We weren't

16  betting but like $2 on the point and once you get the

17  point you bet like $3 more.  Once you get the point.

18       Q.    So it was a small game, a very small

19  amount of money being bet on each roll of the dice?

20       A.    Well, sometimes it can get, it all

21  depends on who bets or what's the point.  People bet

22  on certain points.

23       Once you get a point on the dice, if you like

24  this number then you bet whatever you feel like you

25  want to bet on that number.

```
 1            Q.    But you said it was two or three dollars,
 2     right?
 3            A.    Yeah.
 4            Q.    You talked about Clarence being put in
 5     the car.
 6            A.    Yes, sir.
 7            Q.    Explain that again for me, what was that
 8     that happened?
 9            A.    Well, they had all the five of us sitting
10     on the sidewalk, they usually call a paddy wagon or a
11     van, but this day it was a squad car.
12            The squad car arrived at the scene.  They
13     placed Edward Norris in the car first, and then
14     Clarence Mathis in the car.
15            And they put Larry Medlock in the car.  At that
16     time when Larry Medlock went in the car, Clarence was
17     complaining about his knees being uncomfortable or
18     something.
19            And Marano pulled him back out of the car and
20     told me to get in, because I was much smaller.  And
21     then he placed Larry Medlock back in the car.  And
22     they took us to the station.
23            Q.    You were able to hear Clarence
24     complaining about this?
25            A.    Yes, sir.  We was sitting on the sidewalk
```

MOSES HOPE                    45

```
 1    and the car pulled up right along side the road.
 2          Q.    What was it that Clarence actually said?
 3          A.    He said he was uncomfortable, his knees
 4    was--he was too tall to be in the middle.
 5          Q.    Now the police officers--you said they
 6    were dish-ragging people around?
 7          A.    They did Larry Medlock like that.
 8          Q.    They were throwing him around while he
 9    was handcuffed?
10          A.    Yes.
11          Q.    Why would they care about Clarence's
12    comfort at that time?
13          A.    I thought about that myself, I thought
14    about that particular issue, too, because I never saw
15    them being concerned about anyone being comfortable.
16          Q.    Those were the prior times that you were
17    arrested by the Hollywood Street Crimes?
18          A.    Yes.
19          Q.    They didn't care about how you felt?
20          A.    No, they didn't.
21          Q.    They just put you in the back of the car?
22          A.    Yes,  they did.
23          Q.    How about other people that you've seen
24    them arrest, how did they treat those people?
25          A.    I've seen them treat a few rather rough,
```

```
 1    out of the ordinary, but that was something to be
 2    expected.
 3        Q.    You never saw them bend over backwards to
 4    help somebody out, right?
 5        A.    No. .  .
 6        Q.    For instance, if handcuffs were too
 7    tight, they weren't gonna go loosen them, were they?
 8        A.    I've never seen it.
 9        Q.    So this was really the first time you've
10    seen Hollywood Street Crimes accommodate someone?
11        A.    Yes, it was.  Trying to get three guys in
12    the backseat of a car I think that would be kind of
13    uncomfortable, too.
14        Q.    Was it uncomfortable for you?
15        A.    No,  it wasn't to me.
16        Q.    How about the other two guys on the sides
17    of you?
18        A.    They weren't complaining.  Clarence was
19    the only one complaining about being uncomfortable
20    because he was kind of tall.  He taller than the rest
21    of us.
22        Q.    Who was James Borgmann doing this whole
23    time while you guys were being arrested?
24        A.    He was sitting under the tree just
25    observing everything.
```

MOSES HOPE                          47

```
 1              Q.    He wasn't doing anything at that point?
 2              A.    He wasn't doing nothing until once we got
 3    handcuffed and sat on the sidewalk, I remember one of
 4    the officers saying, well, if you clean this yard up
 5    we'll consider letting them go.
 6              Q.    Who was he talking to when he said you
 7    all?
 8              A.    He was talking to the guys sitting up
 9    under the tree.
10              Q.    What did they do?
11              A.    They started to pick up the trash.
12              Q.    What kind of trash was out there?
13              A.    Beer bottles, soda cans, soda bottles,
14    just trash, potato chip bags, junk food.
15              Q.    Who was picking up the trash?
16              A.    Borgmann, Wayne Collier, and Clifton
17    Sherrod.
18              Q.    Did any one of those three get arrested?
19              A.    No, they didn't.
20              Q.    Where did they put the trash?
21              A.    In the big green dumpster that's on the
22    corner.
23              Q.    On the front corner of the property?
24              A.    Yes, sir.
25              Q.    Mr. Countryman had asked you about some
```

MOSES HOPE                    48

```
 1    of your prior arrests for drug dealing and you said
 2    that you used to leave the drugs in the house?
 3         A.    Yes, sir.
 4         Q.    And that was so you wouldn't have the
 5    drugs on you?
 6         A.    Yes, sir.
 7         Q.    You couldn't get robbed that way?
 8         A.    Yes, sir.
 9         Q.    If the police came up, you wouldn't have
10    the drugs on you?
11         A.    Yes, sir.
12         Q.    In fact all you'd have was cash, right?
13         A.    Yes, sir.
14         Q.    And you could always give any explanation
15    as to where the cash came from, right?
16         A.    That's correct.
17         Q.    So it would be fair to say that as a drug
18    dealer you wouldn't want to hold the crack on you?
19         A.    If a drug dealer had sense they wouldn't
20    have it on them.
21         Q.    And those are the smart drug dealers that
22    don't keep the drugs on them?
23         A.    Well, you could say that, yeah.
24         Q.    So when you used to deal drugs and you
25    left the drugs in your house would you have
```

1    considered those to be your drugs?

2        A.    Yes, I would have.

3        Q.    They frisked everyone, didn't they?

4        A.    Yes, the guys in the dice game they did.

5        Q.    Pulled their pockets out?

6        A.    Yes, they did.

7        Q.    Basically pulled everything out of the

8    pockets?

9        A.    Yes, sir.

10       Q.    Because they were looking for drugs on

11   these guys, right?

12       A.    Yes, sir.

13       Q.    Do you think they wanted to arrest these

14   other guys for drugs also?

15       A.    They wanted to arrest anybody with drugs

16   on them, I guess.

17       Q.    Drugs can be pretty small, right?  Crack

18   rocks can be very small?

19       A.    Yes, they can be.

20       Q.    So they would have done a pretty thorough

21   search, right?  I mean they found all the papers on

22   you?

23       A.    Yes, sir.

24       Q.    They reached into your pockets and pull

25   them inside out?

MOSES HOPE                    50

```
1         A.    Well, like I say, Officer Trunce searched
2    me, he pulled my money, and took all my other
3    personal property and he gave it to Mr. Borgmann.
4         He gave my cash to Sergeant Marano.  At that
5    time Sergeant Marano stuffed my cash in his pocket
6    and they handcuffed me and dropped me on the
7    sidewalk.
8         Q.    So they reached into your pockets?
9         A.    Yes, sir.
10        Q.    How about the other guys, did they reach
11   in their pockets?
12        A.    Yes, they did.
13        Q.    Searched them up and down?
14        A.    Yes, they did.
15        Q.    Very thorough searches?
16        A.    I would say it was, yeah.
17        Q.    Because they were looking for drugs,
18   right?
19        A.    Yes, they were.
20        Q.    And they didn't find drugs on any of the
21   guys, right?
22        A.    No, they didn't.
23        Q.    What time did you first get to the
24   apartment that afternoon or morning?
25        A.    I wasn't there that morning.  It was in
```

MOSES HOPE                    51

```
 1   the afternoon I got there.
 2          Q.    Do you know about what time it was?
 3          A.    Probably about maybe three o'clock or
 4   three-thirty.
 5          Q.    When you first got there at three o'clock
 6   or three-thirty what did you do?
 7          A.    I played a couple of games of dominoes.
 8          Q.    How long did that game last?
 9          A.    Maybe twenty or thirty minutes?
10          Q.    Twenty or thirty minutes later, it's
11   almost four o'clock, right?
12          A.    Yes, sir.
13          Q.    What did you do then?
14          A.    We went into Mr. Borgmann's house and
15   started watching the football game.
16          Q.    Who else was there in James Borgmann's
17   apartment?
18          A.    It was me, Mr. Borgmann, Edward Norris,
19   and his fiance.
20          Q.    What did you guys talk about during the
21   football game?
22          A.    Just about the Miami Dolphins.
23          Q.    What time did you finally leave
24   Borgmann's apartment?
25          A.    I would say halftime, about an hour or
```

```
 1    so.  However long it took for halftime to come on,
 2    that's when we exited the apartment.
 3         Q.    So that would be somewhere what--each
 4    quarter is fifteen minutes?
 5         A.    Yeah.  Probably about forty-five minutes,
 6    close to an hour.
 7         Q.    So you're talking somewhere around an
 8    hour later,  right?  Somewhere around five to
 9    five-thirty is when you went outside?
10         A.    Yes, sir.
11         Q.    And you were only going to be out there
12    just for the halftime, right?
13         A.    Yes, sir.
14                    MR. BUSCHEL:  Can we take a break
15    for a second, I need to make a call.
16         (Whereupon, a brief recess was taken).
17                    MR. COUNTRYMAN:  Back on the
18    record, Mr. Patterson you had asked the last
19    question.
20         Q.    (Mr Patterson):  You're watching the
21    football game with these other people in
22    Mr. Borgmann's apartment?
23         A.    Yes, sir.
24         Q.    What time was it that you went outside?
25         A.    I don't know exactly what time, I know it
```

MOSES HOPE                    53

```
 1    was halftime on the football game.
 2         Q.    Halftime of the Dolphins-Eagles football
 3    game?
 4         A.    It was the Dolphins playing, I'm not sure
 5    if it was the Eagles, but I know it was the Dolphins
 6    playing.  I think it was the Eagles.
 7         Q.    How long were you outside before the
 8    police officers drove up?
 9         A.    Not even five minutes, probably three
10    minutes. I had just got into the dice game.
11         Q.    When you walked outside what was the
12    first thing that you did?
13         A.    I walked to the dice game, I saw them
14    shooting dice and I went over there and got in it
15    with them.
16         Q.    You pulled money out of your pocket?
17         A.    Yes, sir.
18         Q.    Threw some money down into the game?
19         A.    I asked what was the point, what was the
20    point.  Once they told me the point I said, well,
21    four or five dollars you don't make your point and I
22    put it on the ground.
23         Q.    Did you even get to roll the dice at all?
24         A.    No, I didn't.
25         Q.    Was there other drug dealing going on at
```

1    that location?

2         A.    I'm sure there was.

3         Q.    2247 Sim Street?

4         A.    Yeah, that's a known drug street.

5         Q.    Did you ever see it going on?

6         A.    Yes, I've seen it going on.

7         Q.    You knew some of the people that would

8    sell drugs there?

9         A.    Yes, sir.

10        Q.    How about yourself, did you ever sell

11   drugs in the past?

12        A.    Yes, in the past I have.

13        Q.    So you're familiar with the location and

14   the layout of 2247 Sim Street?

15        A.    Yes, sir.

16        Q.    Are you familiar with how people would

17   drive up to the front of the location and ask for

18   drugs?

19        A.    Yes, sir.

20        Q.    Did you ever hear how the drugs got in

21   the back of that police car?

22        A.    I never heard of how it got in there but

23   from my perception, from me being involved in it

24   myself, I would assume that Clarence put it in the

25   backseat of the car and that was the purpose for him

MOSES HOPE                            55

```
 1    wanting to get out.
 2         Q.    Have you talked over this case with James
 3    Borgmann at all?
 4         A.    No.  I haven't spoken with Mr. Borgmann
 5    since I've been incarcerated.
 6         Q.    Has he ever come over to the jail and
 7    talked to you at all?
 8         A.    No, he hasn't.
 9         Q.    Have you ever talked to him on the phone?
10         A.    No, I haven't.
11         Q.    When was the last time you talked to
12    James Borgmann prior to today?
13         A.    '95.
14         Q.    '95?
15         A.    Before I got arrested.
16         Q.    So before September 17th of '95? Or it
17    was that day?
18         A.    I spoke with him after I got arrested
19    after I bonded out, maybe about two or three weeks.
20         Q.    What did you talk to him about?
21         A.    Nothing in particular.  Just basically,
22    he asked me what I was arrested for, I said they took
23    me down for possession with intent.  We hung at a
24    club and that was it.
25         Q.    What did he say about you being arrested
```

```
1    for possession with intent?
2         A.    He said, man, that's messed up.  That's
3    all he said.  That's messed up.
4         Q.    He'd been in the military, right?
5         A.    Yes, sir.
6         Q.    Did he ever tell you, hey, you should
7    call Internal Affairs on this?
8         A.    No, he never did.
9         Q.    So he told you this was a messed up
10   arrest, right?
11        A.    Yes, sir.
12        Q.    He himself is a security guard, right?
13        A.    Yes, sir.
14        Q.    He knows bad police work when he sees it,
15   right?
16        A.    I would assume he would, yeah.
17        Q.    He never told you to file a complaint
18   with Internal Affairs, did he?
19        A.    No, he never mentioned that to me.
20        Q.    Do you think that's something that a
21   police officer would know about, Internal Affairs?
22        A.    They should, yeah.  It's in their line of
23   work.
24        Q.    So since you got arrested on your arrest
25   warrant back in January of '96, have you spoken with
```

MOSES HOPE                    57

```
 1     James Borgmann?

 2          A.    No, I haven't.

 3          Q.    Has he contacted you in any way?

 4          A.    How can he unless he visits me.

 5          Q.    Has he come to visit you?

 6          A.    No, he hasn't.

 7          Q.    Have you called him from the jail?

 8          A.    No.

 9          Q.    Has he called you from outside the jail

10     to the jail?

11          A.    Can't call inside the jail.

12          Q.    How about any of his girlfriends, he's

13     friends with your cousin, has she come to talk with

14     you?

15          A.    No.

16          Q.    So you have had no contact whatsoever

17     with James Borgmann?

18          A.    None whatsoever.

19          Q.    Only from Mr. Haas was telling me he

20     spoke with him.  Other that that I had no contact

21     with him.

22                    MR. PATTERSON:  I don't have

23     anything else.

24

25     EXAMINATION BY SERGEANT WYNN:
```

```
 1        Q.    Did Mr. Borgmann tell you that it was a
 2   messed up arrest prior to May 24th, 1996?
 3        A.    Prior to May?  No, I haven't spoken with
 4   him since '95.
 5        Q.    My question is did Mr. Borgmann tell you
 6   that the arrest by the Raiders of you, was a messed
 7   up arrest prior to May 24th, 1996, when we visited
 8   you in the jail?
 9        A.    Well, he didn't specifically say it was
10   messed up arrest.  He said, man, that's fucked up,
11   that's messed up.  He didn't say it's a messed up
12   arrest.
13        He was basically saying that it was messed up
14   pertaining to they charge me with a possession
15   charge.
16        Q.    What else did he tell you?
17        A.    Nothing in particular.
18        Q.    How did you get on that subject?
19        A.    Well, I bonded out.  I saw him maybe two
20   or three weeks later and he was like, he said, well,
21   man you know the mother fucker charged me with
22   possession of cocaine with intent.
23        He said, no, man.  I said yeah, man, they gave
24   me a possession charge.  He said, man, that's messed
25   up.  That is it.
```

MOSES HOPE                          59

```
1         Q.    Nothing more?

2         A.    Nothing more.

3         Q.    Do you know whether the police actually

4    found drugs under that tree that day?

5         A.    Not while I was at the scene they didn't

6    find anything. When I was there I seen them find

7    absolutely nothing and I continually kept asking what

8    was I being arrested for.

9         And Fernander, the black officer, he came over

10   and he was like, you're going down for loitering and

11   gambling, and then he also made a statement, he said

12   if you were gonna gamble why didn't you go inside?

13        And I said, well, you know how it was when you

14   gambling, you just get in it, you know? And I used

15   to see him out to the football games on Friday and

16   when I would get off work I would go out to the

17   football game and he would be there.

18        And after I bonded out I saw him at a football

19   game and I specifically asked him, Mr. Fernander, who

20   wrote me that case?

21        And he said I don't know. I think it was

22   Fernandez. And I said man, you know, that's messed

23   up. And I went on about my business.

24        Q.    And what did Fernander say to you?

25        A.    At that particular day?
```

1          Q.    When you talked to him about the messed

2    up arrest?

3          A.    Well, when I asked him who the wrote the

4    report he said I think it was Mr. Fernandez.  So I

5    said, well, man, you know that was messed up.  You

6    know I didn't have no drugs on me.

7          He said well, Mr. Hope, you got to speak with

8    Mr. Fernandez about that because I didn't write the

9    report.  So I pushed my bicycle away and went on

10   about my business.

11         Q.    Did you ever see the officers searching

12   around the base of that tree on the day of your

13   arrest?

14         A.    I seen them kicking rocks, walking around

15   the yard, looking, searching the whole yard.  But not

16   once did I see them say I found drugs or look what I

17   got.

18         Not once, not once did anyone out there say I

19   found drugs, no one that I seen found no drugs.

20                    MR. COUNTRYMAN:  Are there any

21   questions from any of you?  All right, what we're

22   going to do is have this typed up as soon as

23   reasonably possible.

24         I'll try to get a hold of Detective Carbone

25   today or tomorrow, and we'll arrange for a time to

MOSES HOPE                    61

```
 1    have you brought over.
 2         I need to go over to Judge Goldstein's to get
 3    you transferred because he's the only one that can
 4    authorize your transfer here.
 5         We'll try to do it this week or the first part
 6    of next week.
 7
 8    EXAMINATION BY MR. COUNTRYMAN:
 9         Q.    Before we end is there anything here that
10    you can think about-- we've been asking you questions
11    for a good hour, an hour and fifteen minutes.
12    Anything that you want to change?
13         A.    No, I don't.
14         Q.    Making it very clear, you did not have
15    drugs in your possession on that Sunday, September
16    17th?
17         A.    No, I didn't.
18         Q.    And you did not sell drugs to anybody
19    that day or you did not meet up with two people
20    coming on to the property on Sim Street?
21         A.    No, I didn't.
22         Q.    All you're doing was rolling dice?
23         A.    That's it.
24                    MR. COUNTRYMAN:   This will
25    terminate the statement of Mr. Hope.   I want to
```

1    thank-you for coming here today.

2          (Whereupon, the statement was concluded at

3    10:45 a.m.).

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      STIPULATION

 2

 3           It is hereby stipulated by and between

 4      appearing counsel and the witness that the reading

 5      and signing of the foregoing statement be, and the

 6      same are, hereby waived.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MOSES HOPE                    64

```
1          C E R T I F I C A T E

2

3     STATE OF FLORIDA }
      COUNTY OF BROWARD}
4

5          I, LISA DONAHUE, being a Notary Public in and

6     for the State of Florida at Large, do hereby certify

7     that I reported the statement of MOSES HOPE, a

8     witness called in by the STATE in the above-styled

9     cause: that the witness was duly sworn to tell the

10    whole truth; that the foregoing pages, numbered 1 to

11    64, inclusive, constitute a true record of the

12    statement of said witness as stenographically

13    recorded by me; and that this transcript was prepared

14    under my supervision.

15         I further certify that I am not an attorney or

16    counsel of any of the parties, nor a relative or

17    employee of any attorney or counsel connected with

18    the action, nor financially interested in the action.

19         WITNESS my hand and official seal in the City

20    of Fort Lauderdale, County of Broward, State of

21    Florida, this 2nd day of April, 1997.

22

23                                          

      _____
24    LISA DONAHUE,
      Associate Court Reporter
      TRUMP FAIRCHILD COURT REPORTING
25    Notary Public, State of Florida
```

TRUMP FAIRCHILD COURT REPORTERS 1-800-283-4731

**COMPLAINT AFFIDAVIT**

ARREST NO _____

| FILING AGENT | OFFENSE REPORT | LOCAL I.D NO | | FDLE | FBI | SS NO |
|---|---|---|---|---|---|---|
| HW | 95-119747 | - | | | | 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 |

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF | ALIAS STREET NAME | | CITIZENSHIP |
|---|---|---|---|---|---|---|
| HOPE | MOSES BRYANT | | | | | US |

| RC | SEX | HGT | EYES | HAIR | WGT | COMP | AGE | DOB | BIRTHPLACE | SCARS MARKS, TT |
|---|---|---|---|---|---|---|---|---|---|---|
| B | M | 506 | BRO | BLK | 152 | DRK | 28 | 12/27/66 | FL | TATTOO-ULARM- |

| PERMANENT ADDRESS | LOCAL ADDRESS |
|---|---|
| 2210 DOUGLAS ST, HOLLYWOOD, FL | |

| | PLACE OF EMPLOYMENT | LENGTH |
|---|---|---|
| RESIDENCE TYPE   1   (1) CITY   (2) COUNTY   (3) FLORIDA   (4) OUT-OF-STATE | WESTBROOK & BROTHERS CONSTRUCT | |

| HOW LONG DEFENDANT IN BROWARD COUNTY- yrs 28 | BREATHALYZER BY/CCN | READING | PLACE OF ARREST | DATE/TIME ARRESTED | ARRESTING OFFICER(S) CCN |
|---|---|---|---|---|---|
| | | | 2247 SIMMS ST, HOLLYW 09/17/95 18:11 1902 | | 2039 |

| OFFICER INJURED | UNIT | ZONE | BEAT | SHIFT | UNIT TRANSPORTING PRISONER | TRANSPORTING OFFICER/CCN | PICK-UP TIME- | DRUG TYPE |
|---|---|---|---|---|---|---|---|---|
| Y ☐  N ☒ | | | | | | | TIME ARRIVED AT BSO- | CO |

| TYPE N-N/A A-AMPHETAMINE | B-BARBITUATE C-COCAINE E-HEROIN | H-HALLUCINOGEN M-MARIJUANA O-OPIUM | P-PARAPHERNALIA EQUIPMENT S-SYNTHETIC | U-UNKNOWN Z-OTHER | ACTIVITY °P | ACTIVITY V-V.I # POSSESS | S-SELL B-BUY T-TRAFFIC | A-SMUGGLE D-DELIVER E-USE | M-MANUFACTURE PRODUCE CULTIVATE | N-DISPENSE DISTRIBUTE | Z-OTHER | INDICATION OF ALCOHOL INFLUENCE DRUG INFLUENCE | Y | N | U-K X |

ATTACH DEFENDANT'S PHOTO

DEFENDANT'S VEHICLE-MAKE _____ TYPE _____ YEAR _____ COLOR ____ VIN. NO. _____

VEHICLE TOWED TO _____ TAG NO. _____ OTHER IDENTIFIERS OR REMARKS _____

**TRANSPORTED TO BSO**

| NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP) | ADDRESS | PHONE # |
|---|---|---|
| FLORIDA STATE OF | | |

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S.# OR CAPIAS/WARRANT # |
|---|---|---|---|
| 1 | POSSESS COCAINE WITH INTENT TO DELIVER | | 893.13(1A) |
| | | | |
| | | | |
| | | | |

**PROBABLE CAUSE AFFIDAVIT**

Before me this date personally appeared FERNANDEZ, ANTHONY _____ who being first duly sworn deposes and says that on 17th day September 19 95 at 2247 SIMMS ST, HOLLYWOOD, FL (crime location). The above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows

ON 09/17/95, AT OR ABOUT 1811 HOURS, AT THE LOCATION OF 2247 SIMMS ST, WHICH IS

LOCATED WITHIN THE JURISDICTIONAL LIMITS OF THE CITY OF HOLLYWOOD, IN THE COUNTY OF

BROWARD AND THE STATE OF FLORIDA, THE ABOVE NAMED DEFENDANT DID COMMIT THE VIOLATION OF

POSSESSION OF COCAINE. MOSES BRYANT HOPE DID HAVE IN HER ACTUAL OR CONSTRUCTIVE

POSSESSION A CONTROLLED SUBSTANCE, TO WIT: COCAINE, IN AN AMOUNT OF TWENTY EIGHT (28)

GRAMS OR LESS. A VALTOX TEST WAS CONDUCTED ON THE SUSPECT COCAINE BY OFFICER STRAUSS

#2039 AND TESTED POSITIVE FOR THE PRESENCE OF COCAINE. THE REMAINDER WAS SENT TO THE

I swear the above statement is correct and true to the best of my knowledge and belief.

OFFICER/AFFIANT'S SIGNATURE _____ 1902     OFFICER'S NAME/CCN FERNANDEZ / 1902     OFFICER'S DIVISION S.C.U.

STATE OF ___ COUNTY OF Broward
The foregoing instrument was acknowledged before me this 17 day of Sept 19 95, who (personally) known to me or who has produced (ID Type) _____ as identification and who ___ DID OR DID NOT take an oath.         (SEAL OR STAMP)

_____ 228360

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY     TITLE OR RANK/CCN
SEVENTEENTH JUDICIAL CIRCUIT

BROWARD COUNTY    HW254180

PROBABLE CAUSE AFFIDAVIT CONTINUATION

ARREST NO _____     OBTS NO _____

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF | HGT | WGT | RC | SEX | DOB 12/27/66 | OFFENSE REPORT | ARRESTING OFFICER (S) CCN | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HOPE | | MOSES BRYANT | | 506 | 152 | B | M | | 95-119747 | 1902 | 2039 |

| NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) | ADDRESS | PHONE # |
|---|---|---|
| FLORIDA STATE OF | | |

| COUNT NO | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT # |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared __FERNANDEZ, ANTHONY__ _____ who being first duly swor

deposes and says that on __17th__ day __September__ 19 _95_ 2247 SIMMS ST, HOLLYWOOD, FL ___ (crime location) th

above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows - ......

BROWARD COUNTY SHERIFF'S OFFICE LABORATORY FOR      -

ANALYSIS.

THE UNDERSIGNED IS A MEMBER OF THE HOLLYWOOD STREET CRIMES UNIT, WHO OPERATE IN

PLAIN CLOTHES AND DRIVE UNMARKED POLICE VEHICLES.

ON 09/17/95 THE UNDERSIGNED'S UNIT WAS INSTRUCTED TO INVESTIGATE COMPLAINTS OF

NARCOTICS SALES, GAMBLING, AND LOITERING AT 2247 SIMMS ST. THE UNDERSIGNED, ALONG WITH

SGT MARANO, OFFICERS STRAUSS, FERNANDER, AND TRUNIZ, RESPONDED INTO THE IMMEDIATE AREA.

PRIOR TO DRIVING TO 2247 SIMMS ST, SGT MARANO DROPPED OFF THE UNDERSIGNED JUST WEST OF

THE LOCATION. THE UNDERSIGNED FOUND A POSITION IN WHICH 2247 COULD BE SURVEILLED FOR

THIS TYPE OF ACTIVITY. THE UNDERSIGNED OBSERVED SEVERAL SUBJECTS INVOLVED IN A DICE

GAME ON THE SIDEWALK IN FRONT OF 2247 SIMMS ST FROM AN UNDISCLOSED PROXIMITY WITH A   LOCATION ⊕

CLEAR AND UNOBSTRUCTED VIEW. APPROXIMATELY 5-7 MINUTES INTO THE SURVEILLANCE, A

SUBJECT, WHO IS KNOWN TO THE UNDERSIGNED AS THE ABOVE DEFENDANT HOPE, WAS OBSERVED TO

EXIT THE SOUTHERNMOST APARTMENT WEARING A MULTI COLORED STRIPED SHIRT AND LONG JEAN

SHORTS. DEFENDANT HOPE STOOD IN AND AROUND THE DICE GAME FOR SEVERAL MINUTES BEFORE A

VEHICLE PROCEEDING FROM THE EAST ON SIMMS ST STOPPED AT THE CORNER OF N 23RD AVE AND

SIMMS. A LONE B/M HAILED TO DEFENDANT HOPE. DEFENDANT HOPE APPROACHED THE PASSENGER

SIDE OF THE VEHICLE WITH THE WINDOW DOWN, AT WHICH TIME A CONVERSATION COULD BE HEARD

I swear the above statement is correct and true to the best of my knowledge and belief.

_____ OFFICER/AFFIANT'S SIGNATURE     FERNANDEZ 1902 OFFICER'S NAME/CCN     S.C.H. OFFICER'S DIVISION

STATE OF __Florida__ COUNTY OF __Broward__

The foregoing instrument was acknowledged before me this __17__ day of __Sept__, 19_95_, who personally

known to me or who has produced (ID/Type) _____ as identification and who DID/DID DID NOT) take an oath.

_____ 2283 C.D.

(SEAL OR STAMP)

DEPUTY CLERK OF THE COURT NOTARY PUBLIC OR ASSISTANT STATE ATTORNEY     TITLE OR RANK/CCN

BROWARD COUNTY    HW954180    PROBABLE CAUSE AFFIDAVIT CONTINUATION

ARREST NO. ___    OBTS NO. ___

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF | HGT | WGT | RC | SEX | DOB 12/27/66 | OFFENSE REPORT | ARRESTING OFFICER (S)/CCN | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HOPE | MOSES | BRYANT | | 506 | 152 | B | M | | 95-119747 | 1902 | 2039 |

NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.)    ADDRESS    PHONE #
FLORIDA STATE OF

| COUNT NO | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT # |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared ___FERNANDEZ, ANTHONY___ who being first duly swo-
deposes and says that on ___17th___ day ___September___, 19 __95__ at ___2247 SIMMS ST, HOLLYWOOD, FL___ (crime location) :-
above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows: .

FROM THE UNDERSIGNED'S SURVEILLANCE POSITION. THE DEFENDANT STATED TO THE OCCUPANT OF

THE VEHICLE, "HOLD ON MAN". THE DEFENDANT HOPE TURNED AND PROCEEDED TO A TREE IN THE

COURTYARD OF 2247 SIMMS ST, KNELT DOWN NEAR THE BASE OF THE TREE, REMOVED STONES AT THE

BASE OF THE TREE, AND RETRIEVED A BLUE PLASTIC BAG FROM THE GROUND. DEFENDANT AGAIN

APPROACHED THE VEHICLE, AT WHICH TIME DEFENDANT HOPE DELIVERED A SMALL OFF WHITE ROCK TO

THE OCCUPANT OF SAID VEHICLE IN EXCHANGE FOR U S CURRENCY. DEFENDANT HOPE THEN

PROCEEDED BACK TO THE TREE AND REPLACED THE BLUE PLASTIC BAGGIE TO THE GROUND, COVERING

THE PLASTIC BAGGIE WITH STONES. DEFENDANT HOPE THEN RETURNED TO THE VICINITY OF THE

DICE GAME AND STOOD FOR SEVERAL MINUTES. SEVERAL MINUTES PASSED WHEN A SUBJECT ON A

BICYCLE APPROACHED AND ENGAGED IN A CONVERSATION WITH DEFENDANT HOPE. DEFENDANT HOPE

THEN INSTRUCTED THE SUBJECT ON THE BICYCLE TO RIDE BEHIND THE DUMPSTER WHICH WAS AT THE

SOUTH SIDE OF THE PARKING LOT. ONCE THE SUBJECT ON A BICYCLE DID SO, DEFENDANT HOPE

THEN APPROACHED THE TREE IN THE SAME MANNER, REMOVED STONES, RETRIEVING THE BLUE PLASTIC

BAGGIE. AS DEFENDANT HOPE RETURNED, ANOTHER TRANSACTION OCCURRED. THE B/M ON THE

BICYCLE LEFT NORTHBOUND ON N 23RD AVE AS DEFENDANT HOPE THEN RETURNED TO THE TREE AND

BEGAN TO BURY THE BLUE PLASTIC BAGGIE.

ONCE THE NARCOTICS DEAL WAS WITNESSED BY THE UNDERSIGNED, THE UNDERSIGNED GAVE WORD

VIA POLICE RADIO FOR OTHER MEMBERS OF THE HOLLYWOOD STREET CRIMES UNIT TO MOVE IN,

I swear the above statement is correct and true to the best of my knowledge and belief

___FERNANDEZ / 1902___    ___S.C.___
OFFICER/AFFIANT'S SIGNATURE    OFFICER'S NAME/CCN    OFFICER'S DIVISION

STATE OF Florida COUNTY OF Broward
The foregoing instrument was acknowledged before me this __17__ day of __Sept__, 19 _95_, who is personally
known to me or who has produced (type) ___ as identification and who ___ (DID OR DID NOT)    take an oath.
(SEAL OR STAMP)

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY    TITLE OR RANK/CCN

BROWARD COUNTY     HW954180      □ COMPLAINT AFFIDAVIT      PAGE 4 of    □ ARREST FORM

ARREST NO _____     PROBABLE CAUSE AFFIDAVIT CONTINUATION     OBTS NO _____

| DEFENDANT S LAST NAME | FIRST | MIDDLE | SUF | HGT | WGT | RC | SEX | DOB 12/27/66 | OFFENSE REPORT | ARRESTING OFFICER (S)/CCN |
|---|---|---|---|---|---|---|---|---|---|---|
| HOPE | MOSES | BRYANT | | 506 | 152 | B | M | | 95-119747 | 1902   2039 |

NAME OF VICTIM (IF CORPORATION EXACT LEGAL NAME AND STATE OF INCORP.)
FLORIDA STATE OF      ADDRESS      PHONE #

| COUNT NO | OFFENSES CHARGED | CITATION #, IF APPLICABLE | FS # OR CAPIAS/WARRANT # |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared    FERNANDEZ, ANTHONY          who being first duly sworn deposes and says that on _____17th_____ day _____September_____ 19 __95__ at _____2247 STHHS ST, HOLLYWOOD, FL_____ (crime location the above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows:

GIVING THE DESCRIPTION OF DEFENDANT HOPE AND THE SUBJECT ON THE BICYCLE, INSTRUCTING

THEM THAT A NARCOTICS DEAL WAS BEING DONE AND THAT THE DEFENDANT RETRIEVED NARCOTICS

FROM THE BASE OF A TREE IN THE COURTYARD. AT THIS TIME, OFFICERS STRAUSS, FERNANDER,

TRUNTZ, AND SGT MARANO, MOVED IN IN TWO SEPARATE VEHICLES. SGT MARANO DETAINED

DEFENDANT HOPE. THE UNDERSIGNED, WHILE STILL IN A SURVEILLANCE POSITION, GUIDED OFFICER

STRAUSS TO THE TREE WHERE DEFENDANT HOPE WAS BURYING THE NARCOTICS. OFFICER STRAUSS

REMOVED THE STONES AND RETRIEVED A BLUE ZIPLOCK BAGGIE CONTAINING ONE LARGE ROCK AND ONE

SMALL ROCK STILL LEFT IN THE PLASTIC BAG. DEFENDANT HOPE WAS THEN PLACED INTO CUSTODY

AND TRANSPORTED TO HOLLYWOOD DETENTION BY OFFICER STASIO. NOTE THAT DURING THE

SURVEILLANCE, AFTER EACH NARCOTICS TRANSACTIONS, DEFENDANT HOPE TOOK THE --

U S CURRENCY GIVEN TO HIM BY SAID BUYERS AND PLACED THE U S CURRENCY IN HIS RIGHT FRONT

POCKET. A SEARCH INCIDENT TO ARREST CONDUCTED BY SGT MARANO REVEALED $190 CASH CURRENCY

IN ARRESTEE'S RIGHT FRONT POCKET. THIS CASH IS SUBJECT TO CONFISCATION AND PLACED INTO

HOLLYWOOD PROPERTY.

I swear the above statement is correct and true to the best of my knowledge and belief.

OFFICER/AFFIANT'S SIGNATURE     FERNANDEZ / 1902     S.CU

OFFICER'S NAME/CCN       OFFICER'S DIVISION

STATE OF _Florida_ COUNTY OF _Broward_
The foregoing instrument was acknowledged before me this _17_ day of _Sept_, 19_95_, who is personally known to me or who has produced (ID type) _____ as identification and who _____ take an oath.

_____2283 CO___ (DID OR DID NOT)      (SEAL OR STAMP)

IR200
HOLLYWOOD POLICE DEPARTMENT                          Case# 95-119747
v-06069-WDF     Document 42 INCIDENTEREd on FLSD Docket 03/06/2001     Pa
          Informati    Available as of: 09/28/19     11:32        Page   1

```
==================================================================================
                                                              Operator: 1552
NCIDENT DATA:
Type>  NARCOTICS                              Reported Dt: 09/17/1995  18:11
      (    57    )                            Occurred>Fr: 09/17/1995  18:11
Dispo     : RPT                                       To:
Location  : 2247 SIMMS ST, HOLLYWOOD, FL
Zip       : 33020                            Geograph> X: 0038225
Reprt Area: HW038                                     Y: 0041379
Watch Area:                                  Rpt Distr : 018
Clear>Date: 09/17/1995                       DomViolence:
 Method   : ARREST ADULT                     Bias/HateCr:

LASSIFICATION:
Offense   : POSSESSION OF DRUG WITH INTENT TO SELL
Attempt?  : N                                Premise>Typ: HWY/ROADWY
Theft Type:                                  Occupancy :
OffenseCnt: 1                                # Entered : 0
InvolvWeap: N/A                              Force?    :
 Alcohol? : N  Drugs?: Y  Computer?:         Drug/Activ : POSSESS
UCR Codes>: DRUGS/NARCOTICS                  Type      : COCAINE
 Statute  : 89313                            Quantit.  :
 Seq. #   :                                  Unit      :
 UCR Only?:                                  Value     :

NVOLVED OFFICER(S):              BADGE# NAME
ASSISTING OFFICER    09/17/1995  2039   STRAUSS, DAVID
REPORTING OFFICER    09/17/1995  1902   FERNANDEZ, ANTHONY                SC1

NVOLVED PERSON:
Role      : VICTIM OTHER #1        NamTyp: G
Name      : FLORIDA STATE OF
DOB       :
Local ID  :
Caution   :                                       Hgt  :
Weapons>  :                                        Wgt  :
Relationsh: N/A                                    Hair :
AdvocCard?:     AfdvtSigned?:                       Eyes :
DomViol?  :                                        Build:
CrInfo>Nat:                                        Skin :
 Local    :                                        Ethnc:

NVOLVED PERSON:
Role      : ARRESTEE #1            NamTyp: P        Race : B
Name      : HOPE, MOSES BRYANT                      Sex  : M
DOB       : 12/27/1966                              Age  : 28
Local ID  : 8512
Address(s): RES   2210 DOUGLAS ST, HOLLYWOOD, FL
Phone #(s): RES   (305) 926-7922
Ident #(s): SOC   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
```

IR200                              HOLLYWOOD POLICE DEPARTMENT          Case# 95-119747
v-06069-WDF    Document 48cidentered on FLSD Docket 03/06/2001    Pa
                  Informati  Available as of: 09/28/19    11:32      Page   2

===============================================================================

| | |
|---|---|
| Caution   : | Hgt  : 506 |
| Weapons>  : N/A | Wgt  : 152 |
| Relationsh: | Hair : BLK |
| AdvocCard?:      AfdvtSigned?: | Eyes : BRO |
| DomViol?  : | Build : MED |
| CrInfo>Nat: | Skin : DRK |
| Local     : | Ethnc: |
| Citizenshp: USA | ResidStat> CITY (ARREST ONLY) |
| Birthplace: FLORIDA | BrowCounty: 28 |
| BloodAlcoh: | Occupation : CONSTR |
| Condition : | Length   : |
| Note: | |
| TATTOO    :          UPPER LEFT A | |

ALIAS/ASSOCIATE:
Relationsh: EMPLOYER of HOPE, MOSES BRYANT:
Role       : OTHER #1              NamTyp: B
Name       : WESTBROOK & BROTHERS CONSTRUCTION
DOB        :
Local ID   :

PROPERTY:
Status      : EVIDENCE/SEIZED          Item   : CURRNECY
Type        : CURRENCY/COINS           Color  :
Year        :                          #of Items: 1
Make        :                          Tot Value: $190.00
Model       :
Description: SEALED - $190.00
Serial #   :                           Own App #:
Serial Rnge:
Recovery>Dt: 09/17/1995                CrInf>Nat:
Value       :                          Local   :
Release>Dt :                           Photos? :
To          :

ARREST:
PrimaryName: HOPE, MOSES BRYANT
FrstOnCase#: 95-119747                  Booking #    : HW954180
Arrest Type: ARRESTED AT TIME OF INCIDENT   OBTS #       : HW95119747
Date        : 09/17/1995  18:11         Multi-Clear #: 1
Arrest Loc : 2247 SIMMS ST, HOLLYWOOD, FL
Release>Dt :
Reason     :
TransferTo: BSO

Officer (s): ARREST HWP  1902    FERNANDEZ, ANTHONY
             ASST   HWP  2039    STRAUSS, DAVID

Charge # 1 : POSSESS COCAINE WITH INTENT TO D   Warrant #  :
Date        : 09/17/1995                ORI #      :
Level       : FELONY                    Citation # :
DomViol?   :

HOLLYWOOD POLICE DEPARTMENT          Case# 95-119747

===============================================================================

```
Bail/Fine :                              Drug>Type    : COCAINE
Disposi n :                              Activity     : POSSESS
Dispo Date:                              Quantity     :
Amnded Chg:                              Unit         :
Attorney  :                              Value        :
Sentence  :
```

NARRATIVE(S) :
NARO1         09/25/95 1902 (09/25/95 @ 1807) DRUG POSS INTENT TO SELL
                        INCIDENT REPORT
              POLICE DEPARTMENT  -  HOLLYWOOD, FLORIDA

ncident Number:  95-119747          Date:  09/25/95
qd: 15B       Badge:  1902        * Entered by:  DDE33
--------------------------------------------------------------------

     THE UNDERSIGNED IS A MEMBER OF THE HOLLYWOOD STREET CRIMES UNIT, WHO
PERATE IN PLAIN CLOTHES AND DRIVE UNMARKED POLICE VEHICLES.
     ON 09/17/95 THE UNDERSIGNED'S UNIT WAS INSTRUCTED TO INVESTIGATE
OMPLAINTS OF NARCOTICS SALES, GAMBLING, AND LOITERING AT 2247 SIMMS ST.
THESE COMPLAINTS WERE RECEIVED BY NUMEROUS SOURCES INVOLVING THE COMMUNITY
RIENTED POLICE UNIT AND ALSO CRIME WATCH UNITS IN THE AREA.   THE
NDERSIGNED, ALONG WITH SGT MARANO, OFFICERS STRAUSS, FERNANDER, AND
RUNTZ, RESPONDED INTO THE IMMEDIATE AREA.  PRIOR TO DRIVING TO 2247 SIMMS
T, THE UNDERSIGNED WAS DROPPED OFF BY SGT MARANO JUST WEST OF THE
OCATION.  THE UNDERSIGNED PROCEEDED TO FIND A POSITION IN WHICH 2247 COULD
E SURVEILLED FOR THIS TYPE OF ACTIVITY.  THIS POSITION WAS LOCATED WEST OF
HE APARTMENT COMPLEX APPROXIMATELY 90-100 FEET FROM SAID APARTMENT COMPLEX
HERE THIS OFFICER COULD BE CONCEALED IN SHRUBBERY AND OBJECTS THAT WERE IN
HE AREA.  THE UNDERSIGNED OBSERVED SEVERAL SUBJECTS INVOLVED IN A DICE
AME ON THE SIDEWALK IN FRONT OF 2247 SIMMS ST FROM THIS LOCATION WITH A
LEAR AN UNOBSTRUCTED VIEW.  APPROXIMATELY 5-7 MINUTES INTO THE
URVEILLANCE, A SUBJECT, WHO IS KNOWN TO THE UNDERSIGNED AS ARRESTEE HOPE,
AS OBSERVED TO EXIT THE SOUTHERNMOST APARTMENT WEARING A MULTI COLORED
TRIPED SHIRT AND LONG JEAN SHORTS.  ARRESTEE HOPE STOOD IN AND AROUND THE
ICE GAME FOR SEVERAL MINUTES CONVERSING WITH THE SUBJECTS WHO WERE-
NVOLVED IN THE DICE GAME BEFORE A VEHICLE PROCEEDING FROM THE EAST ON
IMMS ST STOPPED AT THE CORNER OF N 23RD AVE AND SIMMS ST.  A LONE B/M, WHO
AS OPERATING THE VEHICLE, WHICH WAS A WHITE OLDER MODEL FORD PICKUP TRUCK,
AILED ARRESTEE HOPE.  THE DRIVER WAS OVERHEARD YELLING "YO YO YO, LET ME
ET ONE, LET ME GET ONE".  ARRESTEE HOPE APPROACHED THE PASSENGER SIDE OF
HE VEHICLE, WHICH THE WINDOW DOWN, AT WHICH TIME A CONVERSATION COULD BE
EARD FROM THE UNDERSIGNED'S SURVEILLANCE POSITION. THE ARRESTEE STATED TO
HE DRIVER OF THE VEHICLE, "HOLD ON MAN".  THE ARRESTEE HOPE THEN TURNED
ND PROCEEDED TO A TREE IN THE COURTYARD OF 2247 SIMMS ST.  ARRESTEE HOPE
NELT DOWN AT THE BASE OF THE TREE AND REMOVED STONES FROM THE BASE OF THE
REE, AND RETRIEVED A BLUE PLASTIC BAG FROM THE GROUND.  ARRESTEE HOPE
GAIN APPROACHED THE VEHICLE, AT WHICH TIME ARRESTEE HOPE DELIVERED A SMALL
F WHITE ROCK TO THE OCCUPANT OF SAID VEHICLE IN EXCHANGE FOR U. S.
URRENCY.  ARRESTEE HOPE WAS OBSERVED TO TAKE THE BAG, TILTING IT OVER,
MPTYING A PORTION OF IT'S CONTENTS INTO HIS LEFT HAND.  ARRESTEE HOPE THEN
ROCEEDED BACK TO THE TREE AND REPLACED THE BLUE PLASTIC BAGGIE TO THE
ROUND, COVERING THE PLASTIC BAGGIE WITH STONES.  ARRESTEE HOPE THEN
ETURNED TO THE VICINITY OF THE DICE GAME AND STOOD FOR SEVERAL MORE
INUTES.  SEVERAL MINUTES PASSED, A SUBJECT ON A BICYCLE APPROACHED AND

================================================================================

ENGAGED IN A CONVERSATION WITH ARRESTEE HOPE. ARRESTEE HOPE THEN
INSTRUCTED THE SUBJECT ON THE BICYCLE TO RIDE BEHIND THE DUMPSTER WHICH WAS
AT THE SOUTH SIDE OF THE PARKING LOT. THE SUBJECT ON THE BICYCLE DID SO,
RIDING TO THE NORTHERN MOST SIDE OF THE DUMPSTER WHICH WAS STILL IN THE
VIEW OF THE UNDERSIGNED, BUT WAS CONCEALED FROM ANY PERSONS SOUTH OF THAT
LOCATION. ONCE THE SUBJECT ON THE BICYCLE DID SO, ARRESTEE HOPE THEN
APPROACHED THE TREE IN THE SAME MANNER, REMOVED THE STONES, RETRIEVING THE
BLUE PLASTIC BAGGIE. AS ARRESTEE HOPE RETURNED, ANOTHER TRANSACTION
OCCURRED. IT SHOULD BE NOTED THAT THESE TRANSACTIONS THAT THE UNDERSIGNED
WITNESSED WERE MOST COMMONLY DONE IN THE SALES AND DISTRIBUTION OF STREET
LEVEL NARCOTICS MOST COMMONLY CRACK COCAINE. THE B/M ON THE BICYCLE LEFT
NORTHBOUND ON 23RD AVE AS ARRESTEE HOPE THEN RETURNED TO THE TREE AND BEGAN
TO BURY THE BLUE PLASTIC BAGGIE.
    ONCE THE NARCOTICS DEAL WAS WITNESSED BY THE UNDERSIGNED, THE
UNDERSIGNED GAVE WORD VIA POLICE RADIO FOR OTHER MEMBERS OF THE HOLLYWOOD
STREET CRIMES UNIT TO MOVE IN, GIVING THE DESCRIPTION OF ARRESTEE HOPE AND
THE SUBJECT ON THE BICYCLE, INSTRUCTING THEM THAT A NARCOTICS DEAL WAS
BEING DONE AND THAT THE ARRESTEE RETRIEVED NARCOTICS FROM THE BASE OF A
TREE IN THE COURTYARD. AT THIS TIME, OFFICERS STRAUSS, FERNANDER, AND SGT
MARANO, MOVED IN IN TWO SEPARATE VEHICLES. SGT MARANO DETAINED ARRESTEE
HOPE. THE UNDERSIGNED, WHILE STILL IN A SURVEILLANCE POSITION, GUIDED
OFFICER STRAUSS TO THE TREE VIA THE POLICE RADIO WHERE ARRESTEE HOPE WAS
BURYING THE NARCOTICS. OFFICER STRAUSS, ON THE UNDERSIGNED'S INSTRUCTIONS,
REMOVED THE STONES AND RETRIEVED A BLUE PLASTIC BAG CONTAINING ONE LARGE
ROCK AND ONE SMALL ROCK STILL LEFT IN THE PLASTIC BAG. ARRESTEE HOPE WAS
THEN PLACED INTO CUSTODY AND TRANSPORTED TO HOLLYWOOD DETENTION BY OFFICER
STASIO. NOTE THAT DURING THE SURVEILLANCE, AFTER EACH NARCOTICS
TRANSACTIONS, ARRESTEE HOPE TOOK THE U. S. CURRENCY GIVEN TO HIM BY SAID
BUYERS AND PLACED THE U. S. CURRENCY IN HIS RIGHT FRONT POCKET. A SEARCH
INCIDENT TO ARREST CONDUCTED BY SGT MARANO REVEALED $190 CASH CURRENCY IN
ARRESTEE'S RIGHT FRONT POCKET. THIS CASH WAS SUBJECT TO CONFISCATION AND
PLACED INTO HOLLYWOOD PROPERTY.

************************************************************************

THE FOREGOING POLICE REPORT, EACH PAGE HAVING BEEN INITIALED BY ME, IS
HEREBY SWORN TO AND THE FACTS CONTAINED THEREIN ARE TRUE AND CORRECT TO THE
BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____    _____

_____    _____

SWORN TO AND SUBSCRIBED BEFORE ME, THIS _____ DAY OF _____, 19_____.

SIGNATURE:_____BADGE#____TITLE:_____

NARRATIVE(S):
  SPO1      09/20/95 2039 (09/19/95) DRUG POSS
                      INCIDENT REPORT
                POLICE DEPARTMENT  -  HOLLYWOOD, FLORIDA

Incident Number:  95-119747        Date:  09/20/95
Sqd: 15B        Badge:  2039       Entered by:  DDE036

```
;=======================================================================================
-----------------------------------------------------------------------
```

ON 09/17/95, AT OR ABOUT 1811 HOURS, THIS OFFICER WAS IN THE IMMEDIATE
AREA OF 2247 SIMMS ST AWAITING OFFICER FERNANDEZ'S SIGNAL FOR THIS OFFICER
TO MOVE IN ON A NARCOTICS INVESTIGATION. OFFICER FERNANDEZ WAS IN A
SURVEILLANCE POSITION, VIA THE RADIO, ADVISED THIS OFFICER, TWO (2)
NARCOTICS TRANSACTIONS HAD OCCURRED. AT THIS TIME, THIS OFFICER MOVED IN
WITH SERGEANT MARANO AND A VEHICLE. AFTER THIS OFFICER EXITED THE VEHICLE,
OFFICER FERNANDEZ, VIA THE RADIO, GUIDED THIS OFFICER OVER TO THE AREA IN
FRONT OF A LARGE TREE. THIS OFFICER THEN LOOKED TOWARDS THE BASE OF THE
TREE, WHICH IS LOCATED IN THE COURTYARD, AT WHICH TIME, I STARTED TO REMOVE
THE STONES FROM IN FRONT OF THE TREE AND I LOCATED A BLUE ZIP-LOCK BAGGIE
CONTAINING ONE (1) LARGE SUSPECT CRACK COCAINE ROCK AND A SMALLER SUSPECT
CRACK COCAINE ROCK.

THIS OFFICER ALSO DID A FIELD VALTOX TEST ON THE NARCOTICS AND ALSO
VALTOXED THE COCAINE, WHICH TESTED POSITIVE AT HOLLYWOOD POLICE DEPARTMENT.
THE NARCOTICS WAS PLACED INTO EVIDENCE AND TRANSPORTED TO BSO LABORATORY
FOR FURTHER TESTING.

```
*********************************************************************
```

THE FOREGOING POLICE REPORT, EACH PAGE HAVING BEEN INITIALED BY ME, IS
HEREBY SWORN TO AND THE FACTS CONTAINED THEREIN ARE TRUE AND CORRECT TO THE
BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____     _____

_____     _____

SWORN TO AND SUBSCRIBED BEFORE ME, THIS _____ DAY OF _____, 19____.

SIGNATURE:_____BADGE#____TITLE:_____

| FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT | | | FORM USED TO REPORT FOLLOWUP INVESTIGATION OR SUPPLEMENTAL INFORMATION | | |
|---|---|---|---|---|---|
| 4 EXTRA COPIES | 5 PAGE NO | 8 TRAFFIC CITATION NO | 9 OFFENSE AND CLASSIFICATION | | CHANGED? |
| | | | | | YES |
| KIND OF REPORT CONTINUED | | | 10 STATUS UNFOUNDED | 11 MULTIPLE CLEAR UP? LIST OTHER COMPLAINT | |
| OFFENSE TRAFFIC ACCIDENT ARREST FOLLOWUP OR SUPPLEMENTAL | | | CLEARED NOT CLEARED | YES NOS IN NARRATIVE | NO |
| 5 OFFENSE OR CHARGE | | | 12 FURTHER POLICE ACTION & REPORT REQUIRED? | | 13 VALUE OF PROPERTY RECOVERED |
| | | | YES | NO | $ |
| INSTRUCTIONS FOR FOLLOW UP OR SUPPLEMENTAL USAGE | UNDER NARRATIVE RECORD ALL DEVELOPMENTS IN THE CASE SUBSEQUENT TO LAST REPORT DESCRIBE AND RECORD VALUE OF ANY PROPERTY RECOVERED NAMES AND ARREST NUMBERS OF ANY PERSONS ARRESTED EXPLAIN ANY OFFENSE CLASSIFICATION CHANGE CLEARLY SHOW DISPOSITION OF RECOVERED PROPERTY AND INVENTORY NUMBER | | | | |

THE FOREGOING POLICE REPORTS, CONSISTING

OF _____ PAGES, EACH PAGE HAVING

BEEN INITIALED BY ME, ARE HEREBY SWORN

TO AND THE FACTS CONTAINED THEREIN ARE

TRUE AND CORRECT TO THE BEST OF MY

KNOWLEDGE, INFORMATION AND BELIEF.

_____
AFFIANT

SWORN TO AND SUBSCRIBED BEFORE ME, THE

UNDERSIGNED AUTHORITY, THIS _28_

DAY OF _September_ 19 _95_.

_____
NOTARY PUBLIC

KATHLEEN SKINNER
MY COMMISSION # CC 276168
EXPIRES: May 2, 1997
Bonded Thru Notary Public Underwriters

( SEAL )

| 4 DATE TIME REPRODUCED SERIAL | 15 REPORTING OFFICER | SERIAL | DATE TIME | 16 SUPERV APPROVING SERIAL | 17 REVIEWER |
|---|---|---|---|---|---|

22-111

| AFFIDAVIT<br>HOLLYWOOD POLICE DEPARTMENT | | | 1. ARRESTEE, COMPLAINANT, DRIVER #1, VICTIM | 2. ARREST NO. | 3. COMPLAINT NO.<br>95-11974 |
|---|---|---|---|---|---|
| ☐ FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT | | | ☐ FORM USED TO REPORT FOLLOWUP INVESTIGATION OR SUPPLEMENTAL INFORMATION | | |
| 4. EXTRA COPIES | 5. PAGE NO. | 6. TRAFFIC CITATION NO. | 4. OFFENSE AND CLASSIFICATION | | CHANGED<br>☐ YES |
| 7. KIND OF REPORT CONTINUED<br>☐ OFFENSE  ☐ TRAFFIC ACCIDENT  ☐ ARREST  ☐ FOLLOWUP OR SUPPLEMENTAL | | | 10. STATUS   ☐ UNFOUNDED<br>☐ CLEARED  ☐ NOT CLEARED | 11. MULTIPLE CLEAR UP*<br>(LIST OTHER COMPLAINT<br>☐ YES  NOS  IN NARRATIVE)  ☐ NO | |
| 8. OFFENSE OR CHARGE | | | 12. FURTHER POLICE ACTION & REPORT REQUIRED*<br>☐ YES                    ☐ NO | | 13. VALUE OF PROPERTY<br>RECOVERED<br>$ |
| INSTRUCTIONS FOR FOLLOW-UP<br>OR SUPPLEMENTAL USAGE. | UNDER NARRATIVE, RECORD ALL DEVELOPMENTS IN THE CASE SUBSEQUENT TO LAST REPORT, DESCRIBE AND RECORD VALUE OF ANY PROPERTY RECOVERED. NAMES AND ARREST NUMBERS OF ANY PERSONS ARRESTED. EXPLAIN ANY OFFENSE CLASSIFICATION CHANGE CLEARLY SHOW DISPOSITION OF RECOVERED PROPERTY AND INVENTORY NUMBER | | | | |

THE FOREGOING POLICE REPORTS, CONSISTING

OF _____ PAGES, EACH PAGE HAVING

BEEN INITIALED BY ME, ARE HEREBY SWORN

TO AND THE FACTS CONTAINED THEREIN ARE

TRUE AND CORRECT TO THE BEST OF MY

KNOWLEDGE, INFORMATION AND BELIEF.

_David Strums_

AFFIANT

SWORN TO AND SUBSCRIBED BEFORE ME, THE

UNDERSIGNED AUTHORITY, THIS __28__

DAY OF __September__ 19 __95__.

_Kathleen Skinner_

NOTARY PUBLIC

KATHLEEN SKINNER
MY COMMISSION # CC 295163
EXPIRES: MAY 2, 1997
Bonded Thru Notary Public Underwriters

( SEAL )



# CITY of HOLLYWOOD, FLORIDA

**POLICE DEPARTMENT • 3250 HOLLYWOOD BOULEVARD • ZIP 33021-6967**
**Telephone: (954) 967-4300 • Fax: (954) 967-4313**

Rick Stone
Chief of Police

*"Serving with Honor and Committed to Community Needs"*

May 08, 1997

Mr. John Countryman, ASAIC
Public Corruption Unit
State Attorney's Office
Broward County Courthouse
201 S.E. 6th Street
Fort Lauderdale, Fl

Dear Mr. Countryman:

Attached hereto please find the computerized dispatch log for the calls relevant to the incident involving the arrest of Moses Hope. You will notice that there are (3 three particular calls that occurred on 9/17/95 at 2247 Simms Street.

1.  Incident # 9509170413
    Case # 95-119732
    Location:  2247 Simms St
    Incident Type:  61 Gambling
    Time:  18:11:53  (6:11 p.m.)

2.  Incident # 9509170414
    Case # 95-119733
    Location:  2247 Simms St
    Incident Type:  27 Prowler/Peeping Tom
    Time:  18:12:08  (6:12 p.m.)

3.  Incident # 9509170418
    Location:  2247 Simms St
    Incident Type:  1017 Conducting Investigation
    Time:  18:16:16  (6:16 p.m.)
            18:16:16 - Officer Andres Astacio #2223 for transport
                       Yankee Units (Street Crime Units)
            18:17:49 - 1019,15, 3 BM (Enroute to headquarters,
                       Prisoners in Custody, 3, black, males)

4.  Incident # 9509170429
    Location: 2247 Simms St
    Incident Type:  57 Narcotics
    Time:  18:39:19  (6:39 p.m.)

Mr. John Countryman
Page 2

Hoping this will be of some assistance. Do not hesitate to contact
us should you have a question.

Sincerely,

Sergeant Bill Wynn
Internal Affairs Unit

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT
BROWARD COUNTY, FLORIDA

CASE NO. $95 - 16311 C F10A$

JUDGE: Goldstein

INVESTIGATION
IN RE:

State v. Moses Hope

## POLYGRAPH AGREEMENT AND STIPULATION

I, __Moses Hope__ , do hereby request, voluntarily,
without duress, coercion, threats, promises of reward or immunity,
to be examined by the Polygraph (lie detector) detection of
deception technique. I have had the nature of this examination
explained to me, and do hereby consent to the use of any electronic
hearing or recording devices operated contemporaneously with this
examination. I hereby release and forever hold harmless the State
Attorney of The Seventeenth Judicial Circuit, his assistants,
investigators, and employees, and the Polygraph Examiner and all
his superiors, colleagues and subordinates, from any liability
flowing either from the operation of the devices or use of the
results obtained therefrom. I further agree that the results of
this examination may be made available to the proper authorities.

I HEREBY AGREE AND STIPULATE that __Frank Carbone__ is an
expert Polygraph Examiner. I also stipulate to his qualifications
to testify as an expert in this case. I also waive any right to
attack the reliability of the polygraph detection of deception
technique.

I ALSO STIPULATE that the questions propounded by said
Examiner and the answers given by me and the recordings of my
reactions thereto and everything appertaining to said and the
entire results of said test, including the opinions of said
Examiner shall be received in evidence either on behalf of the
State of Florida or on my behalf in the above-styled case or any
retrial of same, and I hereby waive my constitutional privilege
against self-incrimination to the extent that the same may be
involved in the presentation in evidence of the foregoing matters.

However, should the Examiner determine that I am not a testable subject or should the Examiner be unable to arrive at an opinion, then neither the fact that I was willing to take a polygraph examination nor the fact that I submitted to a test with inconclusive results shall be admissible in evidence.

I ALSO STIPULATE that the focus of the examination in this case is whether or not:

$$possess \; (constructively \; or \; actually) \; cocaine$$
$$on \; the \; date \; of \; his \; arrest.$$

I ALSO STIPULATE that the results of this examination shall be admitted into evidence in the above-styled case without any instruction to the jury that indicates that polygraph tests are unreliable. I stipulate that I hereby waive any right to adduce evidence of unreliability, or to comment about unreliability, or to request any such Jury Instruction on the unreliability of polygraphs other than the standard jury instruction on expert witnesses, Florida Standard Jury Instructions in Criminal Cases, Section 2.04(a), under the authority of Davis v. State, 520 So.2d 572 (Fla. 1988).

I ALSO STIPULATE that, at the discretion of the said Examiner, I shall provide blood and urine samples which may be analyzed for the presence of any substance that could affect the integrity of my performance on the polygraph test, and the results of any such chemical or toxicological analyses shall be admissible in evidence.

I ALSO STIPULATE that I have not previously been administered a polygraph test on the above-referenced focus of the examination or any facts in this case. I understand that the discovery of any prior tests will, at the option of the State Attorney, render any opinions of the above-referenced Polygraph Examiner to be NOT admissible in evidence.

I ALSO STIPULATE that I understand that this stipulation applies only to a polygraph examination to be conducted pursuant to this agreement by the above-referenced Polygraph Examiner. I also stipulate and understand that the results of any other future examinations conducted by anyone other than the above-referenced Polygraph Examiner will NOT be admissible in evidence, unless another Polygraph Agreement and Stipulation form is entered into by all the undersigned parties. I also stipulate and understand that the opinions of any other Polygraph Experts, other than the above-referenced Polygraph Examiner, will not be admissible in evidence, unless another Polygraph Agreement and Stipulation form is entered

into by all the undersigned parties.

DATED at _____Ft Lauderdale_____, Florida, this _3/_ day of
_____March_____, 19 47.

I have advised my client in connection
with this Agreement and Stipulation.

ATTORNEY FOR DEFENDANT

I have conferred with my attorney in connection
with the Agreement and Stipulation, and he has advised
me accordingly.

*Moses B. Hope*

DEFENDANT


                              MICHAEL J. SATZ
                              State Attorney

                              *John E. Countryman*

                              ASSISTANT STATE ATTORNEY
                              Florida Bar # 288161

PUBLIC CORRUPTION/SPECIAL PROSECUTIONS CLOSEOUT

**TO:**       File

**FROM:**    John E. Countryman

**SUBJ:**    Ofc. Anthony Fernandez
            SP97-03-049

**DATE:**    June 16, 1997

---

## REASON FOR CLOSEOUT :

This matter concerns the allegation by Moses Hope, a Hollywood resident, that he was falsely arrested by the Hollywood Street Crimes Unit for Possession of Cocaine with Intent to Deliver in Case No: 95-16831CF10A. The arrest occurred on September 17, 1995. Although Mr. Hope initially was released on bail, that bail was revoked when Mr. Hope was arrested on a warrant for violation of probation in Case No: 92-18583CF10A on December 31, 1995. Mr. Hope remained in custody until April 7, 1997, when the charges in Case No: 95-16381CF10A were dismissed and his probation was reinstated because Mr. Hope passed a stipulated polygraph examination. The issue for the stipulated polygraph was whether Mr. Hope possessed cocaine on September 17,1995, the date of his arrest, at or near the time of his arrest at 6:00 p.m.. According to Frank Carbone, the polygrapher, Mr. Hope answered truthfully when he denied that possession.

Mr. Hope's test result and his pre-polygraph sworn statement as well as the sworn statement of witness James Christopher Borgmann prompted this inquiry. The gist of those statements is as follows: Mr. Hope was watching the Dolphins football game (which began at 4:00 p.m.) with Mr. Borgmann inside Mr. Borgmann's apartment at 2247 Douglas Street in Hollywood. At half time, both men went outside. Mr. Hope joined an illegal dice game in progress on the apartment sidewalk and Mr. Borgmann went to sit under a tree in the apartment building's front yard. A few minutes later, three unmarked police cars drove up quickly to the apartment building,

including Officer Fernandez. The police officers jumped out and immediately broke up the dice game. After searching the participants, the police searched the apartment building's front yard. According to Mr. Hope and Mr. Borgmann, the police did not find cocaine or any other controlled substance either on the people or on the ground.

According to Mr. Borgmann, the police then said to him and his companion who was sitting with him under the tree that if they cleaned up the yard, no one would go to jail. Mr. Borgmann said that they proceeded to clean up the front yard. However, after a few minutes a police squad car arrived. Five men were placed under arrest, including Mr. Hope. According to Mr. Hope, the police told them that the charges were misdemeanors, although one of the men was arrested on an outstanding warrant. Since the squad car's back seat space was limited, only three of the men (not including Mr. Hope) could be placed into the car at one time. According to both Mr. Hope and Mr. Borgmann, the police removed the three men from the back seat, substituted Mr. Hope for one of the other arrestees, and placed Mr. Hope and the other two men in the back seat for transport. He said that Transporting Officer Astacio told him and the other two men at the station that cocaine rocks were found in the squad car's back seat where Mr. Hope was seated. Only after the Street Crimes Unit arrived at the station, according to Mr. Hope, was the decision made to charge him with Possession with Intent. It should be noted that none of the police reports mentions finding alleged cocaine in the squad car. In addition, Officer Astacio has no recollection of transporting Mr. Hope, according to Sgt. Wynn of Internal Affairs.

The police version is as follows: Officer Anthony Fernandez of the Street Crimes Unit secreted himself in a secluded area on the opposite side of Douglas Street in the late afternoon of September 17, 1995. From that vantage point, he watched as two persons drove up to the apartment yard and engaged in apparent drug transactions with Moses Hope. Each time, Mr. Hope would go to a pile of rocks located in the yard near the tree and remove what appeared to be cocaine from a small blue plastic bag. He would then exchange this substance for currency with the persons who came to the

yard. These apparent drug purchasers would then leave the area. Because of manpower shortages, these two persons were not apprehended by the police.

According to the police reports, Officer Fernandez then radioed his fellow Street Crimes officers who converged on the apartment building, broke up the dice game, and located the blue plastic bag containing the cocaine. According to Officer David Strauss, Officer Fernandez directed him from his hiding spot to the pile of rocks near the tree where the bag was hidden. There Officer Strauss found cocaine rocks in a plastic bag. This bag and its contents were placed into evidence and formed the basis for the cocaine charge (Possession with Intent to Deliver) against Moses Hope. There is no mention of the police recruiting Mr. Borgmann to pick up the yard or any conditional promise not to arrest the men on the gambling charges. The police reports are relatively straightforward and all six Street Crimes officers including Sgt. Marano, the supervisor of that squad, provided sworn depositions detailing their knowledge of and involvement with this incident. On the surface, this case appeared to be a routine drug arrest.

Shortly after his incarceration on the VOP warrant in January, 1996, Mr. Hope told his Public Defender that he wished to take a stipulated polygraph exam on this case, alleging that the police reports were false. In October, 1996, in the midst of the Street Crimes Unit inquiry, this writer was contacted regarding a polygraph exam for Mr. Hope. There was then no known corroborative witness to Mr. Hope's allegation, so a polygraph exam was deemed inappropriate. Shortly before the scheduled trial in late March, 1997, a corroborative witness (Mr. Borgmann) came forward. Based on Mr. Borgmann's statement, it was decided that Mr. Hope would be asked to give a sworn statement and to submit to a polygraph exam. As stated above, the results indicated that Mr. Hope was truthful when he denied possessing or selling cocaine on September 17, 1995. Accordingly, the charges in Case No: 95-16310CF10A were dismissed pursuant to that stipulation.

As part of this office's inquiry, a sworn statement was taken from Edward Norris, a neighborhood resident who was also arrested on September 17, 1995 with

4
SP97-03-049
Officer Anthony Fernandez

Mr. Hope. He said that he had been in Mr. Borgmann's apartment with Mr. Hope
watching the football game. At half-time, they all went out of the apartment. Mr.
Borgmann went to sit under the tree; Mr. Hope joined the dice game; and Mr. Norris,
after watching the dice game for a while, went to talk to a girlfriend down the street.
Mr. Norris said that at no time did Mr. Hope leave the apartment during the first half
of the game and at no time did Mr. Hope meet with strangers in the yard, exchange
objects, and collect money. Mr. Norris stated that he was arrested for loitering but in
fact was one-half block away when the police unmarked cars came to the apartment. He
described how the police searched the yard and found nothing. He also stated that first
three men were placed in the squad car then taken out, and Mr. Hope substituted for
one of the men; then, the transporting officer drove them to jail. Mr. Norris was
transported when the officer returned to the scene.

In addition to Mr. Norris, another area resident, Mrs. Claudia Hubbard, was
contacted. Mrs. Hubbard who has lived in the apartment building since 1962, knows
Mr. Hope, Mr. Borgmann, and Mr. Norris. She is ill with cancer and could not keep
her sworn statement appointment. However, she told the undersigned telephonically
that she recalled the day of Mr. Hope's arrest. She said she heard the police say that if
the grounds were picked up, no one would be arrested. She corroborated Mr. Norris'
allegation that he was not in front of the apartment when the police came, but was
down the street. She said that Mr. Borgmann was seated under a tree in the front yard
when the police came. She also said that Mr. Hope had not been selling drugs that
afternoon in the front yard.

The police dispatch logs regarding this incident also raise questions. The initial
call mentioned only misdemeanor gambling and loitering violations. The next entry was
"investigation". The third referred to Officer Astacio arrival. Some twenty minutes
later, and nearly thirty minutes after the initial contact at 2247 Douglas, the dispatch
log classified the matter as a "narcotics incident." Mr. Hope and Mr. Norris both
stated that they first learned that the police were making a narcotics arrest at the police
station. At the scene, they said they were told that the arrests were for misdemeanors,

5
SP97-03-049
Officer Anthony Fernandez

that is gambling and loitering. None of the police reports reflects the apparent change
of purpose as indicated on the dispatch logs; they indicate or suggest that a narcotics
violation was the reason they went to 2247 Douglas Street where they came upon a dice
game in progress.

However, there are problems with these civilians' accounts of the events on
September 17, 1995. First, Mr. Borgmann and Mr. Hope appear to have collaborated
at least in part on their version of events. Both said they had been watching the
Dolphins game. However, the Dolphins played a Monday night game on September 18,
1995, and did not play on September 17, 1995, the date of arrest. While this
inaccuracy might seem trivial at first glance, Mr. Hope has denied under oath that he
had discussed his testimony with Mr. Borgmann prior to their sworn statements, yet
both inaccurately describe the same specific game.

Second, Mr. Hope has a lengthy prior felony record. In his sworn statement, he
said that he had in the past sold cocaine across the street from the 2247 Douglas Street
apartments. Although he said he had not done so since his 1992 arrest, his drug dealing
and criminal record might well impeach his testimony at trial.

Third, Mr. Hope and Mr. Borgmann insist that Officer Fernandez could not
have hidden himself from their view and still have been able to watch the apartment
front yard. That assertion is dubious inasmuch as there are cars, trees, fences, houses,
sheds, etc. in the area where Officer Fernandez said he was hiding, that is, across the
street from the apartment building. These objects could allow a person to watch the
apartment building's front yard undetected. Moreover, Officer Fernandez is renowned
among his fellow officers for his willingness to go to any length to reach a surveillance
point. Officer Wilbur Fernander has stated that Officer Fernandez thinks nothing of
crawling through bushes, trash, and fences to get to his hiding spot. According to the
police reports, Officer Fernandez did not accompany the other officers to the apartment
at the time of arrest. That would be consistent with his being in a secluded, undisclosed
location which he did not then wish to reveal.

6
SP97-03-049
Officer Anthony Fernandez

Fourth, there are dramatically opposing accounts of who was present. The police officers have stated that James Borgmann was not even present at the time of arrest. Officer Fernander, an African-American, is adamant that no Caucasian was present in the apartment front yard when the arrests at 2247 Douglas occurred. Officer Fernander also denied that the bystanders were asked to pick up the front yard or that any promises were made to the arrestees. On the other hand, Mr. Hope stated to the undersigned that Officer Fernandez drove up to help break up the dice game. This assertion is contradicted by all of the police reports.

Prosecution for false arrest and falsified police reports would require the disproof of all six sworn statements by these police officers and the unqualified acceptance of the civilians' testimony. There are no disinterested witnesses to this incident. The police accounts tend to intersect with and corroborate each other. There is also no apparent motive for the police to have "framed" Mr. Hope; he was at most a street level narcotics dealer. Although Mr. Hope and others have surmised that the police have an active dislike for him and his family and knew he was then on probation, that is conjecture. It does not begin to prove that the police would single him out, given that there is no known personal animus between Officer Fernandez and Mr. Hope. It is unlikely that a criminal jury would accept the allegations of Mr. Hope and the other civilian witnesses beyond a reasonable doubt in these circumstances.

Nevertheless, this case presents troubling factual issues. Moses Hope alone took and passed a polygraph. The police dispatch logs suggest at least that the police originally went to the Douglas Street apartments because of a gambling, not a narcotics, violation. Three witnesses corroborate Mr. Hope's allegations that he was falsely arrested. However, the police reports and statements contradict these witnesses.. There are also no disinterested, objective witnesses to these events. Because there is insufficient evidence to establish that Mr. Hope was falsely arrested, this inquiry will be closed.

cc: Inv. Andrew Grieco

7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 97-6825
CIV FERGUSON

DWIGHT EDMAN,                    )
                                 )
            Plaintiff,           )
                                 )
vs.                              )            UNIVERSAL
                                 )
JEFFREY A. MARANO,               )
individually, ANTHONY            )
FERNANDEZ, individually,         )
and the CITY OF HOLLYWOOD,       )
a Florida municipal              )
corporation.                     )
                                 )
            Defendants.          )
_____)

                                 Fort Lauderdale, Florida
                                 June 30th, 1998
                                 2:30 o'clock P.M.

APPEARANCES:

        HUGH KOERNER, ESQUIRE,
        Appearing on behalf of the Plaintiff.

        PURDY, JOLLY & GIUFFREDA, P.A.
        BY:  BRUCE JOLLY, ESQUIRE,
        Appearing on behalf of the Defendants,
        Anthony Fernandez and Jeffrey Marano.

        RICHARD T. KILGORE, ESQUIRE
        Appearing on behalf of the Defendant, City of
        Hollywood.

                    _____

                         DEPOSITION
                             OF
                     KATHLEEN SKINNER

                    _____

7

## I N D E X

|  | PAGE |
|---|---|
| Direct Examination by Mr. Koerner | 3 |
| Plaintiff's 1 for ID | 5 |

7

          1          Deposition of KATHLEEN SKINNER, a witness of

          2     lawful age, taken by the Plaintiff for the purpose of

          3     discovery and for use as evidence in the above-entitled

          4     cause, pursuant to notice heretofore filed, before

          5     PATRICE BRUENS, a Shorthand Reporter and Notary Public

          6     in and for the State of Florida at Large, on the 30th

          7     day of June, 1998, at 524 South Andrews Avenue, Suite

          8     102 N, Fort Lauderdale, Florida, commencing at 2:30

          9     o'clock P.M.

         10                        _____

         11     THEREUPON:

         12                        KATHLEEN SKINNER

         13     a witness named in the notice heretofore filed, being

         14     of lawful age, and being first duly sworn in the above

         15     cause, testified on her oath as follows:

         16                        DIRECT EXAMINATION

         17     BY MR. KOERNER:

         18          Q    Could you state your name, please?

         19          A    Kathleen Skinner.

         20          Q    Miss Skinner, my name is Hugh Koerner.  I

         21     think you have met Mr. Jolly and Mr. Kilgore.  Correct?

         22          A    Yes.

         23          Q    Have they introduced themselves to you?

         24          A    Yes.

         25          Q    We are here today in a civil action.  I

1    represent the plaintiff, Dwight Edman styled Dwight

2    Edman versus Jeffrey Marano, Anthony Fernandez and the

3    City of Hollywood.

4            My understanding is that you have some

5    familiarity with this case based upon having been

6    involved in an investigation that John Countryman at

7    the State Attorney's Office.  Is that correct?

8        A    Correct.

9        Q    Have you had an opportunity to review the

10   paperwork that was marked as Exhibit Number 1 to the

11   deposition of Miss Byfield?

12       A    Her paperwork, no.

13       Q    Miss Skinner, have you had an opportunity

14   to review what's been marked as Exhibit Number 1 to the

15   deposition of Miss Byfield?

16       A    Yes, I have seen them.

17       Q    Do you in fact recognize that package of

18   documents?

19       A    Uh-huh.

20       Q    Couple of simple basic rules for your

21   deposition.

22            The first rule is that if I ask you a

23   question that you -- and you don't understand it, ask

24   me to rephrase it and I will do that for you.  Okay?

25       A    Okay.

7

1    Q    The simple rule is that the court reporter

2    isn't really looking at you.  Sometimes can't see

3    shakes of the head or nods.

4          Additionally, your answers need to be

5    verbal, using words like yes or no because sounds like

6    uh-huh, huh-uh and hmm-hmm all really are typed out the

7    same, believe it or not.

8          Can you answer with words that we

9    recognize?

10    A    Yes.

11    Q    Thank-you.  Where in fact have you seen

12    Exhibit Number 1, previously?

13    A    This is a standard package that we send to

14    the State Attorney.

15    Q    Okay.  Are you still employed by the City

16    of Hollywood?

17    A    Yes.

18    Q    And in what capacity?

19    A    I'm a crime prevention specialist.

20    Q    What do crime prevention specialists do?

21    A    Well, we work out of the Community Affairs

8

22    unit.  We talk to the children about Crime Prevention.

23    We do personal safety talks.  We're involved in Crime

24    Watch, things like that, business home securities.

25    Q    What is your education and training as it

8

1   relates to law enforcement?

2       A    I have -- I have had 120 hours of Crime

3   Prevention. I'm certified with the state for Crime

4   Prevention.

5       Q    Has all of your training and experience

6   with regard to the Crime Prevention been since you

7   began your employment with the City of Hollywood?

8       A    No.

9       Q    Did you work for another city prior to the

10  time that you worked for Hollywood?

11      A    No.

12      Q    How many years in Hollywood?

13      A    I have been there approximately 14 years.

14      Q    And did you work in Crime Prevention prior

15  to the time that you came to the City of Hollywood?

16      A    No.

17      Q    Did you work on Crime Prevention on your

18  own aside from training that was supplied to you from

19  the City of Hollywood?

20      A    No.

21      Q    Has all of your training in Crime

22  Prevention been by or through the City of Hollywood?

23      A    Yes.

24      Q    Okay. Did you in fact work in the Case

25  Filing unit at the City of Hollywood Police Department

8    1    at the time that these particular documents marked as

     2    Exhibit 1 were generated?

     3         A    No.

     4         Q    My understanding is that you would have

     5    left the Case Filing unit sometime prior to February

     6    12th, 1996.  Correct?

     7         A    Right.

     8         Q    When in fact did you leave the Case Filing

     9    unit?

    10         A    I left November of '95.

    11         Q    And how many years did you work in the

    12    Case Filing unit?

    13         A    Approximately seven and a half years.

    14         Q    And during the seven and a half years that

    15    you worked in the Case Filing unit, was it the practice

    16    of that unit to use presigned affidavit pages for all

    17    of the members of the Department for purposes of

    18    attaching those reports to narrative and supplemental

    19    reports presented or procured by you for purposes of

    20    Case Filing?

    21              MR. KILGORE:  Object to form.

    22              THE WITNESS:  Not at all times, no.

    23    BY MR. KOERNER:

    24         Q    Okay.  When did the practice of using

    25    presigned affidavits begin?

8

1          A     Well, when I came to the unit in '88, it

2     was a practice.  We had them then.

3          Q     When you came to the unit, who was your

4     supervisor?

5          A     Sergeant John Thomas.

6          Q     And was Sergeant Thomas aware of the

7     practice of using the presigned affidavits?

8          A     Well, we only used them in emergencies.

9     Many years ago the reports were generated in

10    three-fold.

11         Q     Triplicate?

12         A     Right.

13         Q     Cash bonds?

14         A     Uh-huh.  Cash bonds.

15         Q     You need to say yes or no.

16         A     Okay.  Cash bonds.

17         Q     Okay.

18         A     And what would happen, Data won't send off

19    the reports.

20              And the officer, if it pertained to an

21    arrest, would send it back to us signed.  If we had

22    that with an arrest, we would send that signed copy on.

23    If in fact he failed to send us back the signed copy,

24    then we would have to go to the affidavit file and send

25    it.

8

1          Q      Would you have a file that had the

2     affidavits of all of the police officers in the

3     Department?

4          A      Yes.  We had originals.  And off the

5     original, we would make a copy or five copies to keep

6     them on file.  We would never use the original.  We

7     would always work off a copy of the original.

8          Q      And when you say emergency, would that be

9     in instances where the police officer had failed or

10     forgotten to sign the original of the triplicate cash

11     bond?

12          A      Right.  And send it back to us.

13          Q      Okay.  Would you first try to call the

14     officers in Case Filing to get them to sign the report

15     or would you just go ahead and use the back-up system?

16          A      Well, they had it.  They -- I forget the

17     colors.  We had color schemes.  And they knew that they

18     would have to send the green back to us.

19               If they didn't, then we had to generate it

20     out of the computer.

21               And that's when the affidavit would get

22     attached.

23          Q      Would there be any efforts to get the

24     officer to come to Case Filing and actually sign the

25     report?

OFFICIAL REPORTING SERVICE, INC.  (954) 467-8204

8

9

```
 1              A      Oh, yeah.  We -- we have what we call

 2     Nastygrams that we would send the officer.  You need to

 3     call in your report, you need to do this, you need to

 4     come sign an affidavit.

 5                     And, you know, sometimes they came.

 6     Sometimes they didn't.

 7              Q      So if an officer failed or refused to come

 8     to your unit in response to a Nastygram, is that when

 9     you would use the backup system?

10              A      Correct.

11              Q      Was Sergeant John Thomas aware of the

12     backup system and how it was used?

13              A      Yes, he was.  And at one time, he had us

14     throw them all away.  And we would generate from an

15     original at all times.

16              Q      An original what?

17              A      An original signed affidavit.  He would

18     have to come up and sign it.

19              Q      In the presence of the notary?

20              A      Of us, yes.

21              Q      So Sergeant Thomas did not approve of the

22     practice?

23              A      No.

24              Q      And do you know if anybody was disciplined

25     as a result of that practice in Sergeant Thomas' era?
```

OFFICIAL REPORTING SERVICE, INC.   (954) 467-8204

| | |
|---|---|
| 1 | A     No. |
| 2 | Q     Who assumes Sergeant Thomas' position |
| 3 | after his tenure in the unit? |
| 4 | A     I believe it was Sergeant Chriziak |
| 5 | (phonetic).   I'm not sure. |
| 6 | Q     Were -- was the practice of using the |
| 7 | presigned affidavits reinvigorated during Sergeant |
| 8 | Thomas' tenure in the unit? |
| 9 | A     Right.   We changed computer systems.   So |
| 10 | we no longer had that triplicate report being |
| 11 | generated. |
| 12 | Q     Were all of the supplemental narrative |
| 13 | reports handled by way of having a separate affidavit, |
| 14 | like the one that's attached to Exhibit 1 of Miss |
| 15 | Byfield's deposition? |
| 16 | A     Yes.   Right. |
| 17 | Q     And at that time, would police officers |
| 18 | actually come into the unit and swear to the |
| 19 | truthfulness of their report? |
| 20 | A     No. We relied on the affidavit. |
| 21 | Q     The presigned affidavits? |
| 22 | A     Correct. |
| 23 | Q     So as soon as Sergeant Thomas left, the |
| 24 | practice of using the presigned affidavits was |
| 25 | basically made the uniform practice of the Case Filing |

9    1    unit?

2    A    Correct.  We had to do it for necessity,

3    convenience.  You know, the officers work shift work.

4    We couldn't get them in to sign a report

5    if they worked a midnight shift or afternoon shift.

6    And we, the State Attorney's office,

7    wouldn't file it unless we attached this affidavit to

8    the report.

9    So we did it, you know, out of

10    convenience, necessity, so to speak.

11    Q    And as you alluded to, you were aware that

12    the State Attorney's Office refused to file the City's

13    cases without the affidavit page attached to the

14    narrative and supplemental report.  Correct?

15    A    Right.  They would get declined.

16    Q    And the notes that would come back would

17    say no affidavit page?

18    A    No sworn affidavit.

19    Q    Was that practice of the State Attorney's

20    Office widely known within your Case Filing unit in the

21    City of Hollywood?

22    A    I think so.

23    Q    Was it known by you?

24    A    Yeah.

25    Q    And did you share that information with

9

1     anybody else in your unit?

2          A      Probably.  I don't remember.

3          Q      Would you see the cases come back that

4     would say declined, no affidavit?

5          A      Right.

6          Q      So that's how you learned about the

7     practice of the State Attorney's Office not accepting

8     cases?

9          A      No. No. We always would have to attach an

10    affidavit.  Whether or not the officers signed it or we

11    used a precopy, it was just how I was trained.

12         Q      Right.  But you became aware of the State

13    Attorney's Office refusing to file cases unless there

14    was a sworn affidavit attached by virtue of getting

15    back the declines?

16         A      Right.  Right.

17         Q      And did you actually get back the decline

18    or would you get back a note from a police officer

19    saying hey, the State won't file my case without an

20    affidavit, please get me one?

21              MR. KILGORE:  Object to form.

22              THE WITNESS:  No. They are -- our

23         liaison brought back the actual initiation slips

24         that came back from the State Attorney.

25              And we would log them in, stamping them.

9

1        And then we would keep one for the file and

2        the arresting officer would get a copy of it.

3             We would keep the original in the

4        file, and it would say right on

5        there why the case was initiated or why it was

6        declined, and somewhere declined because

7        of no affidavit.  I remember seeing that.

8   BY MR. KOERNER:

9        Q    Which computer system would you log in

10  this information to regarding whether a case was

11  accepted or declined?

12       A    Oh, we didn't have that ability to do it.

13  It was just the slip came to us and we taped it on an

14  eight and a half by eleven.

15            And it just went into a file like this by

16  case number.

17       Q    Would that file be the file from the

18  Records department or some other file?

19       A    Right.  No. Records kept all of it, the

20  copy of the PC, any labs that came in, any property

21  sheets, things like that.  And it would just go in the

22  case file under a particular case number.

23       Q    To the best of your knowledge, once the

24  practice of using a presigned affidavit began after

25  Thomas left the Case Filing unit, did it continue from

0   1    that period of time until sometime after 1996 when this

    2    Dwight Edman's case caused some changes?

    3         A    Well, we also tried another procedure that

    4    when the officer came to detention, he would attach a

    5    signed affidavit to his PC and send it up through the,

    6    you know, paperwork.

    7              And then we would have this -- his signed

    8    affidavit attached to the PC.  We worked with that.

    9         Q    Would you take the affidavit and remove it

    10   from the PC sheet and then attach the affidavit to the

    11   supplemental narrative report?

    12        A    Correct.  After notarizing it.

    13        Q    But you understood that the affidavit that

    14   the police officer was sending up with his Probable

    15   Cause Affidavit was notarizing a document that the

    16   officer could not have been swearing to.  Correct?

    17        A    I was under the impression we were

    18   notarizing his signature.

    19        Q    That he signs it and then we notarize it.

    20        Q    Did you ever learn that it was improper

    21   for a notary public to notarize a signature when the

    22   person whose signature would be notarized was not in

    23   the presence of the notary at the time the signature

    24   would be notarized?

    25        A    Say that again.

OFFICIAL REPORTING SERVICE, INC.  (954) 467-8204

.0

1          Q      Did you ever become aware that it was

2      inappropriate for you to notarize the signature of an

3      individual who was not in the presence of yourself at

4      the time that the signature was being notarized?

5          A      No.

6          Q      Did you ever understand what Sergeant

7      Thomas' objections were to the practice using the

8      presigned affidavits?

9          A      No. He just had us throw them out.  We

10     never questioned why or whatever. He just says throw

11     them all out, so we did.

12         Q      And after the practice -- I should say how

13     did the practice of using the affidavit that came up

14     through Detention attached to the Probable Cause

15     Affidavit come to an end?

16         A      We started not receiving them through

17     Detention.  They just stopped coming.

18         Q      Would you send them Nastygrams?

19         A      Well, we would inquire, and oh, it's so

20     busy, we are so busy.

21                And we lost track.  So then we have had to

22     revert back to pulling one that we had.

23         Q      Did they look real, real busy like they

24     couldn't come by your unit?

25                MR. JOLLY:  Let me object to form.

OFFICIAL REPORTING SERVICE, INC.  (954) 467-8204

.0

1             MR. KILGORE:  Form.

2             THE WITNESS:  I don't know.

3    BY MR. KOERNER:

4         Q    How long does it take to get from the

5    Detention Center to your unit?

6         A    Well, we are there Monday through Friday

7    8:00 to 4:00.  If the arrest happened Friday at 11:00

8    o'clock at night, we didn't get the paperwork until

9    like Monday morning.

10        Q    I see.  After the practice of some officer

11   sending the affidavit through by attaching it to the

12   Probable Cause Affidavit when they were in Detention,

13   did the present practice or the practice that existed

14   up until January of '96 then come into place?

15        A    Well, we always -- we had that there, too.

16   But if we had the actual signed affidavit, we of course

17   would use that.

18        Q    I guess what I'm saying is what I call the

19   backup system, which is the system of using all the

20   presigned affidavits, that would have been used

21   virtually exclusively after the people stopped sending

22   the affidavit up with their PC up from Detention.

23   Correct?

24        A    Correct.

25        Q    Do you have any idea a time frame as to

10

1    when the practice of using the presigned PC sheets

2    exclusively would have begun?

3         A    You mean them coming from Detention?

4         Q    No. Of that practice stopping.

5         A    Oh, stopping.  I think -- well, I had left

6    the unit in November, '95.  And I heard after that,

7    they are having the officer come up now and sign it.

8         Q    But before -- I should say, you know,

9    after people stopped attaching there PC sheet or their

10   affidavit to their PC sheet, you started using a

11   xeroxed affidavit page exclusively.  Correct?

12        A    Right.

13        Q    Can you give me an idea as to when that

14   occurred, timewise?

15        A    No, I really can't.

16        Q    Would it have been at least a couple of

17   years before your seven and a half year tenure in the

18   Case Filing unit ended?

19        A    Well, we tried it while I was actually

11

20   there, but I don't know how long it lasted.  I just

21   can't remember.

22        Q    Okay.  Who was the supervisor when you

23   left the Case Filing unit?

24        A    I think it was a gentleman by the name of

25   Perritti.  Richard Perritti.

.1      1           Q    Do you know whether Mr. Perritti was aware

        2      of the practice of using presigned affidavits?

        3           A    I don't think he was aware of it.  I don't

        4      know how long he was there.  I don't think he was with

        5      us a year and a half.  I think this case brought

        6      everything to maybe his attention.  I don't think he

        7      was in charge of Data Entry, which types the reports

        8      that the officers call in, records and tells us.  And I

        9      don't know if anyone would have gone through procedures

       10      with him.

       11           Q    Well, did Mr. Perritti know that affidavit

       12      pages were being attached to these supplemental

       13      narrative reports?

       14           A    He may have.  I don't know.

       15           Q    Was Mr. Perritti ever physically in the

       16      Case Filing unit?

       17           A    Yeah.

       18           Q    Did Mr. Perritti ever make inquiry as to

       19      whether there was a lack of people, uniformed officers

       20      coming in and out of the unit to notarize their

       21      signatures?

       22           A    No.

       23           Q    Did you ever have any meetings with any

       24      non-civilian employees that were -- that oversaw your

       25      unit?

```
 1          A    With Mr. Perritti.

 2          Q    Mr. Perritti was not a law enforcement

 3   officer.  Correct?

 4          A    No.

 5          Q    Were there any sworn law enforcement

 6   officers that were high level administrators that

 7   oversaw your unit?

 8          A    That we would meet with?

 9          Q    Yes.

10          A    About --

11          Q    The unit, its functioning problems,

12   suggestions.

13          A    We might complain to a supervisor

14   somewhere along the road that, oh, these officers

15   aren't calling the report in, something like that.  But

16   we didn't have meetings with high ranking officials.

17          Q    Who would you complain to if a police

18   officers wasn't cooperating?

19          A    We would go to the officer's sergeant.

20   And then if we didn't get any results we would go to

21   his lieutenant if, say, he didn't call a report in.

22   You know, we have 21 days -- 21 days to file the case.

23          Q    What would you do if you ran out of copies

24   of a person's presigned affidavit?

25          A    We would have him come up and sign an
```

1   original.

2        Q    And who would explain to the police

3   officer what the purpose was of having him come up and

4   sign the original?

5        A    Whoever called him up to tell him to have

6   him sign it.

7        Q    Did any officers object to providing you

8   with a blank affidavit for purposes of copying it and

9   using it over and over again?

10       A    Not that I recall.

11       Q    Do you ever recall any police officers

12  even questioning the practice?

13       A    Question is what am I signing?  And we

14  would say well, this is for whenever you do a call-in,

15  police reports, and we have to attach your signature to

16  the back of the report.

17       Q    Would a copy of the notarized presigned

18  affidavit be placed in the case file for each

19  particular offense report?

20       A    Yes.

21       Q    So it's fair to say that if any police

22  officers ever pulled the records from a report, they

23  would see that there was a notarized signature page

24  appended to the narrative or supplemental report.

25  Correct?

```
 1              MR. JOLLY:  Object to form.

 2              MR. KILGORE:  Object to form.

 3    BY MR. KOERNER:

 4         Q    You can answer.

 5         A    In the case -- you mean that Records

 6    keeps?

 7         Q    Right.

 8         A    They would get the -- this would not be in

 9    the Records file because this can be generated out of

10    the computer.

11         Q    This is the narrative and supplemental

12    portion of the report?

13              MR. JOLLY:  Plaintiff's 1.

14              THE WITNESS:  Yes.

15    BY MR. KOERNER:

16         Q    And would the presigned affidavit with the

17    offense report number go into the hard copy records?

18         A    Yes.

19         Q    Why did you leave the unit?

20         A    I -- there was an opening in the Community

21    Relations unit, and I wanted to transfer.

22         Q    Do you know if have any member of the City

23    of Hollywood Police Department, civilian or uniformed

24    officer, whoever, has been disciplined regarding any of

25    the notary practices that existed during your 14 years
```

.1    1   in the Department?

      2          A     No.

      3                MR. KOERNER:  I have nothing further.

      4          It's possible that these lawyers have some

      5          questions for you.

      6                MR. KILGORE:  No questions?

      7                MR. JOLLY:  No questions.

      8                MR. KOERNER:  We're going to have your

      9          deposition typed up.  I guess we should probably

     10          just for prosperity sake put an exhibit sticker

     11          on this.  Also make it Exhibit 1 to your

     12          deposition, also, because you looked at it.

     13                And when it's typed up, you can

     14          -- Is she going to read, Richard?

     15                MR. KILGORE:  Do you want to either

     16          read or waive if it's typed up?  Probably better

     17          to let her read.

     18                MR. KOERNER:  I went through my

     19          spiel.  You turned to the witness, said she will

     20          read.

     21                MR. KILGORE:  Let her read.

     22                MR. KOERNER:  You'll need to give a

     23          telephone number.

     24                MR. JOLLY:  She will send it to me.

     25                (Thereupon, the deposition was concluded.)

1

2

_____

        SWORN TO AND SUBSCRIBED BEFORE ME THIS _____

3    DAY OF,_____, 1998 by _____ who
    produced _____ as Identification.

4

5

_____

                  Notary Public-State of Florida

6                      My Commission No.
                  Expires:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        CERTIFICATE OF OATH
         STATE OF FLORIDA
2        COUNTY OF BROWARD:

3            I, the undersigned authority, certify that
         KATHLEEN SKINNER personally appeared before me and was
4        duly sworn.

5            WITNESS my hand and official seal this 30 day
         of June, 1998.
6
7                              _____
                               Patrice Bruens
                               Notary Public-State of Florida
8

9

10

11

12             REPORTER'S DEPOSITION CERTIFICATE

13       STATE OF FLORIDA
         COUNTY OF BROWARD
14
             I, PATRICE BRUENS, a Shorthand Reporter, certify
15       that I was authorized to and did stenographically
         report the foregoing deposition; and that the
16       transcript is a true record of the testimony given by
         the witness.
17
             I further certify that I am not a relative,
18       employee, attorney or counsel of any of the parties,
         nor am I a relative or employee of any of the parties'
19       attorney or counsel connected with the action, nor am I
         financially interested in the action.
20
             Dated this ___30___ day of June, 1998.
21
22                             _____
                               Patrice Bruens
23                             Shorthand Reporter

24

25
```

```
:=========================================================================
```
Operator: 1671

:IDENT DATA:
/pe> NARCOTICS                                    Reported Dt: 01/31/1996  22:39
    (    57    )                                  Occurred>Fr:
.spo    : RPT                                                To:
)cation : 720 N FEDERAL HW, HOLLYWOOD, FL 33020
:p      : 33020                                   Geograph> X: 0000000
:prt Area: HW090                                            Y: 0000000
atch Area:                                        Rpt Distr : 015
lear>Date: 01/31/1996                             DomViolence:
1ethod  : ARREST ADULT                            Bias/HateCr:

ASSIFICATION:
ffense  : POSS/SELL/DELIVER/MANUFACTURE CNTRFT DRUG
ttempt? : N                                       Premise>Typ: HWY/ROADWY
heft Type:                                        Occupancy :
ffenseCnt: O                                      # Entered : O
nvolvWeap: N/A                                    Force?    :
Alcohol? : N  Drugs?: N  Computer?:               Drug/Activ : NONE
CR Codes>: MISCELLANEOUS (ARREST ONLY)            Type       : NONE
Statute  : 83131                                  Quantity  :
Seq. #   :                                        Unit      :
UCR Only?:                                         Value     :

VOLVED OFFICER(S):                 BADGE# NAME
:EPORTING OFFICER    01/31/1996  1902  FERNANDEZ, ANTHONY              SC1
:SSISTING OFFICER    01/31/1996  1088  MARANO, JEFFREY ANTHONY

IVOLVED PERSON:
:ole     : ARRESTEE #1            NamTyp: P          Race : B
lame     : WATSON, JEROME                           Sex  : M
)OB      : 07/30/1976                                Age  : 19
.ocal ID : 19260
Address(s): RES  33 SW 6TH AV, DANIA, FL
Phone #(s): RES  (305) 926-0193
Ident #(s): SOC    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
:aution  :                                          Hgt  : 511
Jeapons> : N/A                                       Wgt  : 185
Relationsh:                                          Hair : BLK
AdvocCard?:    AfdvtSigned?:       EXHIBIT PB        Eyes : BRO
DomViol? :                        Strauss           Build: MED
CrInfo>Nat:                       for ID            Skin : MED
Local    :                        PB 6-30-98        Ethnc:
Citizenshp: USA                                     ResidStat> COUNTY (ACCIDENT O
Birthplace: FLORIDA                                 BrowCounty:
BloodAlcoh:                                          Occupation : UNEMPLOYED
Condition : NO ALCOHOL/NO DRUGS                     Length   :
Note:
SCARS    :              RIGHT HAND

NVOLVED PERSON:
Role     : ARRESTEE #2            NamTyp: P          Race : B
Name     : EDMAN, DWIGHT ALSTON                      Sex  : M
DOB      : 02/02/1977             EXHIBIT            Age  : 18
Local ID : 21283                  Skinner
                                  for ID

:=====================================================================

ldress(s): RES   5223 JEFFERSON ST, HOLLYWOOD, FL
lent #(s): SOC     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
ιution    :                                          Hgt  : 510
:apons>   : N/A                                      Wgt  : 190
:lationsh:                                            Hair : BLK
ivocCard?:         AfdvtSigned?:                      Eyes : BRO
ɔmViol?   :                                           Build: MED
·Info>Nat:                                            Skin : DRK
_ocal     :                                           Ethnc:
itizenshp: USA                             ResidStat> CITY (ARREST ONLY)
irthplace: NEW YORK                          BrowCounty: 11
loodAlcoh:              ι,                  Occupation : OTHER
ɔndition :                                   Length    :
ɔte: OCCUPATION-BAG BOY
ATTOO     :               RIGHT SHOULD

IAS/ASSOCIATE:
elationsh: EMPLOYER of EDMAN, DWIGHT ALSTON:
ole       : OTHER #2                NamTyp: B
ame       : PUBLIX
OB        :
ocal ID   :

VOLVED PERSON:
ole       : VICTIM OTHER #1          NamTyp: G
ame       : FLORIDA STATE OF
OB        :
ocal ID   :
aution    :                                          Hgt  :
eapons>   :                                          Wgt  :
·elationsh: N/A                                      Hair :
ιdvocCard?:        AfdvtSigned?:                      Eyes :
ιomViol?  :                                          Build:
:rInfo>Nat:                                           Skin :
Local     :                                          Ethnc:

ːOPERTY:
ːtatus    : EVIDENCE/SEIZED             Item    : CURRENCY
·ype      : CURRENCY/COINS             Color   :
·ear      :                            #of Items: 1
1ake      :                            Tot Value:
1odel     :
)escription: SEALED- AMERICAN CURRENCY - $25
ːerial #  :                            Own App #:
ːerial Rnge:
Recovery>Dt: 01/31/1996                CrInf>Nat:
 Value    :                             Local   :
Release>Dt :                           Photos? :
 To       :

:==============================================================================

**)PERTY:**

```
;atus       : EVIDENCE/SEIZED               Item      : COPY $
/pe         : MISCELLANEOUS PROPERTY        Color     :
?ar         :                               #of Items: 1
ıke         :                               Tot Value:
ıdel        :
?scription: SEALED- PHOTOCOPY - $20 BILL - F43795934C
?rial #     :                               Own App #:
?rial Rnge:
?covery>Dt: 01/31/1996                      CrInf>Nat:
/alue       :                                 Local   :
?lease>Dt :                                 Photos?   :
Го          :
```

**REST:**

```
rimaryName: WATSON, JEROME
rstOnCase#: 96-15708                        Booking #   : HW960447
rrest Type: ARRESTED AT TIME OF INCIDENT    OBTS #      : HW96015708
ate       : 01/31/1996  22:39               Multi-Clear #: 1
rrest Loc : 720 N FEDERAL HW, HOLLYWOOD, FL 33020
elease>Dt :
Reason    :
TransferTo: BSO
```

```
fficer (s): ARREST HWP  1902   FERNANDEZ, ANTHONY
            ASST   HWP  1088   MARANO, JEFFREY ANTHONY
```

```
harge # 1 : DISTRIBUTE IMITATION CONTROLLED    Warrant #  :
Date      : 01/31/1996                         ORI #      :
Level     : FELONY                             Citation # :
DomViol?  :
Bail/Fine :                                    Drug>Type  : NONE
Dispositn :                                    Activity   : NONE
Dispo Date:                                    Quantity   :
Amnded Chg:                                    Unit       :
Attorney  :                                    Value      :
Sentence  :
```

**REST:**

```
rimaryName: EDMAN, DWIGHT ALSTON
rstOnCase#: 96-15708                        Booking #   : HW96046
rrest Type: ARRESTED AT TIME OF INCIDENT    OBTS #      : HW96015708
)ate      : 01/31/1996  22:39               Multi-Clear #:
rrest Loc : 720 N FEDERAL HW, HOLLYWOOD, FL 33020
telease>Dt :
Reason    :
TransferTo:
```

```
)fficer (s): ARREST HWP  1902   FERNANDEZ, ANTHONY
             ASST   HWP  1088   MARANO, JEFFREY ANTHONY
```

======================================================================

harge # 1 : POSSESS IMITATION CONTROLLED SUB      Warrant #  :
Date      : 01/31/1996                            ORI #      :
Level     : FELONY                                Citation # :
DomViol?  :
Bail/Fine :                                       Drug>Type  : NONE
Dispositn :                                        Activity  : NONE
Dispo Date:                                        Quantity  :
Amnded Chg:                                        Unit      :
Attorney  :                                        Value     :
Sentence  :

RRATIVE(S):
AR01        02/08/96 1902 (02/07/96 @ 0026) CNRTF CONTRL SUB
                         INCIDENT REPORT
            POLICE DEPARTMENT  -  HOLLYWOOD, FLORIDA

cident Number:  96-015708        Date:  02/08/96
d: 15B       Badge:  1902        Entered by:  DDE036
----------------------------------------------------------------
   ON 01/30/96 AT 2239 HOURS, AT THE LOCATION OF 720 N 18TH AVE, WHICH IS
CATED WITHIN THE JURISDICTIONAL LIMITS OF THE CITY OF HOLLYWOOD, IN THE
UNTY OF BROWARD AND THE STATE OF FLORIDA, THE ABOVE NAMED DEFENDANTS DID
MMIT THE VIOLATION OF DELIVERY OF COUNTERFEIT CONTROLLED SUBSTANCE.   THE
OVE DEFENDANT DID THEN AND THERE UNLAWFULLY DELIVER AN OFF WHITE CREAM
LORED ROCK TO UNDERCOVER POLICE OFFICER SGT. MARANO #1088 AND PRESENTED
IS ITEM AS BEING A CONTROLLED SUBSTANCE, TO WIT:  CRACK COCAINE FOR THE
M OF TWENTY DOLLARS.  THE PURCHASE WAS DONE WITH A PREMARKED AND PRE-
OTOGRAPHED $20 BILL BY SGT. MARANO.
   THE UNDERSIGNED IS A MEMBER OF THE HOLLYWOOD STREET CRIMES UNIT, WHO
ERATE IN PLAIN CLOTHES AND DRIVE UNMARKED POLICE VEHICLES.  ON 01/30/96,
E UNDERSIGNED, ALONG WITH OFFICERS STRAUSS, BIEN, BRADFORD, HAYES, AND
RANO WERE IN THE AREA OF 700 N 18TH AVE CONDUCTING A BUY/BUST OPERATION.
T. MARANO WAS SENT IN TO THE LOCATION OF 720 N 18TH AVE IN AN ATTEMPT TO
RCHASE NARCOTICS.  THE UNDERSIGNED, ALONG WITH OFFICERS STRAUSS, WINN,
ADFORD, AND HAYES WERE IN A TAKE DOWN POSITION INSIDE APARTMENT #21 OF
E VENTURA INN LOCATED AT 720 N 18TH AVE.  A SURVEILLANCE WAS BEING
NDUCTED ON SGT. MARANO ATTEMPTING TO PURCHASE NARCOTICS BY OFFICER BIEN
OM AN UNDISCLOSED LOCATION, AT WHICH POINT, OFFICER BIEN HAD A CLEAR AND
OBSTRUCTED VIEW OF THE FRONT OF THE VENTURA INN.  APPROXIMATELY TEN
NUTES INTO THE SURVEILLANCE, SGT. MARANO WAS OBSERVED TO MAKE CONTACT
TH TWO B/M'S, LATER IDENTIFIED AS DEFENDANTS WATSON AND EDMOND.  SGT.
RANO MADE CONTACT WITH THE DEFENDANTS BY STATING, "I NEED A TEN, I NEED A
N," AT WHICH TIME DEFENDANT WATSON, WHO WAS CLAD IN A WHITE T-SHIRT AND
ACK PANTS, STATED TO SGT. MARANO TO WAIT IN FRONT OF HIS APARTMENT WHICH
S #21 AND HE WOULD RETURN WITH NARCOTICS. BOTH DEFENDANTS EDMOND AND
TSON LEFT THE AREA AND TRAVELLED TO AN UNKNOWN LOCATION. MINUTES LATER,
TH SUBJECTS RETURNED AND REAPPROACHED SGT. MARANO, AT WHICH TIME SGT.
RANO HANDED DEFENDANT WATSON A PREMARKED AND PRE-PHOTOGRAPHED TWENTY
LLAR BILL, SERIAL #F43795934C.  UPON RECEIVING THE TWENTY DOLLAR BILL,
FENDANT WATSON, HANDED THE DEFENDANT EDMOND, WHO WAS STANDING IN THE
COVE NEAR APARTMENT #21.  DEFENDANT EDMOND WAS OBSERVED TO TAKE THE
ENTY DOLLAR BILL AND PLACE IT IN HIS RIGHT FRONT POCKET AND STEPPED BACK
T OF THE ALCOVE ONTO THE SIDEWALK AND TURNED HIS HEAD FROM LEFT TO RIGHT,
OKING NORTH AND SOUTH ON FEDERAL HWY, THEN STATING TO DEFENDANT WATSON TO

==========================================================================

IRRY, HURRY, IT'S GETTING HOT OUT HERE MAN." AT THIS TIME, DEFENDANT
SON REMOVED A CREAM COLORED ROCK FROM INSIDE HIS MOUTH, EXPELLING IT
'O HIS HAND AND THEN HANDING IT TO SGT. MARANO. SGT. MARANO THEN GAVE A
DETERMINED SIGNAL THAT A NARCOTICS DEAL HAD BEEN COMPLETED, AT WHICH
IE THE UNDERSIGNED AND THE ABOVE LISTED OFFICERS EXITED APARTMENT #21 AND
'REHENDED BOTH DEFENDANTS. THE UNDERSIGNED PLACED DEFENDANT WATSON INTO
STODY AS OFFICER STRAUSS TOOK INTO CUSTODY DEFENDANT EDMOND.
   A SEARCH INCIDENTAL TO ARREST REVEALED THAT DEFENDANT EDMOND HAD $25
CASH IN HIS RIGHT FRONT POCKET, ALONG WITH THE PREMARKED AND
-PHOTOGRAPHED TWENTY DOLLAR BILL.
   BOTH SUBJECTS WERE PLACED INTO CUSTODY AS OFFICER HAYES TOOK CUSTODY
THE NARCOTICS. A FIELD VALTOX TEST WAS CONDUCTED ON THE CREAM COLORED
CK, AT WHICH TIME THE TEST WAS INCONCLUSIVE.


****************************************************************

E FOREGOING POLICE REPORT, EACH PAGE HAVING BEEN INITIALED BY ME, IS
REBY SWORN TO AND THE FACTS CONTAINED THEREIN ARE TRUE AND CORRECT TO THE
BT OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____     _____

_____     _____

ORN TO AND SUBSCRIBED BEFORE ME, THIS _____ DAY OF _____, 19____.

GNATURE:_____BADGE#____TITLE:_____

RRATIVE (S) :
PO1        02/11/96 1088 (02/08/96 @ 0029) CNRTF CONTROL SUB
                     INCIDENT REPORT
           POLICE DEPARTMENT  -  HOLLYWOOD, FLORIDA

icident Number: 96-015708          Date:  02/11/96
id: 15B       Badge:  1088         Entered by:  DDE031
-------------------------------------------------------------------

   THE UNDERSIGNED IS A SGT ASSIGNED TO THE HOLLYWOOD STREET CRIMES UNIT
HO OPERATE IN PLAIN CLOTHES AND DRIVE UNMARKED POLICE VEHICLES. ON
1/30/96, THE UNDERSIGNED, ALONG WITH THE OTHER OFFICERS ASSIGNED TO THE
DLLYWOOD STREET CRIMES UNIT, SECURED AN APT AT THE VENTURA INN LOCATED AT
20 N 18TH AVE. THE APT WAS #21. ON THIS DATE AND TIME, THE UNDERSIGNED
AS ACTING AS A DECOY IN A BUY BUST OPERATION IN AN ATTEMPT TO PURCHASE
ARCOTICS IN FRONT OF THE APT COMPLEX. A SURVEILLANCE WAS BEING CONDUCTED
N THE UNDERSIGNED BY OFFICER BIEN FROM AN UNDISCLOSED LOCATION. OFFICERS
TRAUSS, WINN, BRADFORD, HAYES, AND FERNANDEZ WERE INSIDE APT #21 BEING
TILIZED AS TAKE DOWN OFFICERS. IN A BRIEFING PRIOR TO THE OPERATION, THE
NDERSIGNED ADVISED ALL MEMBERS OF THE UNIT THAT THE OPERATION WOULD TAKE
LACE IN FRONT OF THE VENTURA, AND THAT THE UNDERSIGNED WOULD ATTEMPT TO
URCHASE NARCOTICS AND BRING THE NARCOTIC DEALERS BACK TO ROOM #21 OR IN A
LOSE PROXIMITY WHILE GIVING THE TAKE DOWN SIGNAL. A SHORT TIME INTO THE
PERATION, THE UNDERSIGNED WAS CONTACTED BY TWO B/M'S, ONE WAS CLAD IN A

=============================================================================

E T-SHIRT AND BLACK PANTS, AND WAS LATER IDENTIFIED AS ARRESTEE WATSON.
 B/M'S APPROACHED FROM THE NORTH ON THE SIDEWALK.  THE UNDERSIGNED
.MPTED TO GAIN THEIR ATTENTION BY MAKING EYE CONTACT AND STATING HOW'S
iOING, AT WHICH TIME DEFENDANT WATSON STATED, "WHAT YOU NEED."  THE
.RSIGNED THEN STATED, "I NEED A TEN.  I NEED A TEN."  THIS WAS COMMON
iINOLOGY FOR $10.00 WORTH OF STREET LEVEL CRACK COCAINE.  BOTH
:STEES, WATSON AND EDMAN, STOPPED, LOOKED AROUND THE AREA, AND THEN
:OACHED.  ARRESTEE EDMAN STATED TO THE UNDERSIGNED, "LET'S SEE THE
:Y."  AT THIS TIME THE UNDERSIGNED WAS UNSURE WHAT THE ARRESTEE'S
:NTIONS WERE, SO THE UNDERSIGNED BACKED INTO THE ALCOVE NEAR APT #21 AND
>LAYED A $10.00 BILL WHICH WAS PRODUCED FROM THE RIGHT FRONT POCKET.
:NDANT WATSON THEN STATED TO THE UNDERSIGNED, "WAIT RIGHT HERE, WE'LL BE
<," AS BOTH ARRESTEES TURNED AND WALKED IN THE DIRECTION THAT THEY HAD
:.  SEVERAL MINUTES LATER BOTH ARRESTEES RE-APPROACHED FROM THE NORTH
APPROACHED THE UNDERSIGNED WHILE STANDING IN THE ALCOVE OF APT #21.  AT
5 TIME ARRESTEE WATSON STATED, "ALRIGHT GIVE ME THE MONEY."  AT THIS
E THE UNDERSIGNED HANDED THE $10.00 PRE-MARK, PRE-PHOTOGRAPHED BILL TO
:STEE WATSON, WHO THEN HANDED IT TO ARRESTEE EDMAN, WHO WAS STANDING IN
ALCOVE NEAR APT #21.  ARRESTEE EDMAN WAS OBSERVED TO TAKE THE BILL AND
CE IT IN HIS RIGHT FRONT POCKET.  HE THEN STEPPED BACK UNDER THE ALCOVE
O THE SIDEWALK AND TURNED HIS HEAD FROM LEFT TO RIGHT AS IF HE WAS
KING FOR SOMETHING.  HE LOOKED NORTH AND SOUTH UP AND DOWN FEDERAL HW,
N HE STATED TO ARRESTEE WATSON, "HURRY UP HURRY UP, IT'S GETTING HOT OUT
MAN."  AT THIS TIME ARRESTEE WATSON REMOVED A CREAM COLORED ROCK FROM
:DE HIS MOUTH.  ARRESTEE WATSON SPIT IT INTO THE PALM OF HIS HAND AND
PLAYED IT TO THE UNDERSIGNED THEN HANDED IT TO THE UNDERSIGNED.  THE
ERSIGNED RECEIVED DELIVERY OF THE CREAM COLORED ROCK AND THEN GAVE THE
DETERMINED SIGNAL TO THE TAKE DOWN UNITS INSIDE APT #21.  AT THIS TIME
. OFFICERS EXITED THE APT AND TOOK DOWN BOTH ARRESTEE.  THE UNDERSIGNED
THIS TIME POSITIVELY IDENTIFIED BOTH SUBJECTS AS BEING INVOLVED IN THE
.IVERY.  THE UNDERSIGNED THEN DELIVERED THE OFF-WHITE ROCK TO OFFICER
'ES, AT WHICH TIME SHE TOOK CUSTODY OF IT AND CONDUCTED A FIELD VALTOX
iT ON IT WHICH CONCLUDED TO BE POSITIVE FOR COCAINE.

:*****************************************************************

: FOREGOING POLICE REPORT, EACH PAGE HAVING BEEN INITIALED BY ME, IS
:EBY SWORN TO AND THE FACTS CONTAINED THEREIN ARE TRUE AND CORRECT TO THE
5T OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____      _____

_____      _____

ORN TO AND SUBSCRIBED BEFORE ME, THIS _____ DAY OF _____, 19____.

GNATURE:_____BADGE#____TITLE:_____

**AFFIDAVIT**
**HOLLYWOOD POLICE DEPARTMENT**

| 1. ARRESTEE, COMPLAINANT, DRIVER #1, VICTIM | 2. ARREST NO | COMPLAINT NO. |
|---|---|---|
| | | 96-15708 |

ORM USED AS CONTINUATION SHEET FOR CURRENT REPORT

☐ FORM USED TO REPORT FOLLOWUP INVESTIGATION OR SUPPLEMENTAL INFORMATION

| 1A COPIES | 5. PAGE NO. | 6. TRAFFIC CITATION NO. | 9. OFFENSE AND CLASSIFICATION | CHANGED* |
|---|---|---|---|---|
| | | | | ☐ YES |

OF REPORT CONTINUED

| | | | | 10. STATUS   ☐ UNFOUNDED | 11 MULTIPLE CLEAR-UP* |
|---|---|---|---|---|---|

ENSE   ☐ TRAFFIC ACCIDENT   ☐ ARREST   ☐ FOLLOWUP OR SUPPLEMENTAL

☐ CLEARED  ☐ NOT CLEARED

(LIST OTHER COMPLAINT
☐ YES  NOS. IN NARRATIVE)   ☐ NO

ENSE OR CHARGE

12. FURTHER POLICE ACTION & REPORT REQUIRED*    13. VALUE OF PROPERTY RECOVERED

☐ YES          ☐ NO           $

TRUCTIONS FOR FOLLOW-UP
SUPPLEMENTAL USAGE.

UNDER NARRATIVE, RECORD ALL DEVELOPMENTS IN THE CASE SUBSEQUENT TO LAST REPORT. DESCRIBE AND RECORD VALUE OF ANY PROPERTY RECOVERED. NAMES AND ARREST NUMBERS OF ANY PERSONS ARRESTED. EXPLAIN ANY OFFENSE CLASSIFICATION CHANGE. CLEARLY SHOW DISPOSITION OF RECOVERED PROPERTY AND INVENTORY NUMBER

THE FOREGOING POLICE REPORTS, CONSISTING

OF _____ PAGES, EACH PAGE HAVING

BEEN INITIALED BY ME, ARE HEREBY SWORN

TO AND THE FACTS CONTAINED THEREIN ARE

TRUE AND CORRECT TO THE BEST OF MY

KNOWLEDGE, INFORMATION AND BELIEF.

_____
AFFIANT

SWORN TO AND SUBSCRIBED BEFORE ME, THE

UNDERSIGNED AUTHORITY, THIS __12th__

DAY OF __February__ 19 __96__ .

_____
NOTARY PUBLIC



OFFICIAL NOTARY SEAL
KAREN BYFIELD
COMMISSION NUMBER
CC478719
MY COMMISSION EXPIRES

( SEAL )

| REPORTING OFFICIAL | 15. REPORTING OFFICER | SERIAL | DATE-TIME | 16 SUPERV. APPROVING SERIAL | 17. REVIEWER |
|---|---|---|---|---|---|

| 1. ARRESTEE, COMPLAINANT, DRIVER #1, ¿TIM | 2. ARREST NO. | 3. COMPLAINT NO. |
|---|---|---|
| | | 96-15708 |

☐ FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT

☐ FORM USED TO REPORT FOLLOWUP INVESTIGATION OR SUPPLEMENTAL INFORMATION

| TRA COPIES | 5. PAGE NO | 6. TRAFFIC CITATION NO. | 8 OFFENSE AND CLASSIFICATION | CHANGED? |
|---|---|---|---|---|
| | | | | ☐ YES |

| NO OF REPORT CONTINUED | | | | 10. STATUS   ☐ UNFOUNDED | 11. MULTIPLE CLEAR UP? (LIST OTHER COMPLAINT | |
|---|---|---|---|---|---|---|
| OFFENSE  ☐ TRAFFIC ACCIDENT  ☐ ARREST  ☐ FOLLOWUP OR SUPPLEMENTAL | | | | ☐ CLEARED  ☐ NOT CLEARED | ☐ YES  NOS IN NARRATIVE  ☐ NO | |
| OFFENSE OR CHARGE | | | | 12. FURTHER POLICE ACTION & REPORT REQUIRED? | | 13. VALUE OF PROPERTY RECOVERED |
| | | | | ☐ YES | ☐ NO | |

INSTRUCTIONS FOR FOLLOW-UP & SUPPLEMENTAL USAGE.

UNDER NARRATIVE, RECORD ALL DEVELOPMENTS IN THE CASE SUBSEQUENT TO LAST REPORT. DESCRIBE AND RECORD VALUE OF ANY PROPERTY RECOVERED. NAMES AND ARREST NUMBERS OF ANY PERSONS ARRESTED. EXPLAIN ANY OFFENSE CLASSIFICATION CHANGE. CLEARLY SHOW DISPOSITION OF RECOVERED PROPERTY AND INVENTORY NUMBER

THE FOREGOING POLICE REPORTS, CONSISTING

OF _____ PAGES, EACH PAGE HAVING

BEEN INITIALED BY ME, ARE HEREBY SWORN

TO AND THE FACTS CONTAINED THEREIN ARE

TRUE AND CORRECT TO THE BEST OF MY

KNOWLEDGE, INFORMATION AND BELIEF.

_Tomas Hernandez_ #2114

AFFIANT

SWORN TO AND SUBSCRIBED BEFORE ME, THE

UNDERSIGNED AUTHORITY, THIS _12th_

DAY OF _February_ 19 _96_.

_Kare Byfield_

NOTARY PUBLIC

OFFICIAL NOTARY SEAL
KAREN BYFIELD
COMMISSION NUMBER
CC476719
MY COMMISSION EXPIRES
OCT. 1 1996

( SEAL )

| DATE.TIME REPRODUCED SERIAL | 15 REPORTING OFFICER | SERIAL | DATE TIME | 16 SUPERV APPROVING SERIAL | 17 REVIEWER |
|---|---|---|---|---|---|

| 78. | ☐ PROPERTY OF DECEASED | ☐ TRIAL | ☐ FOUND PROPERTY | ☒ LABORATORY (ATTACH MEMO) | ☐ STOLEN-RECOVERED |
|---|---|---|---|---|---|

| 2. CASE NO. 96-15708 | 79. DATE - TIME RECEIVED 1-30-96@2239 | INVESTIGATING DIVISION HOLLYWOOD PD | 76 TYPE OF CASE DELIVERY |
|---|---|---|---|

77. ADDRESS WHERE PROPERTY IMPOUNDED (GIVE EXACT LOCATION WHERE FOUND)
720 N. 18 AVE

| 16. FOUND BY SGT. MARANO #1088 | ADDRESS HOLLYWOOD PD | PHONE NO. |
|---|---|---|

| 31. SUSPECT TURNER ELMAN E/M 2-2-77 WATSON JEROME B/M 7-30-76 | ADDRESS 5223 JEFFERSON ST 33 SW 6 AVE DANIA | PHONE NO. |
|---|---|---|

| 14. VICTIM STATE OF FLORIDA | ADDRESS | PHONE NO. |
|---|---|---|

| 49. OWNERS NAME SAME AS SUSPECTS | ADDRESS | ZIP CODE | PHONE NO. |
|---|---|---|---|

| 80. ITEM NO. | 81. QUANTITY | 82. DESCRIPTION | |
|---|---|---|---|
| 1 | 1 | OFF WHITE ROCK | VALTOX TEST INCONCLUSIVE |
| | | END... | |

83. I hereby acknowledge that the above list represents all property taken from my possession and that I have received a copy of this receipt.

SIGNATURE (X)

_Normal_

20. I hereby acknowledge that the above list represents all property impounded by n the official performance of my duty as Deputy Sheriff.

| BADGE NO. | 1992 | UNIT NO. | y-14 | DIV. SCU |
|---|---|---|---|---|
| IMPOUNDING OFFICER | SIGN- | | | |
| | PRINT. | HAYES | | |

| 84. RECEIVED BY | REASON | DATE AND TIME RECEIVED 2-1-96 |
|---|---|---|
| RECEIVED BY | REASON | DATE AND TIME RECEIVED 2-1-96 |
| RECEIVED BY | REASON | DATE AND TIME RECEIVED |
| RECEIVED BY | REASON | DATE AND TIME RECEIVED |
| RECEIVED BY | REASON | DATE AND TIME RECEIVED |
| RECEIVED BY | REASON | DATE AND TIME RECEIVED |

| 85. FINAL DISPOSITION | AUTHORITY | DATE AND TIME OF DISPOSITION |
|---|---|---|

| BSO PROPERTY DIVISION USE ONLY | | | |
|---|---|---|---|
| RECEIPT NO. | BIN NO. | PAGES (IF APPLICABLE) | BSO CASE NO. |

DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF | ALIAS'S | NAME | CITIZENSH

WATFORD | JEROME

| RC | SEX | HGT | EYES | HAIR | WGT | .N° | AGE | DOS | BIRTHPLACE | SCARS MARKS TT |
| B | M | 511 | BRO | BLK | 195 MED | 19 | 07/30/74 | | |

PERMANENT ADDRESS | LOCAL ADDRESS

33 SW 61H AV, DANIA, FL

PLACE OF EMPLOYMENT | LENGTH

RESIDENCE TYPE 1 (1) CITY (2) COUNTY (3) FLORIDA (4) OUT-OF-STATE

HOW LONG DEFENDANT IN BROWARD COUNTY: yrs 0 | BREATHALYZER BY/CCN | READING | PLACE OF ARREST 720 N FEDERAL HW, HOU | DATE TIME ARRESTED 01/31/96 22:39 1902 | ARRESTING OFFICER(S) CCT 1088

OFFICER INJURED Y☐ N☒X | UNIT | ZONE | BEAT | SHIFT | UNIT TRANSPORTING PRISONER | TRANSPORTING OFFICER CCN | PICK-UP TIME- | DRUG TYPE TIME ARRIVED AT BSO- H

DEFENDANT'S VEHICLE-MAKE _____ TYPE ___ YEAR ___ COLOR ___ VIN. NO. ___

**ATTACH DEFENDANT'S PHOTO**

VEHICLE TOWED TO _____ TAG NO. _____ OTHER IDENTIFIERS OR REMARKS _____

## TRANSPORTED TO BSO

NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) | ADDRESS | PHONE #

FLORIDA STATE OF

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S.# OR CAPIAS/WARRANT # |
| 1 | DISTRIBUTE IMITATION CONTROLLED SUBS | | 817.564 |
| | | | |
| | | | |
| | | | |

**PROBABLE CAUSE AFFIDAVIT**

Before me this date personally appeared FERNANDEZ, ANTHONY _____ who being first duly swo deposes and says that on 31st day January 19 96 at 720 N FEDERAL HW, HOLLYWOOD, FL (crime location) above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows:

ON 01/30/96 AT 2239 HOURS, AT THE LOCATION OF 720 N 18TH AVE, WHICH IS LOCATED

WITHIN THE JURISDICTIONAL LIMITS OF THE CITY OF HOLLYWOOD, IN THE COUNTY OF BROWARD AND

THE STATE OF FLORIDA, THE ABOVE NAMED DEFENDANTS DID COMMIT THE VIOLATION OF DELIVERY OF

COUNTERFEIT CONTROLLED SUBSTANCE. THE ABOVE DEFENDANT DID THEN AND THERE UNLAWFULLY

DELIVER AN OFF WHITE CREAM COLORED ROCK TO UNDERCOVER POLICE OFFICER SGT. MARANO #1088

AND PRESENTED THIS ITEM AS BEING A CONTROLLED SUBSTANCE, TO WIT: CRACK COCAINE FOR THE

SUM OF TWENTY DOLLARS. THE PURCHASE WAS DONE WITH A PREMARKED AND PRE-

I swear the above statement is correct and true to the best of my knowledge and belief.

OFFICER/AFFIANT'S SIGNATURE | OFFICER'S NAME/CCN FERNANDEZ 1902 | OFFICER'S DIVISION S-CU

STATE OF FL COUNTY OF _____ The foregoing instrument was acknowledged before me this 31 day of Jan 19__ who is personally known to me or who has produced (ID Type) _____ as identification and who DID/OR DID NOT take an oath. (SEAL OR STAMP)

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY | TITLE OR RANK/CCN

SEVENTEENTH JUDICIAL CIRCUIT BROWARD COUNTY STATE OF FLORIDA | SHOULD ADDITIONAL SPACE BE NEEDED, USE PROBABLE CAUSE AFFIDAVIT CONTINUATION. | Orig. -Court 2nd -State Atty 3rd -Filing Agency

NAME OF VICTIM OR CORPORATION EXACT LEGAL NAME AND STATE OF RECORD     ADDRESS     PHONE #

| COUNT NO | OFFENSES CHARGED | CITATION # IF APPLICABLE | FS # OR CAPIAS WARRANT |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Before me this date personally appeared _FERNANDEZ, SMIRNOV_ _____ who being first duly sworn

deposes and says that on ___31st___ day ___JANUARY___ , 19__ at ___720 N FEDERAL BL IN HOLLYWOOD, FL___ (crime location)

above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows

PHOTOGRAPHED $20 BILL BY SGT. MARANO.

THE UNDERSIGNED IS A MEMBER OF THE HOLLYWOOD STREET CRIMES UNIT, WHO OPERATE IN

PLAIN CLOTHES AND DRIVE UNMARKED POLICE VEHICLES. ON 01/30/96, THE UNDERSIGNED, ALONG

WITH OFFICERS STRAUSS, BIEN, BRADFORD, HAYES, AND MARANO WERE IN THE AREA OF 700 N 18TH

AVE CONDUCTING A BUY/BUST OPERATION. SGT. MARANO WAS SENT IN TO THE LOCATION OF 720 N

19TH AVE IN AN ATTEMPT TO PURCHASE NARCOTICS. THE UNDERSIGNED, ALONG WITH OFFICERS

STRAUSS, WINN, BRADFORD, AND HAYES WERE IN A TAKE DOWN POSITION INSIDE APARTMENT #21 OF

THE VENTURA APT LOCATED AT 720 N 18TH AVE. SURVEILLANCE WAS BEING CONDUCTED ON SGT.

MARANO ATTEMPTING TO PURCHASE NARCOTICS BY OFFICER BIEN FROM AN UNDISCLOSED LOCATION, AT

WHICH POINT, OFFICER BIEN HAD A CLEAR AND UNOBSTRUCTED VIEW OF THE FRONT OF THE VENTURA

APT. APPROXIMATELY TEN MINUTES INTO THE SURVEILLANCE, SGT. MARANO WAS OBSERVED TO MAKE

CONTACT WITH TWO B/M'S, LATER IDENTIFIED AS DEFENDANTS WATSON AND EDMOND. SGT. MARANO

MADE CONTACT WITH THE DEFENDANTS BY STATING, "I NEED A TEN, I NEED A TEN." AT WHICH TIME

DEFENDANT WATSON, WHO WAS CLAD IN A WHITE T-SHIRT AND BLACK PANTS, STATED TO SGT. MARANO

TO WAIT IN FRONT OF HIS APARTMENT WHICH WAS #21 AND HE WOULD RETURN WITH NARCOTICS.

BOTH DEFENDANTS EDMOND AND WATSON LEFT THE AREA AND TRAVELLED TO AN UNKNOWN LOCATION.

MINUTES LATER, BOTH SUBJECTS RETURNED AND REAPPROACHED SGT. MARANO, AT WHICH TIME SGT.

MARANO HANDED DEFENDANT WATSON A PREMARKED AND PRE-PHOTOGRAPHED TWENTY DOLLAR BILL.

I swear the above statements is correct and true to the best of my knowledge and belief.

_____OFFICER/AFFIANT'S SIGNATURE_____     _FERNANDEZ / 1802_ OFFICER'S NAME/CCN     _SCU_ OFFICER'S DIVISION

STATE OF _FL_ COUNTY OF _BROWARD_
The foregoing instrument was acknowledged before me this ___31___ day of ___JUNE___ , 19__96__ who is personally
known to me or who has produced (ID/Type) _____ as identification and who (DID OR DID NOT) take an oath.

_____DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY_____     (SEAL OR STAMP)

TITLE OR RANK/CCN

SEVENTEENTH JUDICIAL CIRCUIT
BROWARD COUNTY     **COURT COPY**
STATE OF FLORIDA

Orig - Court
2nd - State Atty
3rd - Enforcement

NAME OF VICTIM OF CORPORATION E/ACT LEGAL     E AND STATE OF INCORP                    A     SS                    PHONE #

| COUNT NO | OFFENSES CHARGED | CITATION # F APPLICABLE | FS # OR CAPIAS WARRANT # |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

defore me this date personally appeared  FERNANDEZ, ANTHONY                                                      who being first duly swc
eposes and says that on  31st          day  January          19 ___ at  720 N FEDERAL HW  HOLLYWOOD  FL      (crime location) +
bove named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows:

SERIAL NF42795934C.  UPON RECEIVING THE TWENTY DOLLAR BILL, DEFENDANT WATSON, HANDED THE

DEFENDANT EDMOND, WHO WAS STANDING IN THE ALCOVE NEAR APARTMENT #21.  DEFENDANT EDMOND

WAS OBSERVED TO TAKE THE TWENTY DOLLAR BILL AND PLACE IT IN HIS RIGHT FRONT POCKET AND

STEPPED BACK OUT OF THE ALCOVE ONTO THE SIDEWALK AND TURNED HIS HEAD FROM LEFT TO RIGHT,

LOOKING NORTH AND SOUTH ON FEDERAL HWY, THEN STATING TO DEFENDANT WATSON TO "HURRY,

HURRY, IT'S GETTING HOT OUT HERE MAN."  AT THIS TIME, DEFENDANT WATSON REMOVED A CREAM

COLORED ROCK FROM INSIDE HIS MOUTH, EXPELLING IT INTO HIS HAND AND THEN HANDING IT TO

DEF  MARANO.  SGT. MARANO THEN GAVE A PREDETERMINED SIGNAL THAT A NARCOTICS DEAL HAD

BEEN COMPLETED, AT WHICH TIME THE UNDERSIGNED AND THE ABOVE LISTED OFFICERS EXITED

APARTMENT #21 AND APPREHENDED BOTH DEFENDANTS.  THE UNDERSIGNED PLACED DEFENDANT WATSON

INTO CUSTODY AS OFFICER STRAUSS TOOK INTO CUSTODY DEFENDANT EDMOND

    A SEARCH INCIDENTAL TO ARREST REVEALED THAT DEFENDANT EDMOND HAD $25 IN CASH IN HIS

RIGHT FRONT POCKET  ALONG WITH THE PREMARKED AND PRE-PHOTOGRAPHED TWENTY DOLLAR BILL.

    BOTH SUBJECTS WERE PLACED INTO CUSTODY AS OFFICER HAYES TOOK CUSTODY OF THE

NARCOTICS.  A FIELD VALTOX TEST WAS CONDUCTED ON THE CREAM COLORED ROCK, AT WHICH TIME

THE TEST WAS INCONCLUSIVE.

I swear the above statement is correct and true to the best of my knowledge and belief.

OFFICER/AFFIANT'S SIGNATURE          FERNANDEZ  1902          3 CU
                                      OFFICER'S NAME/CCN          OFFICER'S DIVISION

STATE OF  FL   COUNTY OF  BROWARD
The foregoing instrument was acknowledged before me this  31  day of  Jan  19 96  who is personally
known to me or who has produced ID Type)          as identification and who  (DID OR DID NOT)     take an oath.          (SEAL OR STAMP)

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY          TITLE/ORRANK/CCN

SEVENTEENTH JUDICIAL CIRCUIT
BROWARD COUNTY          COURT COPY          Org   - Court
STATE OF FLORIDA                                   2nd   - State Atty
85008-24 (REV 1/92)     FIRST APPEARANCE 'ARREST FORM          3rd   - Filing Agency
                                                   4th   - Arresting Agency